1  Daniel J. Tyukody (SBN 123323)
   *dtyukody@goodwinprocter.com*
2  Christina Queiros Bouchot (SBN 289701)
   *cbouchot@goodwinprocter.com*
3  **GOODWIN PROCTER LLP**
   601 S Figueroa Street, 41st Floor
4  Los Angeles, CA 90017
   Tel.: 213.426.2500
5  Fax.: 213.623.1673

6  James O. Fleckner (*pro hac vice*)
   *jfleckner@goodwinprocter.com*
7  David Rosenberg (*pro hac vice*)
   *drosenberg@goodwinprocter.com*
8  **GOODWIN PROCTER LLP**
   53 State Street
9  Boston, MA 02109
   Tel.: 617.570.1000
10 Fax.: 617.523.1231

11 Attorneys for Defendants

12            **UNITED STATES DISTRICT COURT**
13            **CENTRAL DISTRICT OF CALIFORNIA**

14 ALEKSANDR URAKHCHIN AND          Case No. 8:15-cv-01614-JVS-JCG
   NATHAN MARFICE, INDIVIDUALLY,
15 AS REPRESENTATIVES OF THE        **CLASS ACTION**
   CLASS AND ON BEHALF OF THE
16 ALLIANZ ASSET MANAGEMENT OF      **DEFENDANTS' MEMORANDUM**
   AMERICA, L.P. 401(K) SAVINGS AND **OF POINTS AND AUTHORITIES**
17 RETIREMENT PLAN,                 **IN SUPPORT OF MOTION TO**
                                    **DISMISS THE CLASS ACTION**
18            Plaintiffs,           **COMPLAINT**

19       v.
                                    Date:       April 4, 2016
20 ALLIANZ ASSET MANAGEMENT OF      Time:       1:30 PM
   AMERICA, L.P., ALLIANZ ASSET     Courtroom:  10C
21 MANAGEMENT OF AMERICA, LLC,
   COMMITTEE OF THE ALLIANZ         Judge:      Hon. James V. Selna
22 ASSET MANAGEMENT OF AMERICA,
   L.P. 401(K) SAVINGS AND          Filed Concurrently with:
23 RETIREMENT PLAN, JOHN MANEY,     1. Notice of Motion and Motion to
   ALLIANZ GLOBAL INVESTORS            Dismiss
24 FUND MANAGEMENT LLC, PACIFIC     2. Declaration of David Rosenberg
   INVESTMENT MANAGEMENT            3. Request for Judicial Notice
25 COMPANY LLC, ALLIANZ GLOBAL      4. Proposed Order
   INVESTORS U.S. LLC, NFJ
26 INVESTMENT GROUP LLC, AND
   JOHN DOES 1-30,
27
              Defendants.
28

## **Table of Contents**

Page

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

    I.    The Successful and Generous Plan ...................................................... 3

    II.    Plaintiffs' Allegations ......................................................................... 8

ARGUMENT ....................................................................................................... 8

    I.    Plaintiffs' Claims Are Barred by ERISA's Three-Year Statute of Limitations. ...................................................................................... 9

    II.    Each Count of the Complaint Fails to State a Claim. ........................ 11

        A.    Governing Standards Under Rule 12(b)(6) and ERISA. .......... 11

        B.    Count I Fails to State a Claim for Breach of Fiduciary Duty. ................................................................................... 12

            1.    The Complaint is Devoid of Well-Pleaded Allegations Regarding the Investment Selection Process. ............................................................................ 12

            2.    The Complaint's Allegations Do Not Lead to An Inference that the Alleged Fiduciary Defendants Violated their Duties. ..................................................... 14

                (a)    The Allegation that the Plan Invested in PIMCO and Allianz Global Investors Funds Does Not Support an Inference of Imprudence or Disloyalty. ................................................. 14

                (b)    The Complaint's Other Allegations Do Not Support an Inference of Imprudence or Disloyalty. ...................................................................... 17

        C.    Count II Fails to State a Claim for Violation of ERISA's Anti-Inurement Provision. ....................................................... 23

    III.    Plaintiffs Lack Standing to Sue Regarding Investment Options in Which They Did Not Invest. ............................................................. 27

CONCLUSION .................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................... 2, 11, 16, 17, 22, 23

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ......................................................................... 11, 16, 17

*Blum v. Yaretsky,*
457 U.S. 991 (1982) ................................................................................... 28

*Cafasso v. General Dynamics C4 Sys., Inc.,*
637 F.3d 1047 (9th Cir. 2011) ................................................................... 12

*Conkright v. Frommert,*
559 U.S. 506 (2010) ................................................................................... 12

*David v. Alphin,*
817 F. Supp. 2d 764 (W.D.N.C. 2011) ...................................................... 29

*DeFazio v. Hollistor Employee Share Ownership Trust,*
406 F. Supp. 2d 1085 (E.D. Cal. 2005) ....................................................... 9

*Doyle v. United Steelworkers of Am.,*
494 U.S. 26 (1990) ..................................................................................... 24

*Dupree v. The Prudential Ins. Co. of Am.,*
No. 99-8837, 2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) ..................... 16, 22, 24

*Fifth Third Bancorp v. Dudenhoeffer,*
134 S. Ct. 2459 (2014) ........................................................................ 12, 16, 21

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.,*
493 U.S. 331 (1990) ................................................................................... 28

*Fuller v. SunTrust Banks, Inc.,*
Civ. A. No. 11-cv-784, 2012 WL 1432306 (N.D. Ga. Mar. 20, 2012) ............... 29

*Harris v. Amgen, Inc.,*
788 F.3d 916 (9th Cir. 2014) ..................................................................... 13

ii

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ................................................................. 14, 18, 26

*In re Citigroup ERISA Litig.*,
    --- F. Supp. 3d ----, 2015 WL 2226291 (S.D.N.Y. May 13, 2015) ............... 10, 11

*In re Franklin Mut. Funds Fee Litig.*,
    478 F. Supp. 2d 677 (D.N.J. 2007) .................................................................... 20

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
    712 F. Supp. 2d 958 (N.D. Cal. 2010) ............................................................... 28

*Lazy Y Ranch Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) ............................................................................ 11

*Leber v. Citigroup, Inc.*,
    No. 07 Civ 9329 (SHS), 2010 WL 935442 (S.D.N.Y. Mar. 16,
    2010) ............................................................................................................... 20

*Lewis v. Casey*,
    518 U.S. 343 (1996) ......................................................................................... 28

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
    722 F. Supp. 2d 1157 (C.D. Cal. 2010) .............................................................. 28

*Nachman Corp. v. Pension Benefit Guaranty Corp.*,
    446 U.S. 359 (1980) ......................................................................................... 25

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*,
    712 F.3d 705 (2d Cir. 2013) ............................................................................. 13

*Perez v. Cal. Pac. Bank*,
    No. 13-cv-03792, 2015 WL 5029452 (N.D. Cal. Aug. 25, 2015) ...................... 25

*Pfeil v. State Street Bank & Trust Co.*,
    --- F.3d ----, 2015 WL 6874769 (6th Cir. Nov. 10, 2015) ................................. 13

*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*,
    541 U.S. 1 (2004) ............................................................................................. 26

*Rivera v. Peri & Sons Farms, Inc.*,
    735 F.3d 892 (9th Cir. 2013) .............................................................................. 9

iii

*Ruppert v. Principal Life Ins. Co.*,
    No. 07-00344, 2009 WL 5667708 (S.D. Iowa Nov. 5, 2009) ............................. 26

*Siemers v. Wells Fargo & Co.*,
    No. C 05-04518, 2006 WL 3041090 (N.D. Cal. Oct. 24, 2006) ......................... 28

*Solis v. Sonora Envtl., LLC*,
    No. 10-00675, 2012 WL 5269211 (D. Ariz. Oct. 24, 2012) ................................ 24

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ............................................................................... 11

*Tibble v. Edison Int'l*,
    No. CV 07-5359, 2010 WL 2757153 (C.D. Cal. July 8, 2010) ........................... 13

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015) .................................................................................. 10, 11

*United Savings Ass'n v. Timbers of Inwood Forest Assocs.*,
    484 U.S. 365 (1988) ............................................................................................ 25

*United States v. Fiorillo*,
    186 F.3d 1136 (9th Cir. 1999) ............................................................................. 25

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................................ 27

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ....................................................................... 27, 28

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    550 F. Supp. 2d 416 (S.D.N.Y. 2008) ................................................................... 9

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    325 F. App'x 31 (2d Cir. 2009) ........................................................................... 19

**Statutes**

15 U.S.C. § 77e(b)(2) ............................................................................................ 10

26 U.S.C. § 420 ..................................................................................................... 24

29 U.S.C. § 1101(b)(1) (ERISA § 401(b)(1)) ..................................................... 26

29 U.S.C. § 1103(c)(1) (ERISA § 403(c)(1)) ................................. 8, 23, 24, 25, 26, 27

iv

29 U.S.C. § 1103(c)(2)(A) (ERISA § 403(c)(2)(A)) ................................................ 24

29 U.S.C. § 1103(c)(3) (ERISA § 403(c)(3)) ........................................................ 24

29 U.S.C. § 1108(b)(2) (ERISA § 408(b)(2)) ........................................................ 25

29 U.S.C. § 1108(b)(4) (ERISA § 408(b)(4)) ........................................................ 25

29 U.S.C. § 1108(b)(5) (ERISA § 408(b)(5)) .................................................. 15, 25

29 U.S.C. § 1108(b)(8) (ERISA § 408(b)(8)) .................................................. 15, 25

29 U.S.C. § 1113(2) (ERISA § 413(2)) ................................................................... 9

29 U.S.C. § 1344(d)(1) (ERISA § 4044(d)(1)) ....................................................... 24

**Other Authorities**

17 C.F.R. § 274.11A (1994) ................................................................................... 10

26 C.F.R. § 1.401(a)(17)-1 (2004) .......................................................................... 5

Allianz Global Investors, Awards,
    http://www.allianzglobalinvestors.co.uk/en/AboutUs/Pages/Awards.
    aspx (last visited December 10, 2015) ............................................................ 4

Allianz Group Annual Report 2014, *available at*
    https://www.allianz.com/en/investor_relations/results_reports/annua
    l-reports.html ................................................................................................. 3

Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive
    Problem of Excessive Fees and "Dominated Funds" in 401(k)
    Plans*, 124 YALE L.J. 1476, 1485 (2015) .......................................................... 6

Board of Governors of the Federal Reserve System, Historical Rates for
    the EU Euro,
    http://www.federalreserve.gov/releases/h10/hist/dat00_eu.htm (last
    visited December 10, 2015) ............................................................................. 4

Class Exemption Involving Mutual Fund In-House Plans Requested by
    the Investment Company Institute, 42 Fed. Reg. 18734 (Mar. 31,
    1977) ............................................................................................ 2, 15, 16, 27

Department of Labor, Study of 401(k) Plan Fees and Expenses (April
    13, 1998), *available at* https://www.dol.gov/ebsa/pdf/401kRept.pdf ............ 19

Fed. R. Civ. P. 12(b)(1) ........................................................................ 1, 27

Fed. R. Civ. P. 12(b)(6) .......................................................... 1, 11, 12, 16, 27

H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974), *reprinted in* 1974
    U.S.C.C.A.N. 5038 ................................................................ 15, 25, 26

Investment Company Institute, A Close Look at 401(k) Plans
    (December 2014), *available at*
    https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf .................................... 7

Morningstar.com,
    http://performance.morningstar.com/fund/performance-
    return.action?t=PALLX (last visited December 10, 2015) .................................. 20

Notice of Proposed Rule-Making, Participant Directed Individual
    Account Plans, 56 Fed. Reg. 10724 (Mar. 13, 1991) ...................................... 2, 15

PIMCO, Awards & Accolades, https://www.pimco.com/our-
    firm/awards-and-accolades (last visited December 10, 2015) .............................. 4

Pensions & Investments, Target-date rush pushes assets of DC money
    managers to record (August 10, 2015), *available at*
    http://www.pionline.com/article/20150810/PRINT/308109997/targe
    t-date-rush-pushes-assets-of-dc-money-managers-to-record. .............................. 4

Restatement (Third) of Trusts § 77 cmt. a (2007) ...................................... 13

Schwab Personal Choice Retirement Account Pricing Summary
    (February 1, 2015), *available at*
    http://www.schwab.com/public/file/P-5166587/PCRA_Pricing_ ........................ 6

1    Defendants Allianz Asset Management of America L.P. ("AAM-LP"),

2  Allianz Asset Management of America LLC ("AAM-LC"), Allianz Global Investors

3  Fund Management LLC ("AGIFM"), Pacific Investment Management Company

4  LLC ("PIMCO"), Allianz Global Investors U.S. LLC ("AGI US"), NFJ Investment

5  Group LLC ("NFJ,"[1] collectively, "the AAM Entities"), the Committee of the

6  Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan

7  ("the Committee") and John Maney ("Maney," collectively, "Defendants") submit

8  this Memorandum of Points and Authorities in Support of their Motion to Dismiss

9  Plaintiffs' Class Action Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the

10  Federal Rules of Civil Procedure.

11    **INTRODUCTION**

12    The Class Action Complaint ("Complaint") should be dismissed because it

13  fails to state a claim.[2]  Plaintiffs, who are current participants in the AAM Entities'

14  401(k) plan, the Allianz Asset Management of America L.P. 401(k) Savings and

15  Retirement Plan (the "Plan"), assert that Defendants violated the Employee

16  Retirement Income Security Act of 1974, as amended ("ERISA"), by offering funds

17  managed by PIMCO and AGI—and only those funds—as "core" investment options

18  under the Plan.  The Complaint asserts that the fiduciary process for selecting the

19  Plan's investment options was improperly tainted by a desire to enrich the AAM

20  Entities by increasing the advisory fees at the expense of Plan participants.

21    But the Complaint pleads no facts—as opposed to conclusions—

22  demonstrating that the process was deficient or that fiduciaries had an improper

23  motivation.  Nor is such inference warranted by the entirely innocuous facts set forth

24  in the Complaint.  Indeed, the United States Department of Labor ("DOL") has

25  expressly authorized financial services company plans such as the Plan to include

26

27  _____
[1] AGIFM, AGI US, and NFJ are referred to collectively herein as "Allianz Global Investors" or "AGI."

28  [2] The Complaint is attached to this Memorandum as Exhibit A.

1

mutual funds affiliated with the sponsoring employer;[3] according to the DOL, it would be "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor."[4] It is thus implausible to suggest that offering a lineup of all PIMCO and AGI funds, reflects any ERISA violation.  But, in any event, Plan participants were not limited solely to PIMCO and AGI funds.  Rather, the lineup also includes a very popular self-directed brokerage account through which participants can select from a large universe of stocks, bonds, exchange-traded funds ("ETFs"), and mutual funds, including low-fee funds and thousands of funds not advised by PIMCO, AGI, or any of their affiliates, many of which can be purchased without commission and with low expense ratios.

Further, Plaintiffs' claims are implausible in light of the exceptionally generous contributions that the AAM Entities make to the Plan.  The public record demonstrates that the AAM Entities contributed over $245 million of their own money to the accounts of Plan participants from 2009 through 2014.  Those employer contributions significantly exceeded the amounts contributed by employees and the amounts of supposed excessive fees.  Indeed, the Plan's public filings show that the AAM Entities' employer contributions to the Plan in 2013 were approximately *twenty times* greater than the amount of "excess" fees that the Complaint claims the AAM Entities received from the Plan in that year (the only year for which Plaintiffs quantify this number), entirely negating any inference that the Plan has operated to generate corporate profit at employees' expense.

Instead, there is an "obvious alternative explanation" for the challenged conduct, *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009):  The Plan offered an

---

[3] Class Exemption Involving Mutual Fund In-House Plans Requested by the Investment Company Institute, 42 Fed. Reg. 18734, 18735 (Mar. 31, 1977).

[4] Notice of Proposed Rule-Making, Participant Directed Individual Account Plans, 56 Fed. Reg. 10724, 10730 (Mar. 13, 1991) (discussing Prohibited Transaction Exemption 77-3).

investment lineup of PIMCO and AGI funds to help participants achieve their individualized retirement goals and objectives in a manner authorized by the DOL using the same low-fee and high-quality investments Defendants make available to the public.  Because the factual allegations do not give rise to any plausible inference of disloyal conduct in the face of the public data and such an "obvious alternative explanation," the Complaint should be dismissed.

In addition, the Complaint suffers from numerous other fatal defects:

- Plaintiffs' claims are barred by ERISA's three-year statute of limitations because the relevant facts alleged the Complaint (as opposed to legal conclusions) were, without dispute, known or knowable to Plaintiffs more than three years ago.
- Plaintiffs cannot establish a violation of ERISA's anti-inurement provision because that provision does not reach the conduct alleged here.
- Plaintiffs lack standing to sue with respect to funds in which they never invested because they have not pleaded, and could not plead, any personalized injury with respect to those funds.

In light of this multitude of defects, the Court should grant Defendants' motion to dismiss the Complaint in its entirety.  Because the Plan lineup appears reasonable on its face, the Court should not allow a fishing expedition into the Plan fiduciaries' subjective intent or a "battle of the experts" regarding whether some hypothetical alternative lineup could conceivably be viewed as subjectively preferable.

## FACTUAL BACKGROUND

## I.     The Successful and Generous Plan

PIMCO and AGI are large, well-respected asset managers that sponsor and manage high-quality funds.  They, and their worldwide affiliates, had a combined $2.16 trillion in total assets under management as of December 31, 2014.[5]  PIMCO

---

[5] *See* Allianz Group Annual Report 2014 at 64, *available at* https://www.allianz.com/en/investor_relations/results_reports/annual-reports.html/; *see also* Board of Governors of the Federal Reserve System, Historical Rates for the

was named the Asset Management Firm of the Year by Global Investor Magazine in 2011.[6]  As of December 31, 2014, it was the ninth largest manager of defined contribution assets.[7]  AGI is part of a global family that has received several prestigious awards, including Capital Magazine's Best Asset Management Firm in 2011.[8]

The Plan is among the benefits that the AAM Entities provide to their employees—including the people who deliver award-winning investment management services.[9]  According to the Plan's governing instrument, it is designed to "provide for the accumulation of funds for the benefit of eligible employees."[10] The Plan has over $840 million in assets and 4,000 participants.[11]

Participating employees can elect how much, if any, of their salary to contribute to the Plan.[12]  In addition, the AAM Entities make contributions to eligible employees' accounts in the form of both retirement and matching contributions.  These contributions are exceptionally generous.  For example, the AAM Entities make retirement contributions equal to at least 5.4% of each eligible employee's total compensation.[13]  For certain employees whose compensation

---

EU Euro, http://www.federalreserve.gov/releases/h10/hist/dat00_eu.htm (last visited December 10, 2015).

[6] PIMCO, Awards & Accolades, https://www.pimco.com/our-firm/awards-and-accolades (last visited December 10, 2015).

[7] Pensions & Investments, Target-date rush pushes assets of DC money managers to record (August 10, 2015), *available at* http://www.pionline.com/article/20150810/PRINT/308109997/target-date-rush-pushes-assets-of-dc-money-managers-to-record.

[8] Allianz Global Investors, Awards, http://www.allianzglobalinvestors.co.uk/en/AboutUs/Pages/Awards.aspx (last visited December 10, 2015).

[9] Compl. ¶ 2(b).

[10] 2012 Restatement of the Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan ("Plan Document"), Rosenberg Decl. Ex. 1.

[11] 2014 Form 5500 at MTD-0104, 0108, Rosenberg Decl. Ex. 2.

[12] Plan Document § 3.01(c)(i), MTD-0025, Rosenberg Decl. Ex. 1.

[13] *Id.* § 3.05(c)(i), MTD-0029.

exceeds the Social Security taxable wage base for that year, the AAM Entities contribute an additional 5.4% of the amount of the compensation that exceeds the relevant Social Security taxable wage base, up to an annual contribution limit set by the Internal Revenue Service.[14]  Additionally, the AAM Entities match eligible employee contributions to the Plan, dollar for dollar, up to 5% of each eligible participant's compensation.[15]  The AAM Entities may also make further matching contributions and discretionary contributions on top of these retirement and matching contributions.[16]  In total, the AAM Entities contributed approximately $245 million to the Plan from 2009 through 2014—averaging approximately $41 million per year.[17]

Not surprisingly, the Plan is very popular with the AAM Entities' employees: From 2009 through 2014, employees contributed over $162 million of their salaries to the Plan and rolled over more than $32 million ***into*** the Plan from plans offered by prior employers.[18]  Further, although participants who have left the AAM Entities' employ may withdraw their Plan account balances and roll them over to another retirement arrangement, as of the end of December 2014, over 1,300 retired or separated participants had decided to retain their assets in the Plan.[19]  These participants constituted over one-fourth of the total number of participants in the

---

[14] *Id.* § 3.05(c)(ii), MTD-0029; *see* 26 C.F.R. § 1.401(a)(17)-1 (2004).

[15] *See* Plan Document § 3.05(a)(i), MTD-0029, Rosenberg Decl. Ex. 1; 2014 Form 5500 at MTD-0106, Rosenberg Decl. Ex. 2.

[16] Plan Document §§ 3.05(b)(i), (d)(i), MTD-0029-30, Rosenberg Decl. Ex. 1.

[17] *See* 2014 Form 5500 at MTD-0105, Rosenberg Decl. Ex. 2; 2013 Form 5500 at MTD-0110, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD-0114, Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD-0118, Rosenberg Decl. Ex. 5; 2010 Form 5500 at MTD-0122, Rosenberg Decl. Ex. 6; 2009 Form 5500 at MTD-0126, Rosenberg Decl. Ex. 7.

[18] 2014 Form 5500 at MTD-0105, Rosenberg Decl. Ex. 2; 2013 Form 5500 at MTD-0110, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD-0114, Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD-0118, Rosenberg Decl. Ex. 5; 2010 Form 5500 at MTD-0122, Rosenberg Decl. Ex. 6; 2009 Form 5500 at MTD-0126, Rosenberg Decl. Ex. 7.

[19] 2014 Form 5500 at MTD-0104, Rosenberg Decl. Ex. 2.

1    Plan as of that date.[20]

2            The Plan is entirely participant-directed, meaning that each participant can

3    allocate the amounts credited to her Plan account into any investment option in the

4    lineup that has been made available under the Plan.  The "core" options as of

5    December 31, 2014 consist of a broad array of more than forty mutual funds and

6    two collective investment trusts advised by PIMCO and AGI.[21]  Approximately

7    seventy funds advised by PIMCO and AGI have been offered during the putative

8    class period.[22]  These funds invest and have invested in a full range of asset

9    categories, including stocks, bonds, and real assets.  They include domestic and

10   international funds, and funds that offer different levels of risk and potential

11   reward.[23]

12           The Plan also makes available a self-directed brokerage window offered by an

13   unaffiliated entity (the "Schwab Personal Choice Retirement Account") through

14   which participants can invest up to 100% of their Plan account balance in a large

15   universe of stocks, bonds, ETFs, and mutual funds, including low-fee index funds,

16   funds available for purchase without transaction costs, and thousands of funds not

17   advised by PIMCO, AGI, or any of their affiliates.[24]  This is a significantly larger

18   universe of potential investment options than many self-directed brokerage windows

19   allow, as many brokerage windows only permit participants to invest in mutual

20

21   _____
     [20] *Id.*

22   [21] 2014 Form 5500 at MTD-0107-08, Rosenberg Decl. Ex. 2; Compl. ¶ 63.

23   [22] 2014 Form 5500 at MTD-0107-08, Rosenberg Decl. Ex. 2; 2013 Form 5500 at MTD-0111-12, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD-0115-16, Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD-0119-20, Rosenberg Decl. Ex. 5;

24   2010 Form 5500 at MTD-0123-24, Rosenberg Decl. Ex. 6; 2009 Form 5500 at MTD-0127-28, Rosenberg Decl. Ex. 7.

25   [23] *See* Compl. ¶ 63.

26   [24] Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan Summary Plan Description ("Summary Plan Description") at 12, Compl. Ex. B;

27   Schwab Personal Choice Retirement Account Pricing Summary (February 1, 2015), *available at* http://www.schwab.com/public/file/P-5166587/PCRA_Pricing_

28   Summary_2015.pdf.

funds.[25]  The Schwab Personal Choice Retirement Account has proven to be popular with Plan participants; as of December 31, 2014, over 13% of Plan assets were invested through it, more than were invested in any single one of the "core" investment options.[26]

The AAM Entities also offer several different programs for participants who desire assistance with fund selection.  For example, the AAM Entities offer a free portfolio advisory service, Schwab Personal Retirement Planning, that is provided by "an independent investment advisor" who will recommend "how much to save, which investment funds to select from within the Plan and how much to invest in each of these funds."[27]  Also, if a participant so chose, or if she failed to make any fund selection, her assets were defaulted into the AllianzGI Global Allocation Fund (the "Global Allocation Fund"), a balanced fund that offers exposure to both stocks and bonds.[28]

As a result of the design, funding and operation of the Plan, the AAM Entities' employees are doing far better than most in accumulating assets for retirement:  The average participant account balance in the Plan is more than three times the national average.[29]

---

[25] *See* Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 YALE L.J. 1476, 1485 (2015) (cited in the Complaint at ¶¶ 42, 44, 48).

[26] 2014 Form 5500 at MTD-0107-08, Rosenberg Decl. Ex. 2.  Plaintiffs state that, generically, "only 2% of retirement plan assets are held in [self-directed brokerage accounts]."  Compl. ¶ 44.  Participation in the Schwab Personal Choice Retirement Account by the financially sophisticated AAM Entities' employees far exceeds this generic number, rendering Plaintiffs' generic challenge inapplicable here.

[27] Summary Plan Description at 12, Compl. Ex. B.

[28] Compl. ¶¶ 93, 95.

[29] *Compare* 2012 Form 5500 at MTD-0113A, 0116 (average balance, determined by plan assets divided by number of participants, of approximately $175,000), Rosenberg Decl. Ex. 4 *with* Investment Company Institute, A Close Look at 401(k) Plans (December 2014) at MTD-0173, Rosenberg Decl. Ex. 19 (hereinafter "ICI Study") (national average plan account balance was $61,168 as of 2012).

## II.    Plaintiffs' Allegations

Plaintiffs, two current Plan participants, purport to bring their claims on behalf of "[a]ll participants and beneficiaries of the Plan at any time on or after October 7, 2009."[30]  The Complaint alleges that AAM-LP, AAM-LC, the Committee, unnamed Committee members, and Maney, who is the Chief Operating Officer and Managing Director of AAM-LP and AAM-LLC (collectively, the "Alleged Fiduciary Defendants"), are ERISA fiduciaries and that they breached their ERISA fiduciary obligations by choosing proprietary funds as the "core" investment options for the Plan in order to enrich the AAM Entities at the expense of Plan participants.[31]

Specifically, Plaintiffs allege in Count I that the Alleged Fiduciary Defendants (i) "select[ed] and retain[ed] [proprietary] investments in the Plan," (ii) "fail[ed] to monitor Plan investments" and remove or replace the investment options offered with non-proprietary options that "could be provided at [a] lower cost with comparable or superior performance," (iii) "add[ed] new and untested [proprietary] funds within the Plan" to "seed" those funds, and (iv) selected the Global Allocation Fund "as the default investment option" to invest Plan assets "in a steady stream of new and unproven [proprietary] funds."[32]  In Count II, Plaintiffs allege that the AAM Entities violated ERISA's anti-inurement provision, ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1), when they were paid investment management fees "as a result of the Plan's investments in Allianz Family mutual funds."[33]

## ARGUMENT

Plaintiffs' claims fail because (i) they are barred by the statute of limitations, (ii) each Count fails to state a claim, and (iii) Plaintiffs lack standing to bring all of

---

[30] Compl. ¶ 107.

[31] *See id.* ¶¶ 20-25, 116.

[32] *Id.* ¶¶ 82, 96-97, 116.

[33] *Id.* ¶¶ 121, 123.

their claims.

## I.    Plaintiffs' Claims Are Barred by ERISA's Three-Year Statute of Limitations.

The Complaint should be dismissed in its entirety because it is barred by ERISA's three year statute of limitations.

ERISA § 413(2) precludes claims that are filed more than "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2). In applying this provision, courts have "focused on whether documents provided to plan participants sufficiently disclosed the alleged breach of fiduciary duty, not whether the individual plaintiffs actually saw or read the documents." *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 n.3 (S.D.N.Y. 2008), *aff'd on other grounds*, 325 F. App'x 31 (2d Cir. 2009); *see also DeFazio v. Hollistor Employee Share Ownership Trust*, 406 F. Supp. 2d 1085, 1093 (E.D. Cal. 2005) ("Actual knowledge is obtained when a person reasonably should have known of the breach."). As the Ninth Circuit has held, affirmative defenses such as ERISA's statute of limitations may be raised on a motion to dismiss if the facts establishing the defense "are apparent on the face of the complaint." *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013).

Indeed, courts have dismissed as time-barred ERISA claims similar to these that challenge the selection of funds as investment options for a retirement plan where those funds were all fully disclosed. *See, e.g.*, *Young*, 550 F. Supp. 2d at 419. As one court explained, because it was "undisputed that Plaintiffs had actual knowledge that the Plans offered the [challenged] Funds as investment options" more than three years before they filed suit, and because information concerning "the fees and expenses associated with the . . . Funds" had indisputably been made available to participants contemporaneously, plaintiffs' claims were time-barred.

9

1    *Id.*[34]

2         Here, the Complaint alleges that the Plan made available PIMCO and AGI

3    funds to "contribute to the Allianz Family's bottom line"[35]—a practice that the

4    Complaint admits has existed for longer than three years.[36]  Plaintiffs do not and

5    cannot deny that the Plan lineup was fully disclosed to all participants and the public

6    alike, and that Plaintiffs themselves knew more than three years ago, that only funds

7    advised by PIMCO and AGI were offered as "core" investment options.[37]  Plaintiffs

8    acknowledge that they each first participated in the Plan more than three years prior

9    to bringing this suit.[38]  Plaintiffs also do not, and cannot, allege that Defendants

10   failed to inform Plan participants or the investing public about the fees and

11   performance associated with these funds.[39]  Plaintiffs' claims are accordingly time-

12   barred.

13        In anticipation of this statute of limitations bar, the Complaint asserts in a

14   conclusory fashion that Plaintiffs did not have actual knowledge of their claims until

15   "Defendants' misconduct was uncovered shortly before this action was filed."[40]

16   Plaintiffs' conclusory allegation is insufficient to salvage their claims.  As described

17   _____

18   [34] *See also In re Citigroup ERISA Litig.*, --- F. Supp. 3d ----, 2015 WL 2226291, at
     *9-10 (S.D.N.Y. May 13, 2015) (dismissing similar ERISA claims that were based

19   on information publicly available more than three years prior to the date the
     plaintiffs filed suit).

20   [35] Compl. ¶ 116(a)

21   [36] *See, e.g., id.* ¶¶ 59-60, 83-84, 96.  Notwithstanding the conclusory assertion that
     decisions were made to enrich the AAM Entities, the Complaint pleads no facts that

22   there is any benefit to the Committee or its members, or that the Committee or its
     members benefit if the AAM Entities' bottom line increases.  *See generally id.*

23   [37] *See, e.g., id.* ¶ 59; Investment Performance, Compl. Ex. C (disclosure to Plaintiff
     Marfice listing funds available as of December 31, 2009); 2011 Form 5500 at MTD-

24   0119-20 (listing funds available as of December 31, 2011), Rosenberg Decl. Ex. 5.

     [38] Compl. ¶¶ 103-04.
25
     [39] Annual disclosures were provided to participants with information on fees
26   charged.  Summary Plan Description at 11, Compl. Ex. B.  Information on fees and
     performance was also provided to investors in compliance with federal securities

27   law.  *See* 15 U.S.C. § 77e(b)(2); 17 C.F.R. § 274.11A (1994); *see, e.g.*, PIMCO
     StocksPLUS Fund Prospectus at MTD-0139 (Oct. 1, 2015), Rosenberg Decl. Ex. 10.

28   [40] Compl. ¶ 105.

1  above, given the disclosure documents that the Complaint itself attaches and the

2  relevant public filings, the Complaint otherwise makes clear that Plaintiffs had

3  actual knowledge of their claims prior to three years before the date they filed the

4  Complaint. *See In re Citigroup ERISA Litig.*, 2015 WL 2226291, at *9 (plaintiffs'

5  conclusory allegation regarding their knowledge is insufficient to defeat a statute of

6  limitation argument where the complaint otherwise makes clear that the plaintiffs

7  had actual knowledge of their claims).[41]

8  **II.     Each Count of the Complaint Fails to State a Claim.**

9        Not only is the entire Complaint barred by the three year statute of

10  limitations, but each Count of the Complaint also fails to state a claim.

11        **A.     Governing Standards Under Rule 12(b)(6) and ERISA.**

12        To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead

13  "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.*

14  *v. Twombly*, 550 U.S. 544, 570 (2007).  "Conclusory statements . . . do not suffice"

15  to state a claim. *Iqbal*, 556 U.S. at 678; *see Sprewell v. Golden State Warriors*, 266

16  F.3d 979, 988 (9th Cir. 2001) (the court need not "accept as true allegations that are

17  merely conclusory").  Nor do allegations contradicted by documents properly

18  subject to judicial notice or referenced in the complaint. *See Lazy Y Ranch Ltd. v.*

19  *Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).  "Determining whether a complaint

20  states a plausible claim for relief will . . . be a context-specific task that requires the

21  reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556

22  U.S. at 679.

23        Factual allegations that are merely "consistent with" unlawful conduct are

24  insufficient to state a plausible claim where "more likely explanations" or "obvious

25  alternative explanations" of lawful conduct exist. *Iqbal*, 556 U.S. at 682.  Thus, for

26  ―――――――――――――――――

27  [41] Although the Supreme Court addressed a separate timeliness question under
   ERISA earlier this year in *Tibble v. Edison International*, 135 S. Ct. 1823 (2015),
   that case does not apply here as it concerned ERISA's six year statute of repose, not

28  the three year statute of limitations. *Id.* at 1827.

example, the Ninth Circuit affirmed the grant of a motion to dismiss where a plaintiff had brought a qui tam action alleging that her former employer had improperly withheld inventions from business partners to defraud them, given the "obvious alternative explanation" that the former employer had instead done so to "continue to use them as trade secrets." *Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056-57 (9th Cir. 2011). As compared to this explanation, the court found the plaintiff's inferences and allegations of unlawful intent to be implausible. *Id.*

Finally, as the Supreme Court has recognized, in enacting ERISA, "Congress sought to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place." *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (internal quotation marks omitted; alterations in original). Accordingly, courts must avoid superimposing their own views upon reasonable decisions reached by plan fiduciaries. *Id.* Rule 12(b)(6) is an "important mechanism for weeding out meritless claims" under ERISA. *See Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014).

## B.   Count I Fails to State a Claim for Breach of Fiduciary Duty.

### 1.   The Complaint is Devoid of Well-Pleaded Allegations Regarding the Investment Selection Process.

Count I fails to state a claim because it contains no well-pleaded allegations, as it must, regarding the fiduciary process actually employed to select or monitor the Plan's investment options.

ERISA's duties of prudence and loyalty regulate the process employed by, and the motivation of, plan fiduciaries—not the results of such fiduciary action. For example, the Ninth Circuit has focused on fiduciary process in evaluating claims of imprudence, writing that, because the "test of prudence is one of conduct, not results," "the proper question is not whether the investment results were

12

unfavorable, but whether the fiduciary used appropriate methods to investigate the merits of the transaction." *Harris v. Amgen, Inc.*, 788 F.3d 916, 936 (9th Cir. 2014) (internal quotation marks omitted), *petition for cert. filed*, 84 U.S.L.W. 3122 (U.S. Sept. 3, 2015) (No. 15-278).  The Restatement (Third) of Trusts has similarly stated that "[t]he test of prudence is one of conduct not of performance."  *Id.*, § 77 cmt. a (2007).  Claims alleging breach of the duty of loyalty likewise focus on the process employed by the fiduciaries, and in particular on the motivation behind those processes:  "a breach of th[e] duty [of loyalty] requires some showing that the fiduciaries' decisions were motivated by a desire to serve the interests of [the company] over those of the beneficiaries."[42]

Here, the Complaint does not include a single well-pleaded fact concerning the process employed to select or monitor Plan investments.  Plaintiffs assert only in conclusory fashion that the Alleged Fiduciary Defendants "fail[ed] to monitor Plan investments and investigate whether" options could be chosen "at [a] lower cost, with comparable or superior performance, [managed] by an investment manager not affiliated with the Allianz Family."[43]  This allegation is not well-pleaded and is therefore insufficient to state a claim that the process employed was deficient.  *See Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 720-24 (2d Cir. 2013) (affirming dismissal of ERISA claim where plaintiff's conclusory allegation that the defendants "failed to monitor" the plan investment lacked sufficient factual detail about the fiduciary's action to meet the plaintiff's burden to challenge the process employed).

Given the absence of any well-pleaded factual allegation about a deficient process, Count I must fail.

---

[42] *Tibble v. Edison Int'l*, No. CV 07-5359, 2010 WL 2757153, at *24 n.19 (C.D. Cal. July 8, 2010), *aff'd*, 711 F.3d at 1061, *aff'd en banc*, 729 F.3d 1110, *rev'd on other grounds*, 135 S. Ct. 1823 (2015).  Other circuits agree.  *See, e.g., Pfeil v. State Street Bank & Trust Co.*, --- F.3d ----, 2015 WL 6874769, at *5 (6th Cir. Nov. 10, 2015) (citing *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014)).

[43] Compl. ¶ 116(b).

**2.** **The Complaint's Allegations Do Not Lead to An Inference that the Alleged Fiduciary Defendants Violated their Duties.**

Lacking any well-pleaded allegation regarding the actual investment selection or monitoring process, Plaintiffs instead ask the Court to infer a deficient process from publicly-available information. But Plaintiffs' allegations do not lead to a plausible inference that there was any deficiency in the fiduciary process.

**(a)** **The Allegation that the Plan Invested in PIMCO and Allianz Global Investors Funds Does Not Support an Inference of Imprudence or Disloyalty.**

The Complaint first asks the Court to infer a deficient process because fiduciaries selected "investments managed by either PIMCO or Allianz Global Investors"—and only by PIMCO or AGI—as "'core' investment options."[44] The Complaint concludes that this must have been done "to contribute to the Allianz Family's bottom line."[45] But the allegations provide no support for such an inference.

*First*, Plaintiffs' allegations fail because they are contradicted by the Summary Plan Description that they attach to their Complaint. That document makes clear that the Plan participants were not limited to the "core" investment options. Instead, the Plan also made available a Schwab Personal Choice Retirement Account through which participants can invest up to 100% of their Plan accounts in a large universe of stocks, bonds, ETFs, and mutual funds, including unaffiliated mutual funds and investments at all fee levels, many of which can be bought without a commission and have very low fees. *See supra* at 6. As the Seventh Circuit has held, the investment options offered through a brokerage window should be considered when determining whether ERISA fiduciaries have breached their fiduciary duties. *See Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (affirming dismissal where the brokerage window enabled participants to

---

[44] Compl. ¶¶ 59, 116(a).

[45] *Id.*

select from a large universe of additional, varied options).  Here, many Plan participants have taken advantage of the Schwab Personal Choice Retirement Account; indeed, over 13% of Plan assets are invested through it, more than in any one proprietary fund offered as a "core" investment option.  *See supra* at 6-7.  If, in selecting "core" investment options, Defendants were motivated by a desire to generate additional fees for the AAM Entities, the Plan would not have offered the Schwab Personal Choice Retirement Account as an option at all.

**Second**, a plan structure consisting solely of propriety funds would not give rise to an inference that ERISA fiduciaries breached their duties in any event.  Not only do financial services companies routinely utilize their own investment products for their plans, but this practice was expressly anticipated by Congress and the DOL.  Congress has long recognized that it is "common practice" for financial services companies to invest their own plans' assets in their own investment funds.[46]  And the DOL, which is the principal federal regulator of retirement plans, has also recognized that it would be "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor."[47]

For this very reason, when ERISA was enacted, Congress created express exemptions to the ERISA "prohibited transaction" rules—provisions that were designed to protect against self-dealing and conflicts of interest—to allow plans sponsored by banks and insurance companies to offer their own investment products to the participants in the plans they sponsor.  *See* ERISA §§ 408(b)(5), (8), 29 U.S.C. §§ 1108(b)(5), (8).  In 1977, the DOL extended this congressional exemption (retroactive to ERISA's January 1, 1975 effective date) to enable plans sponsored by mutual fund advisors and their affiliates to invest in their affiliated mutual funds

---

[46] H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5096.

[47] 56 Fed. Reg. at 10730.

pursuant to Prohibited Transaction Exemption ("PTE") 77-3.[48]  In so doing, the DOL recognized that making proprietary mutual fund investments available to employees of mutual fund companies is "in the interests of plans and of their participants and beneficiaries" and "protective of the rights of participants and beneficiaries."[49]

Conformity with a commonplace practice that has long been acknowledged and condoned by the relevant regulator, the DOL, and by Congress creates no inference of wrongdoing.  As explained by one court in a case much like this one, that defendants "followed such a practice—the very result Congress [and the DOL] intended to approve by enacting the[se] exemptions—**does not give rise to an inference of disloyalty**."  *Dupree v. The Prudential Ins. Co. of Am.*, No. 99-8837, 2007 WL 2263892, at *45 (S.D. Fla. Aug. 7, 2007) (emphasis added).[50]

**Third**, Plaintiffs' theory that Defendants have structured the Plan "to contribute to the Allianz Family's bottom line" is further implausible because it makes no economic sense.  Since 2009, the AAM Entities have voluntarily contributed **over 245 million dollars of their own money** into the Plan.  *See supra* at 5.  In 2013 alone, they contributed over 47 million dollars—approximately **twenty times** greater than the $2.5 million in alleged excessive fees for that year.[51]  If Defendants had operated the Plan to **improve** their "bottom line," as Plaintiffs suggest,[52] they would not have **reduced** their bottom line through the expenditure of tens and hundreds of millions of dollars to recapture indirectly a small fraction of that amount.

---

[48] 42 Fed. Reg. at 18734-35.

[49] *Id.* at 18735.

[50] While *Dupree* was decided after trial, its observation applies here.  *Dupree* was originally filed before the Supreme Court set forth the present pleading standards in *Twombly* and *Iqbal*.  As the Supreme Court has later said, Rule 12(b)(6) requires courts to weed out "meritless, economically burdensome [ERISA] lawsuits."  *Fifth Third Bancorp*, 134 S. Ct. at 2470-71.

[51] *See* Compl. ¶ 5.

[52] *Id.* ¶ 116(a).

16

1      In sum, the structure of the Plan creates no inference of any deficiency in the

2   fiduciary process.

3                  **(b)      The Complaint's Other Allegations Do Not Support an
                            Inference of Imprudence or Disloyalty.**

4

5      Failing to plead any facts about the actual process employed, and failing to

6   create an inference of a deficient process based on the Plan structure, the Complaint

7   next asserts that the Court should draw a negative inference about the process

8   employed because other investment options "could be provided at lower cost, with

9   comparable or superior performance," and because the fiduciaries allegedly

10  "add[ed] new and untested [proprietary] mutual funds within the plan" to "seed"

11  them.[53]  Like their other allegations, once these additional circumstantial facts are

12  placed in context, they are insufficient to "nudge" Plaintiffs' claims of a deficient

13  process "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 680

14  (quoting *Twombly*, 550 U.S. at 570).

15      *First*, the Complaint fails to adequately allege that any of the Plan's funds

16  charged excessive fees, let alone that Plaintiffs personally were charged more than

17  the fair value of the services they received.  Instead, the public record reflects that

18  the Plan contained low-fee and high-quality investment options.

19      Plaintiffs allege that the aggregate Plan fees were higher than fees charged by

20  other plans, and cite as support a study conducted by the Investment Company

21  Institute.[54]  However, the Investment Company Institute acknowledged that its study

22  is incomplete.[55]  And, even if the data are correct, Plaintiffs' allegation that some

23  funds available in the investment universe have lower fees than those available to

24  the Plan fails to state a claim for breach of fiduciary duties because "nothing in

25  ERISA requires every fiduciary to scour the market to find and offer the cheapest

26  _____

    [53] Compl. ¶¶ 82, 116(b)-(d).

27  [54] Compl. ¶¶ 66, 69.

28  [55] ICI Study at MTD-0174, Rosenberg Decl. Ex. 19.

                                          17

1   possible fund (which might, of course, be plagued by other problems)."  *Hecker*,

2   556 F.3d at 586.[56]

3         By definition, aggregate fees are just an aggregation of participants' choices.

4   As the Plan is participant-directed, some participants may choose to invest in

5   higher-fee options and, if they do so, the aggregate fee level of the Plan would

6   necessarily appear higher than in plans whose participants do not choose such

7   options.  Accordingly, aggregate fee levels reflect on participants' decisions, not the

8   fiduciary's processes.  Indeed, the publicly-available Morningstar data upon which

9   the Complaint itself relies demonstrates that approximately two-thirds of the "core"

10  mutual fund options in the Plan—twenty-nine of the forty-five mutual funds offered

11  as of December 31, 2014—have ***lower than average fees***.[57]

12        Plaintiffs' allegations about fees also fail because Plaintiffs ignore entirely the

13  fact that the Plan's "core" investment options are not the only ones in which

14  participants may invest.  The brokerage window provides participants with the

15  opportunity to invest up to 100% of their account balance in a large universe of

16  stocks, bonds, ETFs, and additional mutual funds, including low-fee options.  *See*

17  *Hecker*, 556 F.3d at 586, 590 (affirming dismissal of claim challenging investment

18  options offered to the Plan where participants could "control the risk of loss from

19  fees" by investing in low-fee options through the brokerage window).

20        Further, Plaintiffs' attempt to compare the Plan's aggregate fees to a supposed

21  benchmark also fails because the allegations nowhere compare the fees charged to

22  the services provided.  Defendants have made available at no cost to Plan

23  participants a wide variety of educational tools and services.  *See supra* at 7.  The

24  sources upon which the Complaint relies acknowledge that such "ancillary services"

25

26  [56] Plaintiffs do not, and cannot, contend that the "core" investment options included anything except the lowest-cost share class offered by the fund.  *See, e.g.*, Compl.
27  Ex. C (investment option disclosure showing that the share classes offered to Plan participants were institutional class shares).

28  [57] Appendix A.

provided to plan participants should be considered when determining if fees are excessive.[58]  But the Complaint fails entirely to look at the service side of the equation.  Plaintiffs' failure to allege that the fees charged "[a]re excessive in relation to the services rendered" dooms their claim.  *Young*, 325 F. App'x at 33 (internal quotation marks omitted).

**Second**, the Complaint fails adequately to allege that the funds offered to Plan participants performed poorly.  In fact, Plaintiffs only allege that fifteen of the approximately seventy "core" funds offered to the Plan between 2009 and 2014 performed poorly.[59]  But even their allegations regarding the minority of funds they identify are inadequate to state a claim.

For example, Plaintiffs allege that five PIMCO RealRetirement funds, six AGI target-date funds, and three other funds have "performed poorly," and "underperformed their benchmark index" or have "significantly underperformed [their] peers"[60]  These allegations are too conclusory.  Plaintiffs do not allege those funds' peers or benchmarks, or by how much or for what periods of time the funds have allegedly underperformed.  Plaintiffs also allege that the Global Allocation Fund has performed poorly, but concede as to that fund, however, that it outperformed its benchmark in some years.[61]  In fact, the institutional share class of the Global Allocation Fund, the share class available under the Plan, has outperformed its benchmarks since the Fund's inception on September 30, 1998, and has outperformed an independently-assigned benchmark in two of the past five

---

[58] DOL, Study of 401(k) Plan Fees and Expenses, at MTD-0131 (April 13, 1998), *available at* https://www.dol.gov/ebsa/pdf/401kRept.pdf, Rosenberg Decl. Ex. 8.

[59] *See generally* Compl.; 2014 Form 5500 at MTD-0107-08, Rosenberg Decl. Ex. 2; 2013 Form 5500 at MTD-0111-12, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD-0115-16, Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD-0119-20, Rosenberg Decl. Ex. 5; 2010 Form 5500 at MTD-0123-24, Rosenberg Decl. Ex. 6; 2009 Form 5500 at MTD-0127-28, Rosenberg Decl. Ex. 7

[60] Compl. ¶¶ 86-88.

[61] *Id.* ¶¶ 101, 116(d).

19

1   years as of November 30, 2015 and is currently doing so again this year.[62]

2         In *Leber v. Citigroup, Inc.*, No. 07 Civ. 9329 (SHS), 2010 WL 935442

3   (S.D.N.Y. Mar. 16, 2010), the court dismissed virtually identical claims of a

4   deficient process based on alleged underperformance of a portion of the

5   investments, holding that "plaintiffs' allegation that the committee defendants

6   breached duties of prudence and care by selecting affiliated mutual funds that

7   'substantially under-performed similar products available from unaffiliated

8   investment managers' is supported by nothing beyond plaintiffs' bare assertion,"

9   and, thus, could not support a claim for breach of fiduciary duty.  *Id.* at *14.  As one

10  court observed in a different context, alleged underperformance is not probative of

11  fiduciary breach because mutual fund performance is "cyclical[; a]n underachieving

12  fund one year may be an overachieving fund the next."  *In re Franklin Mut. Funds*

13  *Fee Litig.*, 478 F. Supp. 2d 677, 687-88 (D.N.J. 2007) (dismissing claim based on

14  alleged underperformance).

15        In addition, Plaintiffs cannot establish an inference of a deficient process

16  based on a small minority of investments.  Relatively few Plan assets are invested in

17  the funds highlighted by Plaintiffs.  In fact, between 2009 and 2014, only

18  approximately 5% of Plan assets were invested in fourteen of the fifteen funds

19  combined, putting aside the Global Allocation Fund, which has performed well.[63]

20  By contrast, as of December 31, 2013, the date Plaintiffs use in their Complaint,[64]

21  over 6% of the Plan's assets were invested in the PIMCO StocksPLUS Fund alone,

22

23  _____
    [62] Global Allocation Fund Prospectus at MTD-0137 (Apr. 1, 2015), Rosenberg Decl.
24  Ex. 9; Morningstar.com, http://performance.morningstar.com/fund/performance-
    return.action?t=PALLX (last visited December 10, 2015) (showing performance
    over the past five years).
25
    [63] 2014 Form 5500 at MTD-0107-08, Rosenberg Decl. Ex. 2; 2013 Form 5500 at
26  MTD-0111-12, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD-0115-16,
    Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD-0119-20, Rosenberg Decl. Ex. 5;
27  2010 Form 5500 at MTD-0123-24, Rosenberg Decl. Ex. 6; 2009 Form 5500 at
    MTD-0127-28, Rosenberg Decl. Ex. 7
28  [64] *See, e.g.*, Compl. ¶ 94.

1    which has outperformed its benchmark over the past year, five years, and ten

2    years.[65]  Similarly, the PIMCO Total Return Fund, which accounted for over 7% of

3    the Plan's assets, has outperformed its benchmarks over the past ten years.[66]

4           ***Third***, and finally, Plaintiffs' allegations that Defendants added PIMCO and

5    AGI funds as Plan investment options to "seed" those funds likewise fails to support

6    the requisite inference.

7           As a preliminary matter, because all of the funds allegedly seeded were added

8    to the Plan no later than December 31, 2011, any claim based on "seeding" is barred

9    by ERISA's three-year statute of limitations.[67]

10          Substantively, Plaintiffs have offered no support for their theory that a plan

11   may not add any proprietary investment options that have been in existence for less

12   than one or two years.[68]  Nor does such an allegation make sense here, where (1) the

13   AAM Entities are mutual fund companies, with numerous employees who are

14   sophisticated about the markets and may wish to invest in the very same innovative

15   products they make available to their customers, and (2) the AAM Entities provide

16   free advisory services through an independent investment advisor to assist less

17   sophisticated participants in avoiding whatever unwanted risks Plaintiffs might

18   perceive in investing in a smaller or less established fund.[69]

19          The Complaint's "seeding" allegations are further implausible in light of the

20   public record, which demonstrates that the funds allegedly "seeded" were generally

21   popular funds with no need for "seed" money from the Plan.  From 2009 to 2014,

22

---

23   [65] 2013 Form 5500 at MTD-0111-12, Rosenberg Decl. Ex. 3; PIMCO StocksPLUS Fund Prospectus at MTD-0142 (Oct. 1, 2015), Rosenberg Decl. Ex. 10.

24   [66] 2013 Form 5500 at MTD-0111-12, Rosenberg Decl. Ex. 3; PIMCO Total Return Fund Prospectus at MTD-0146 (July 31, 2015), Rosenberg Decl. Ex. 11.

25   [67] *See* 2011 Form 5500 at MTD-0119-20, Rosenberg Decl. Ex. 5; *supra* at 9-11.

26   [68] Compl. ¶¶ 82, 84-85.

27   [69] To the extent Plaintiffs' theory is focused instead on any alleged underperformance of the funds alleged to have been "seeded" in Complaint at ¶¶ 86-88, it fails for the reasons described above.  *See supra* at 19-21.

28

the Plan's investments in the allegedly seeded funds constituted only about **one or two percent** of the total assets invested in those funds.[70]  Indeed, there is a "common sense," "obvious alternative explanation," *Iqbal*, 556 U.S. at 679, 682, that is more plausible than Plaintiffs "seeding" theory for the addition of these funds to the Plan lineup:  A wide array of funds advised by PIMCO and AGI provides the greatest participant choice.  *See Dupree*, 2007 WL 2263892, at *39 (the fact that the plan added new Prudential investment products as investment options does not give rise to an inference that these products were added to the plan lineup for the purpose of benefitting Prudential).

Moreover, it defies logic that fiduciaries would believe that they could "seed" a handful of funds by adding them to the Plan lineup in any event.  Given that the Plan is entirely participant directed, no fiduciary could direct Plan assets to any fund.  Participants had complete discretion to choose whether to invest in the small number of new investment options, or to remain invested in the much larger number of established funds.  And, in fact, most participants did not select these newer funds.  Indeed, between 2009 and 2014, Plan participants maintained, in total, only approximately 5% of their Plan assets in the fourteen funds allegedly directly "seeded" during that time.[71]

And, in part because of its generally strong performance, Plaintiffs' conclusory allegations that the Global Allocation Fund was selected as the default investment option to indirectly "seed" other PIMCO and AGI funds[72] are less plausible than the "obvious alternative explanation"—that the Global Allocation Fund was selected as the default option because it was thought to be the best fund

---

[70] *See* Appendix B.

[71] 2014 Form 5500 at MTD-0107-08, Rosenberg Decl. Ex. 2; 2013 Form 5500 at MTD-0111-12, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD-0115-16, Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD-0119-20, Rosenberg Decl. Ex. 5; 2010 Form 5500 at MTD-0123-24, Rosenberg Decl. Ex. 6; 2009 Form 5500 at MTD-0127-28, Rosenberg Decl. Ex. 7

[72] Compl. ¶¶ 96-97, 116(d).

for that role.  As Plaintiffs concede, the Global Allocation Fund is a "balanced fund," meaning that it invests in both stocks and bonds.[73]  Morningstar rates it as having below average fees.[74]  As explained above, even Plaintiffs admit it has had years of outperformance.  Accordingly, it is more plausible that the Global Allocation Fund was selected as the default investment option because it allows Plan participants to obtain favorable performance at a relatively low cost while exposed to a variety of investments.  *See Iqbal*, 556 U.S. at 682.

In sum, Plaintiffs' conclusory allegations about allegedly high fees and poor performance fail to raise any inference of a deficient process, as do their specious allegations that fiduciaries used the Plan to "seed" funds.  Accordingly, Count I should be dismissed, and all the Alleged Fiduciary Defendants terminated from this action.

### C.   Count II Fails to State a Claim for Violation of ERISA's Anti-Inurement Provision.

Count II of the Complaint, brought under ERISA's anti-inurement provision, § 403(c)(1), should be dismissed for lack of a cognizable legal theory.  Quite simply, ERISA's anti-inurement provision does not bar the AAM Entities from receiving compensation or payment with respect to investment options available to the Plan.

ERISA's anti-inurement provision states that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."  29 U.S.C. § 1103(c)(1).  Plaintiffs allege that the AAM Entities violated this provision "as a result of the Plan's investments in Allianz Family mutual funds and the subsequent assessment of

---

[73] *Id.* ¶¶ 42, 95.

[74] Appendix A.

1   investment management expenses against the accounts of Plan participants."[75]   In

2   essence, Plaintiffs interpret the anti-inurement provision to bar any employer who

3   also provides investments to a plan from being compensated directly or indirectly

4   through receipt of an advisory fee from those investment options.  Their

5   interpretation is wrong.  Indeed, one court has already dismissed claims that

6   ERISA's anti-inurement provision bars a financial services company from making

7   its own funds available to participants and receiving normal fees from those

8   investment management activities.  *See Dupree*, 2007 WL 2263892, at *44.

9        ERISA § 403(c)(1) does not bar an employer that sponsors a plan from

10   providing services to that plan, but is rather directed at payments or distributions

11   from the plan to an employer that is acting as such with respect to the plan.  This is

12   confirmed by the explicit exceptions to the anti-inurement provision, all of which set

13   forth circumstances under which an employer may receive plan assets ***when acting***

14   ***as an employer***.  *See* ERISA § 403(c)(2)(A), 29 U.S.C. § 1103(c)(2)(A) (employer

15   may receive back contributions it makes to the plan by mistake); ERISA

16   § 403(c)(3), 29 U.S.C. § 1103(c)(3) (return of overpayment to the employer);

17   ERISA § 4044(d)(1), 29 U.S.C. § 1344(d)(1) (return of residual plan assets to the

18   employer upon termination of plan); 26 U.S.C. § 420 (provision of plan assets to the

19   employer for the purpose of providing those assets to participants' health benefit

20   accounts).[76]

21        It is a well-settled maxim of statutory construction that these statutory

22   provisions shed light on the meaning of the first part of that same statutory section.

23   *See, e.g.*, *Doyle v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) (phrases in a

24   statute are to be understood with relation to others in the same provision).  It is

25   further confirmed by decisions in this Circuit that have found violations of the anti-

---

[75] Compl. ¶ 123.

[76] ERISA § 403(c)(1) expressly references ERISA § 4044(d)(1) and 26 U.S.C. § 420 in addressing whether plan assets may inure to the benefit of the employer.

inurement provisions for conduct far different than that alleged here.  For example, in one case the court entered summary judgment against an employer where the employer diverted plan assets to itself even though it had "no claims" to the amount. *See Perez v. Cal. Pac. Bank*, No. 13-cv-03792, 2015 WL 5029452, at *1, 6-7 (N.D. Cal. Aug. 25, 2015).  In another, the court entered default judgment against an employer that failed to remit contributions to the plan.  *See Solis v. Sonora Envtl., LLC*, No. 10-00675, 2012 WL 5269211, at *1 (D. Ariz. Oct. 24, 2012).

The inapplicability of the anti-inurement provision here is further confirmed when ERISA § 403(c)(1) is placed into context within the entire act.  *See United Savings Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) (statutes should be read as a whole and individual provisions should be interpreted to "produce[] a substantive effect that is compatible with the rest of the law").  Congress recognized that it is "common practice" for financial services companies to invest their own plans' assets in their own investment funds,[77] and has allowed plans to offer products advised by the sponsor or its affiliates.  *See* ERISA §§ 408(b)(5), (8).  ERISA § 408(b)(2), 29 U.S.C. § 408(b)(2), further allows an employer sponsoring a plan to offer services to a plan for payment from the plan, so long as the reimbursement is of a direct expense.  ERISA § 408(b)(4), 29 U.S.C. § 408(b)(4), additionally allows a bank that sponsors a plan for its employees to invest plan assets in deposits held by the employer-bank.

Plaintiffs' view of the anti-inurement provision would necessarily render all of these other statutory provisions meaningless because, under their view, no employer could ever obtain any money directly or indirectly from a plan.  *See Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 379-381 (1980) (rejecting interpretation of one ERISA statutory provision because it would have rendered "meaningless" another ERISA provision and caused it to "serve no useful

---

[77] H.R. Conf. Rep. No. 93-1280, *reprinted in* 1974 U.S.C.C.A.N. at 5096.

purpose").[78]  That Congress did not intend the anti-inurement provision to bar use of proprietary investments is further confirmed by ERISA's legislative history, which expressly contemplates permissible scenarios—subject to the oversight of the DOL—where "investments may inure to the direct or indirect benefit of the plan sponsor."[79]

Plaintiffs' arguments to the contrary fail.  As support for their interpretation of the anti-inurement provision, Plaintiffs cite *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004).[80]  But *Yates* weighs against Plaintiffs. *Yates* held that that an employer may participate in and receive benefits under an ERISA plan without violating the anti-inurement provision.  *Id.* at 23.  Thus, *Yates* further supports that the anti-inurement provision is focused on plan assets received by an employer in its role as employer, rather than payments or distributions from the plan that the employer receives in any other capacity, such as a participant or sponsor of investment products.

Not only are Plaintiffs incorrect in their reading of ERISA's anti-inurement provision, but that provision does not apply to the majority of the Plan's investment options even under Plaintiffs' misconstruction.  By its terms, ERISA § 403(c)(1) applies to "the assets of a plan."  However, ERISA specifically excludes mutual fund assets from its definition of plan assets.  *See* ERISA § 401(b)(1), 29 U.S.C. § 1101(b)(1).  Consequently, payments from mutual funds are also not plan assets.[81] Here, all but two of the Plan's "core" investment options are mutual funds.  *See*

---

[78] *See also United States v. Fiorillo*, 186 F.3d 1136, 1153 (9th Cir. 1999) (rejecting "broad[]" interpretation of one statutory provision that would make another provision in the same statute "meaningless").

[79] H.R. Conf. Rep. No. 93-1280, *reprinted in* 1974 U.S.C.C.A.N. at 5086.

[80] *See* Compl. ¶ 122.

[81] *See Hecker*, 556 F.3d at 584 (fees drawn from mutual fund assets are not plan assets); *Ruppert v. Principal Life Ins. Co.*, No. 07-00344, 2009 WL 5667708, at *20 (S.D. Iowa Nov. 5, 2009) (revenue sharing payments from mutual funds are not ERISA plan assets), *rev'd in part on other grounds*, 796 F. Supp. 2d 959 (S.D. Iowa 2010).

*supra* at 6.  Therefore, the vast majority of the fees about which Plaintiffs complain—the expenses paid by the mutual funds—are not "plan assets," and are therefore not implicated by the anti-inurement provision by its very terms.

This reading is further confirmed by regulatory actions.  The DOL has issued an exemption for the precise conduct at issue here—enabling plans sponsored by mutual fund advisors and their affiliates to invest in their affiliated mutual funds.[82] If ERISA's anti-inurement provision meant what Plaintiffs argue, that the conduct at issue here is a *per se* violation of the anti-inurement provision, the DOL's authorization would be a nullity.  It is not plausible to believe that the DOL issued a prohibited transaction exemption for conduct that could not be exempted due to ERISA § 403(c)(1).

In sum, Plaintiffs misinterpret ERISA's anti-inurement provision.  Because the statute does not bar compensation to mutual fund advisors and affiliated companies for investment management services they provide to funds offered by their plans, Count II should be dismissed, and the AAM Entities dismissed from this action.

### III.   Plaintiffs Lack Standing to Sue Regarding Investment Options in Which They Did Not Invest.

Not only does the Complaint fail to state a claim under Rule 12(b)(6), but Plaintiffs lack constitutional standing to seek redress for Plan investment options in which they did not invest, divesting the Court of subject matter jurisdiction over much of this action pursuant to Rule 12(b)(1).

Whether a plaintiff has Article III standing is a "threshold question in every federal case."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Where a plaintiff lacks constitutional standing, courts lack subject matter jurisdiction.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  To satisfy Article III's case and controversy

---

[82] 42 Fed. Reg. at 18735.

1   requirement, a plaintiff must establish that she "personally has suffered some actual

2   or threatened injury as a result of the putatively illegal conduct." *Franchise Tax Bd.*

3   *of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 335 (1990) (internal quotations

4   omitted).  Even at the motion to dismiss stage, the burden is on the plaintiff to make

5   this showing.  *See White*, 227 F.3d at 1242 (affirming dismissal where the plaintiff

6   failed to establish standing).

7          The case law makes clear that Plaintiffs lack standing to assert any claim with

8   respect to funds in which they did not invest.  As the Supreme Court explained:  "[a]

9   plaintiff who has been subject to injurious conduct of one kind [does not] possess by

10  virtue of that injury the necessary stake in litigating conduct of another kind,

11  although similar, to which he has not been subject." *Blum v. Yaretsky*, 457 U.S.

12  991, 999 (1982).  "[E]ven named plaintiffs who represent a class must allege and

13  show that they personally have been injured" by the conduct charged.  *Lewis v.*

14  *Casey*, 518 U.S. 343, 357 (1996) (internal quotations and citations omitted).

15         Applying these principles, district courts in this Circuit, including in this

16  District, have regularly granted motions to dismiss on standing grounds where

17  named plaintiffs that invested in funds or securities sought to represent a class, and

18  recover for violations, regarding funds or securities they did not own.  *See, e.g.*, *Me.*

19  *State Ret. Sys. v. Countrywide Fin. Corp.,* 722 F. Supp. 2d 1157, 1163-64 (C.D. Cal.

20  2010) (granting motion to dismiss on standing to the extent that the named plaintiffs

21  did not own the securities at issue); *In re Wells Fargo Mortg.-Backed Certificates*

22  *Litig.*, 712 F. Supp. 2d 958, 965 (N.D. Cal. 2010) (same); *Siemers v. Wells Fargo &*

23  *Co.*, No. C 05-04518, 2006 WL 3041090, at *7-8 (N.D. Cal. Oct. 24, 2006) (same,

24  to the extent that the named plaintiff did not own the mutual funds at issue).  As one

25  of these courts succinctly held, "[a] plaintiff has no Article III standing to sue

26  [regarding] those [mutual] funds he did not personally own." *Siemers*, 2006 WL

27  304190, at *7-8.

28         These constitutional principles apply here.  Courts have dismissed similar

1   ERISA claims challenging the use of proprietary investment funds as investment

2   options for retirement plans where the plaintiffs only held some of the funds at

3   issue.  For example, in *Fuller v. SunTrust Banks, Inc.*, Civ. A. No. 11-cv-784, 2012

4   WL 1432306 (N.D. Ga. Mar. 20, 2012), the court dismissed virtually identical

5   ERISA claims to those brought here for lack of standing.  In ruling on the

6   defendants' motion to dismiss, the court held that the named plaintiff lacked

7   standing to raise her claims with respect to a fund in which she did not invest.  2012

8   WL 1432306 at *8.[83]  The court explained that dismissal for lack of standing was

9   required because the complaint did "not describe[] how the offering of a fund in

10   which [plaintiff] did not invest caused her a non-speculative injury."  *Id.*  Similarly,

11   in *David v. Alphin*, 817 F. Supp. 2d 764 (W.D.N.C. 2011), *aff'd on other grounds*,

12   704 F.3d 327 (4th Cir. 2013), the court likewise dismissed, for lack of standing, a

13   claim virtually identical to those asserted in this case because the named plaintiff

14   had not invested in the challenged fund.  *Id.* at 781.

15          This Court should accordingly dismiss Plaintiffs' claims to the extent they

16   concern funds in which Plaintiffs did not invest, as Plaintiffs have no financial

17   interest in those funds.  From 2009 to the present, Plaintiffs have invested in only

18   eleven of the investment options offered by the Plan.[84]  They therefore lack

19   constitutional standing to sue regarding the remaining investment options offered by

20   the Plan, and their claims should be dismissed to the extent they relate to those

21   funds.  For example, Plaintiffs were invested in only two of the fourteen funds that

22   were alleged "seeded" or incurred periods of alleged underperformance.[85]  And,

---

[83] *Aff'd on different grounds*, 744 F.3d 685 (11th Cir. 2014), *abrogated on different grounds*, *Stargel v. SunTrust Banks, Inc.*, 791 F.3d 1309 (11th Cir. 2015).

[84] Compl. ¶¶ 103-04 (Global Allocation Fund, PIMCO StocksPLUS Fund, AllianzGI Retirement 2040 Fund, PIMCO RealPath 2040 Fund, tAllianzGI NFJ Dividend Value Fund, AllianzGI Focused Growth Fund, AllianzGI Micro Cap Fund, AllianzGI Mid-Cap Fund, PIMCO Real Return Fund, PIMCO Short Asset Investment Fund, and PIMCO Total Return Fund).

[85] *See id.* ¶¶ 86-88, 103-04 (of these funds, Plaintiffs only invested in the PIMCO RealPath Fund and the AllianzGI Retirement 2040 Fund).

1  although they allege that the investment options offered to the Plan generally had

2  high fees,[86] Plaintiffs only invested in two funds that were rated by Morningstar as

3  having higher than average fees (the AllianzGI Micro Cap Fund and the AllianzGI

4  Retirement 2040 Fund).[87]

5  ## CONCLUSION

6  For the foregoing reasons, the Complaint should be dismissed with prejudice.

7

8

9  Dated:  December 16, 2015                    Respectfully submitted,

10

11                                             By:*/s/ James O. Fleckner*
                                               James O. Fleckner (*pro hac vice*)
12                                             *jfleckner@goodwinprocter.com*
                                               David Rosenberg (*pro hac vice*)
13                                             *drosenberg@goodwinprocter.com*
                                               **GOODWIN PROCTER LLP**
14                                             53 State Street
                                               Boston, Massachusetts 02109
15                                             Telephone:  (617) 570-1000
                                               Facsimile:  (617) 523-1231
16

17

18                                             Daniel Tyukody (SBN 123323)
                                               *dtyukody@goodwinprocter.com*
19                                             Christina Queiros Bouchot (SBN 289701)
                                               *cbouchot@goodwinprocter.com*
20                                             **GOODWIN PROCTER LLP**
                                               601 South Figueroa Street, 41st Floor
21                                             Los Angeles, CA 90017
                                               Telephone:  (213) 426-2500
22                                             Facsimile:  (213) 623-1673
23

24                                             *Attorneys for Defendants*
25                                             **ALLIANZ ASSET MANAGEMENT OF**
                                               **AMERICA L.P.; ALLIANZ ASSET**
26

27  _____
    [86] *Id.* ¶¶ 69-70.
28  [87] *See id.* ¶¶ 103-04.

30

**MANAGEMENT OF AMERICA LLC; COMMITTEE OF THE ALLIANZ ASSET MANAGEMENT OF AMERICA L.P. 401(K) SAVINGS AND RETIREMENT PLAN; JOHN MANEY; ALLIANZ GLOBAL INVESTORS FUND MANAGEMENT LLC; PACIFIC INVESTMENT MANAGEMENT COMPANY LLC; ALLIANZ GLOBAL INVESTORS U.S. LLC; and NFJ INVESTMENT GROUP LLC**

# *APPENDIX   A*

# *APPENDIX   A*

## Appendix A: Mutual Funds with "Average," "Below Average," or "Low" Fees

| Mutual Fund Name | Fee Level |
|---|---|
| AllianzGI Focus Growth Fund[i] | Average |
| AllianzGI Mid Cap Fund[ii] | Below Average |
| AllianzGI Retirement Income Fund[iii] | Average |
| AllianzGI NFJ Dividend Value Fund[iv] | Below Average |
| AllianzGI NFJ Mid Cap Value Fund[v] | Average |
| AllianzGI NFJ Small Cap Value Fund[vi] | Low |
| AllianzGI US Managed Volatility Fund[vii] | Below Average |
| AllianzGI Global Allocation Fund[viii] | Below Average |
| AllianzGI International Managed Volatility Fund[ix] | Low |
| PIMCO All Asset Fund[x] | Low |
| PIMCO All Asset All Authority Fund[xi] | Average |
| PIMCO Commodity Real Return Strategy Fund[xii] | Below Average |
| PIMCO Diversified Income Fund[xiii] | Average |
| PIMCO Emerging Markets Bond Fund[xiv] | Below Average |
| PIMCO Emerging Markets Currency Fund[xv] | Low |
| PIMCO Global Multi Asset Fund[xvi] | Average |
| PIMCO High Yield Fund[xvii] | Low |
| PIMCO Income Fund[xviii] | Low |
| PIMCO Inflation Response Multi Asset Fund[xix] | Low |
| PIMCO Real Estate Real Return Strategy Fund[xx] | Low |
| PIMCO Real Return Fund[xxi] | Average |
| PIMCO RealPath Income Fund[xxii] | Average |
| PIMCO RealPath 2020 Fund[xxiii] | Below Average |
| PIMCO RealPath 2030 Fund[xxiv] | Below Average |
| PIMCO RealPath 2040 Fund[xxv] | Below Average |
| PIMCO RealPath 2050 Fund[xxvi] | Below Average |
| PIMCO Short Asset Investment Fund[xxvii] | Low |
| PIMCO StocksPLUS Fund[xxviii] | Low |
| PIMCO Total Return Fund[xxix] | Below Average |

[i] Morningstar.com, http://www.morningstar.com/funds/XNAS/PGFIX/quote.html (last visited December 10, 2015).

[ii] Morningstar.com, http://www.morningstar.com/funds/XNAS/DRMCX/quote.html (last visited December 10, 2015).

[iii] Morningstar.com, http://www.morningstar.com/funds/XNAS/AVRIX/quote.html (last visited December 10, 2015).

[iv] Morningstar.com, http://www.morningstar.com/funds/XNAS/NFJEX/quote.html (last visited December 10, 2015).

[v] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRNIX/quote.html (last visited December 10, 2015).

[vi] Morningstar.com, http://www.morningstar.com/funds/XNAS/PSVIX/quote.html (last visited December 10, 2015).

[vii] Morningstar.com, ttp://www.morningstar.com/funds/XNAS/NGFIX/quote.html (last visited December 10, 2015).

[viii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PALLX/quote.html (last visited December 10, 2015).

[ix] Morningstar.com, http://www.morningstar.com/funds/XNAS/NAISX/quote.html (last visited December 10, 2015).

[x] Morningstar.com, http://www.morningstar.com/funds/XNAS/PAAIX/quote.html (last visited December 10, 2015).

[xi] Morningstar.com, http://www.morningstar.com/funds/XNAS/PAUIX/quote.html (last visited December 10, 2015).

[xii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PCRIX/quote.html (last visited December 10, 2015).

[xiii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PDIIX/quote.html (last visited December 10, 2015).

[xiv] Morningstar.com, http://www.morningstar.com/funds/XNAS/PEBIX/quote.html (last visited December 10, 2015).

[xv] Morningstar.com, http://www.morningstar.com/funds/XNAS/PLMIX/quote.html (last visited December 10, 2015).

ACTIVE/84192918.3

**APPENDIX A  -33-**

[xvi] Morningstar.com, http://www.morningstar.com/funds/XNAS/PGAIX/quote.html (last visited December 10, 2015).

[xvii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PHIYX/quote.html (last visited December 10, 2015).

[xviii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PIMIX/quote.html (last visited December 10, 2015).

[xix] Morningstar.com, http://www.morningstar.com/funds/XNAS/PIRMX/quote.html (last visited December 10, 2015).

[xx] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRRSX/quote.html (last visited December 10, 2015).

[xxi] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRRIX/quote.html (last visited December 10, 2015).

[xxii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRIEX/quote.html (last visited December 10, 2015).

[xxiii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRWIX/quote.html (last visited December 10, 2015).

[xxiv] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRLIX/quote.html (last visited December 10, 2015).

[xxv] Morningstar.com, http://www.morningstar.com/funds/XNAS/PROIX/quote.html (last visited December 10, 2015).

[xxvi] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRMIX/quote.html (last visited December 10, 2015).

[xxvii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PAIDX/quote.html (last visited December 10, 2015).

**APPENDIX A  -34-**

---

xxviii Morningstar.com, http://www.morningstar.com/funds/XNAS/PSTKX/quote.html (last visited December 10, 2015).

xxix Morningstar.com, http://www.morningstar.com/funds/XNAS/PTTRX/quote.html (last visited December 10, 2015).

4

**APPENDIX A  -35-**

# *APPENDIX   B*

# *APPENDIX   B*

**Appendix B.  Plan's Investment in an Allegedly "Seeded" Fund as a Percentage of the Fund's Total Assets**

| Fund | 2009[xxx] | 2010[xxxi] | 2011[xxxii] | 2012[xxxiii] | 2013[xxxiv] | 2014[xxxv] |
|---|---|---|---|---|---|---|
| AllianzGI Retirement 2015 Fund[xxxvi] | 9.02% | 10.36% | 8.85% | 3.59% | 3.27% | 3.00% |
| AllianzGI Retirement 2020 Fund[xxxvii] | 8.32% | 10.14% | 11.44% | 6.58% | 3.53% | 1.62% |
| AllianzGI Retirement 2030 Fund[xxxviii] | 7.82% | 14.89% | 20.15% | 10.47% | 7.66% | 5.49% |
| AllianzGI Retirement 2040 Fund[xxxix] | 4.21% | 7.66% | 14.80% | 10.08% | 10.51% | 9.31% |
| AllianzGI Retirement 2050 Fund[xl] | 0.38% | 3.12% | 11.01% | 11.09% | 19.89% | 19.71% |
| AllianzGI Disciplined Equity Fund[xli] | 0.0% | 12.32% | 7.17% | 6.22% | 0.0% | N/A |
| AllianzGI Retirement Income Fund[xlii] | 4.26% | 7.95 | .77% | .63% | .91% | 1.13% |
| PIMCO Equities Pathfinder Fund[xliii] | N/A | 0.00% | 0.04% | 0.33% | 0.48% | 0.66% |
| PIMCO Global Multi Asset Fund[xliv] | 1.88% | 0.58% | 0.42% | 0.33% | 0.29% | 0.82% |
| PIMCO RealRetirement 2015 Fund[xlv] | N/A | N/A | N/A | 0.0% | 0.16% | 0.17% |
| PIMCO RealPath 2020 Fund[xlvi] | 12.30% | 5.18% | 3.98% | 1.93% | 1.09% | 1.09% |
| PIMCO RealPath 2030 Fund[xlvii] | 18.16% | 8.11% | 11.32% | 7.16% | 3.91% | 3.56% |
| PIMCO RealPath 2040 Fund[xlviii] | 8.83% | 8.06% | 12.63% | 6.35% | 4.32% | 3.85% |
| PIMCO RealPath 2050 Fund[xlix] | 6.52% | 6.68% | 7.43% | 9.54% | 6.72% | 6.38% |
| **Weighted Average** | **2.40%** | **0.89%** | **0.49%** | **0.52%** | **0.62%** | **1.36%** |

---

[xxx] 2014 Form 5500 at MTD-0107-08, Rosenberg Decl. Ex. 2.

[xxxi] 2013 Form 5500 at MTD-0111-12, Rosenberg Decl. Ex. 3.

[xxxii] 2012 Form 5500 at MTD-0115-16, Rosenberg Decl. Ex. 4.

[xxxiii] 2011 Form 5500 at MTD-0119-20, Rosenberg Decl. Ex. 5.

[xxxiv] 2010 Form 5500 at MTD-0123-24, Rosenberg Decl. Ex. 6.

[xxxv] 2009 Form 5500 at MTD-0127-28, Rosenberg Decl. Ex. 7.

[xxxvi] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-148 (Nov. 30, 2011), Rosenberg Decl. Ex. 12; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-152 (Nov. 30, 2014), Rosenberg Decl. Ex. 13.  Names of funds in this Appendix are listed as they appear in the Plan's 2014 Form 5500. "N/A" denotes that the fund was not active in that year.

[xxxvii] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-148 (Nov. 30, 2011), Rosenberg Decl. Ex. 12; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-152 (Nov. 30, 2014), Rosenberg Decl. Ex. 13.

[xxxviii] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-148 (Nov. 30, 2011), Rosenberg Decl. Ex. 12; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-153 (Nov. 30, 2014), Rosenberg Decl. Ex. 13.

[xxxix] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-149 (Nov. 30, 2011), Rosenberg Decl. Ex. 12; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-154 (Nov. 30, 2014), Rosenberg Decl. Ex. 13.

[xl] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-149 (Nov. 30, 2011), Rosenberg Decl. Ex. 12; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-155 (Nov. 30, 2014), Rosenberg Decl. Ex. 13.

[xli] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-150 (Nov. 30, 2011), Rosenberg Decl. Ex. 12; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-157 (Nov. 30, 2013), Rosenberg Decl. Ex. 14.

[xlii] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD-149 (Nov. 30, 2011), Rosenberg Decl. Ex. 12; Allianz Funds Multi-Strategy Trust,

ACTIVE/84194051.4

**APPENDIX B  -37-**

Certified Shareholder Report, at MTD-154 (Nov. 30, 2014), Rosenberg Decl. Ex. 13.

[xliii] PIMCO Equity Series, Certified Shareholder Report, at MTD-159 (June 30, 2012), Rosenberg Decl. Ex. 15; PIMCO Equity Series, Certified Shareholder Report, at MTD-161-62 (June 30, 2014), Rosenberg Decl. Ex. 16.

[xliv] PIMCO Funds, Certified Shareholder Report, at MTD-166 (March 31, 2011), Rosenberg Decl. Ex. 17; PIMCO Funds, Certified Shareholder Report, at MTD-171 (March 31, 2014), Rosenberg Decl. Ex. 18.

[xlv] PIMCO Funds, Certified Shareholder Report, at MTD-168 (March 31, 2014), Rosenberg Decl. Ex. 18.

[xlvi] PIMCO Funds, Certified Shareholder Report, at MTD-164 (March 31, 2011), Rosenberg Decl. Ex. 17; PIMCO Funds, Certified Shareholder Report, at MTD-168 (March 31, 2014), Rosenberg Decl. Ex. 18.

[xlvii] PIMCO Funds, Certified Shareholder Report, at MTD-165 (March 31, 2011), Rosenberg Decl. Ex. 17; PIMCO Funds, Certified Shareholder Report, at MTD-169 (March 31, 2014), Rosenberg Decl. Ex. 18.

[xlviii] PIMCO Funds, Certified Shareholder Report, at MTD-165 (March 31, 2011), Rosenberg Decl. Ex. 17; PIMCO Funds, Certified Shareholder Report, at MTD-169 (March 31, 2014), Rosenberg Decl. Ex. 18.

[xlix] PIMCO Funds, Certified Shareholder Report, at MTD-165 (March 31, 2011), Rosenberg Decl. Ex. 17; PIMCO Funds, Certified Shareholder Report, at MTD-170 (March 31, 2014), Rosenberg Decl. Ex. 18.

ACTIVE/84194051.4

**APPENDIX B  -38-**

# EXHIBIT A

# EXHIBIT A

KABATECK BROWN KELLNER LLP
Richard L. Kellner, CA Bar No. 171416
rlk@kbklawyers.com
644 South Figueroa Street
Engine Company No. 28 Building
Los Angeles, CA 90017
Telephone: (213) 217-5000
Facsimile: (213) 217-5010

NICHOLS KASTER, PLLP
Adam W. Hansen, CA Bar No. 264241
ahansen@nka.com
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Phone: (612) 256-3200
Fax: (612) 338-4878

Attorneys for Plaintiffs and the Proposed Class
[*Additional Counsel Listed on Signature Page*]

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Aleksandr Urakhchin and Nathan Marfice, individually, as representatives of the class, and on behalf of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan, <br><br> Plaintiffs, <br><br> v. <br><br> Allianz Asset Management of America, L.P., Allianz Asset Management of America, LLC, Committee of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan, John Maney, Allianz Global Investors Fund Management LLC, Pacific Investment Management Company LLC, Allianz Global Investors U.S. LLC, NFJ Investment Group LLC, and John Does 1–30, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND RESTITUTION** <br><br> **(1) Breach of Fiduciary Duties under ERISA (29 U.S.C. § 1104)** <br><br> **(2) Illegal Inurement of Plan Assets to Employer (29 U.S.C. § 1103)** |

# NATURE OF THE ACTION

1.   Plaintiffs Aleksandr Urakhchin and Nathan Marfice ("Plaintiffs"), individually and as representatives of the class described herein, and on behalf of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan ("Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2.   Plaintiffs assert their class claims against two sets of Defendants:

(a)   the Plan's fiduciaries – Allianz Asset Management of America, L.P. ("AAM-LP"), Allianz Asset Management of America, LLC ("AAM-LLC"), the Committee of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan ("Committee"), John Maney ("Maney"), and John Does 1–30 (together, the "Fiduciary Defendants") – who improperly managed Plan assets for the benefit of themselves and their affiliates instead of the Plan and its participants; and

(b)   several participating employers in the Plan – AAM-LP and AAM-LLC (collectively, "AAM"), Allianz Global Investors Fund Management LLC, Pacific Investment Management Company LLC ("PIMCO"), Allianz Global Investors U.S. LLC, and NFJ Investment Group LLC (together, the "Employer Defendants")[1] – who improperly received Plan assets as profits at the expense of the Plan and its participants.

3.   To remedy the breaches of fiduciary duties and unlawful self-dealing as described herein, Plaintiffs seek to recover the financial losses suffered by the Plan and to obtain injunctive and other equitable relief from Defendants, as provided by ERISA.

---

[1] The Employer Defendants and their affiliates are collectively referred to herein as the "Allianz Family".

**EXHIBIT A  -40-**

**PRELIMINARY STATEMENT**

4.  ERISA imposes strict duties of loyalty and prudence upon plan fiduciaries.  29 U.S.C. § 1104(a)(1).  These fiduciary duties are "the highest known to law."  *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quotation omitted).  Fiduciaries must act "solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).

5.  The Fiduciary Defendants do not act in the best interest of the Plan and its participants.  Instead, the Fiduciary Defendants treat the Plan as an opportunity to promote the Allianz Family's mutual fund business and maximize profits at the expense of the Plan and its participants.  The Fiduciary Defendants have loaded the Plan exclusively with mutual funds from the Allianz Family, without investigating whether Plan participants would be better served by investments managed by unaffiliated companies.  The selection of these proprietary mutual funds costs Plan participants millions of dollars in excess fees every year.  For example, in 2013, the Plan's total expenses were 75% higher than the average retirement plan with between $500 million and $1 billion in assets (the Plan had $772 million in assets as of the end of 2013), costing Plan participants over $2.5 million in excess fees in 2013 alone.  Among the 551 defined-contribution plans in the United States with between $500 million and $1 billion in assets as of the end of 2013, the Plan was one of only eight plans that had total plan costs that were 0.74% (of total plan assets) or higher.  The Plan's high costs can be attributed entirely to the Fiduciary Defendants' selection of high-cost proprietary mutual funds as investment options within the Plan.

6.  To make matters worse, many of the proprietary funds selected for inclusion in the Plan have little or no track record.  The Fiduciary Defendants have a pattern and practice of adding new and unproven mutual funds as investment options within the Plan shortly after the new funds are launched, and even use the Plan's default investment option as a mechanism for providing seed money to these

-2-

1 funds. While this may benefit the Allianz Family, helping it to achieve economies
2 of scale for new funds and market those new funds to other investors, it has not
3 been beneficial for the Plan and the Plan's participants. To the contrary, these new
4 and untested funds have consistently underperformed.

5       7. The Fiduciary Defendants' prioritization of Allianz Family profits over
6 prudent management of Plan assets constitutes a breach of the fiduciary duties of
7 prudence and loyalty, in violation of 29 U.S.C. § 1104.

8       8. Defendants' self-dealing also resulted in illegal inurement of Plan
9 assets for the benefit of an employer in violation of 29 U.S.C. § 1103(c)(1).

10       9. Based on this conduct, Plaintiffs assert claims against the Fiduciary
11 Defendants for breach of the fiduciary duties of loyalty and prudence (Count One),
12 and against the Employer Defendants for unlawful inurement of plan assets to the
13 benefit of an employer (Count Two).

14                 **JURISDICTION AND VENUE**

15       10. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3),
16 which provide that participants in an employee retirement plan may pursue a civil
17 action on behalf of the plan to remedy breaches of fiduciary duties and other
18 unlawful conduct in violation of ERISA, and to obtain monetary and appropriate
19 equitable relief as set forth in 29 U.S.C. § 1109.

20       11. This case presents a federal question, and this Court has subject matter
21 jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

22       12. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §
23 1391(b) because this is the District where the Plan is administered, where the
24 breaches of fiduciary duties giving rise to this action occurred, and where
25 Defendants may be found. In addition, Plaintiffs also reside in this District.

26

27

28

-3-

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND RESTITUTION

**EXHIBIT A  -42-**

## **THE PARTIES**

### **Plaintiffs**

13.    Plaintiff Aleksandr Urakhchin has participated in the Plan since 2011, and is a current participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3).  Plaintiff Urakhchin resides in Newport Beach, California.

14.    Plaintiff Nathan Marfice has participated in the Plan since before 2009, and is a current participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3).  Plaintiff Marfice resides in Orange, California.

### **The Plan**

15.    The Plan was established on January 1, 2003 via the merger of certain predecessor plans (the PIMCO Savings Plan, the PIMCO Retirement Plan, the NACM 401(k) Plan and the NACM Pension Plan).  Prior to 2011, the Plan was known as the "Allianz Global Investors of America L.P. 401(k) Savings and Retirement Plan."

16.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

17.    The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to as a "401(k) plan."

18.    The Plan has been amended and restated multiple times since it was established, most recently on October 29, 2012.  The most recent restatement of the Plan was executed by AAM-LLC.

19.    The Plan covers eligible employees and former employees of AAM and its various subsidiaries including Defendants Allianz Global Investors Fund Management LLC, PIMCO, Allianz Global Investors U.S. LLC, and NFJ Investment Group LLC, all of whom are participating employers in the Plan.  *See* Plan Document § 1.28, attached as **Exhibit A**.

**Defendants**

20.     Defendant AAM-LP is the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B).   AAM-LP is headquartered in Newport Beach, California.  AAM-LP is a fiduciary of the Plan pursuant to the actions of its directors and employees serving on the Defendant Committee.  As the employer of members of the Committee, AAM-LP exercises authority and control over the Committee through its ability to terminate the employment of Committee members, which under the terms of the Plan terminates Committee membership.  Ex. A § 10.01(b).  In addition, AAM-LP is a fiduciary of the Plan by virtue of the actions of its general partner, AAM-LLC.

21.     Defendant AAM-LLC is the sole general partner of AAM-LP.  The October 29, 2012 Plan Restatement was executed by Defendant John Maney, signing on behalf of the "General Partner."  The Plan document gives AAM-LLC authority to appoint the Plan trustee and recordkeeper and appoint an investment manager, if it so chooses.  Ex. A § 10.01(b).  AAM-LLC also has authority to amend the Plan.  *Id.* § 11.01(a).  AAM-LLC is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21) because it exercised discretionary authority or control respecting management of the Plan and exercised authority or control respecting management or disposition of the Plan's assets.  In addition, AAM-LLC appointed the trustee, recordkeeper, and members of the Committee, and possessed the authority to remove and appoint Committee members.[2]

22.     The Defendant Committee was created pursuant to Section 10.01(a) of the Plan Document, which provides that "The General Partner shall appoint a Committee to administer the Plan.   The Committee may consist of directors, officers, [e]mployees, or any other individuals."

23.     The Committee and its members are designated in Section 8.1 of the

---

[2] Members of the Committee serve "at the pleasure of the General Partner."  Ex. A § 10.01(a).

**EXHIBIT A  -44-**

Plan Document as the "administrator" of the Plan under 29 U.S.C. § 1002(16)(A). The Committee has "full discretionary authority and responsibility for the administration of the Plan." Ex. A § 10.03. This includes (among other things) the authority to make investment decisions. *Id.* §§ 1.11, 10.03(h).

24. The Committee and its members are also designated as Plan fiduciaries in Section 10.06 of the Plan document, and are fiduciaries of the Plan under 29 U.S.C. § 1102(a). In addition, the Committee and its members are fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and/or discretionary control respecting the management of the Plan, administration of the Plan, and management and disposition of Plan assets. The current and previous members of the Committee are currently unknown to Plaintiffs, and those individuals are therefore collectively named as John Does 1–20.

25. Defendant Maney is the Chief Operating Officer and Managing Director of AAM. He is the sole member of the management boards of both AAM-LP and AAM-LLC. Maney is also the CEO of Defendant Allianz Global Investors Fund Management LLC and the Managing Director of Defendant Allianz Global Investors U.S. LLC. Maney signed the Plan Document in his capacity as Managing Director and Chief Operating Officer of AAM. By virtue of his management and Board positions at AAM-LP and AAM-LLC, Maney has authority to appoint a recordkeeper and trustee, amend the Plan Document, and appoint and remove members of the Committee. This gives Maney discretionary authority and control over the administration and management of the Plan as well as discretionary control and authority regarding the management and disposition of Plan assets. Accordingly, Maney is a Plan fiduciary under 29 U.S.C. § 1002(21)(A).

26. Any individual or entity to whom the Fiduciary Defendants delegated any fiduciary functions or responsibilities is also a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A). Because the individuals and/or entities that have been delegated fiduciary responsibilities by the Fiduciary Defendants are not currently

known to Plaintiffs, they are collectively named as John Does 21–30.

27. Each of the Fiduciary Defendants are also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because they enabled other fiduciaries to commit breaches of fiduciary duties through their appointment powers, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of their duties, and failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

28. Defendant Allianz Global Investors Fund Management LLC is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment advisor for 24 of the investment options offered within the Plan.

29. Defendant PIMCO is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment advisor for 23 of the investment options offered within the Plan.

30. Defendant Allianz Global Investors U.S. LLC is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment sub-advisor for 20 of the Plan's investment options.

31. Defendant NFJ Investment Group LLC is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment sub-advisor for 4 of the Plan's investment options.

## ERISA FIDUCIARY DUTIES

32. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Fiduciary Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1) states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) For the exclusive purpose of

(i) Providing benefits to participants and their beneficiaries; and

-7-

**EXHIBIT A -46-**

(ii)     Defraying reasonable expenses of administering the plan;

(B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

33.     These ERISA fiduciary duties "are the highest known to the law.'" *Howard*, 100 F.3d at 1488; *accord Johnson v. Couturier*, 572 F.3d 1067, 1077 (9th Cir. 2009) ("[O]ur holding merely comports with congressional intent in establishing ERISA fiduciary duties as 'the highest known to the law.'") (quoting *Howard*).

## DUTY OF LOYALTY

34.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . .  A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan."  Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988) (emphasis added).

## DUTY OF PRUDENCE

35.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).   This duty includes, but is not limited to, a duty to select prudent investments.  Under ERISA,

-8-

1   a fiduciary "has a continuing duty to monitor [plan] investments and remove

2   imprudent ones" that exists "separate and apart from the [fiduciary's] duty to

3   exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct.

4   1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose

5   of it within a reasonable time." *Id.* (quotation omitted). Therefore, "a fiduciary

6   cannot free himself from his duty to act as a prudent man simply by arguing that

7   other funds" available within the plan could have "theoretically . . . create[d] a

8   prudent portfolio." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir.

9   2007) (cited with approval in *Tibble v. Edison Int'l*, 729 F.3d 1110, 1122 (9th Cir.

10  2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015)).

11      36.    Failing to closely monitor and subsequently minimize administrative

12  expenses wherever possible by surveying the competitive landscape and leveraging

13  the plan's size to reduce fees constitutes a breach of fiduciary duty. *Tussey v. ABB,*

14  *Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Similarly, selecting higher-cost

15  investments because they benefit a party in interest constitutes a breach of fiduciary

16  duties when similar or identical lower-cost investments are available. *Braden v.*

17  *Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009); *Tibble v. Edison Int'l*, 729

18  F.3d at 1137–39.

19                  **SOURCE AND CONSTRUCTION OF DUTIES**

20      37.    The Supreme Court has noted that the legal construction of an ERISA

21  fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at

22  1828. Therefore "[i]n determining the contours of an ERISA fiduciary's duty,

23  courts often must look to the law of trusts." *Id.* In fact, the duty of prudence

24  imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law

25  prudent investor rule found in trust law. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp.

26  1518, 1521 (S.D.N.Y. 1983).

27      38.    Pursuant to the prudent investor rule, fiduciaries are required to "incur

28  only costs that are reasonable in amount and appropriate to the investment

**EXHIBIT A  -48-**

responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."). The Introductory Note to the Restatement's chapter on the investment of trust assets further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007). Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . . [T]hese added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

39.     In considering whether a fiduciary has breached the duties of prudence and loyalty, the Court considers both the "merits of the transaction" as well as "the thoroughness of the investigation into the merits of the transaction." *Howard*, 100 F.3d at 1488 (quotation and citation marks omitted). Mere "subjective good faith" in executing these duties is not a defense; "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

-10-

## CO-FIDUCIARY LIABILITY

40.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. § 1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

41.     The Plan is a defined-contribution or 401(k) plan, a type of employee retirement plan in which employees invest a percentage of their earnings on a pre-tax basis. The Employer Defendants often match those contributions up to a certain percentage of the compensation contributed by the employee each pay period. Within the Plan, employees may defer anywhere from 1% to 100% of their compensation on a pre-tax basis (subject to certain limits), and the Employer Defendants have the discretion to make matching contributions on top of the amounts that an employee contributes. 2015 AAM Summary Plan Description ("SPD") at 4, 6–7, attached as **Exhibit B**. Participants direct the investment of these contributions, choosing from among a lineup of options offered by the Plan. Investment Company Institute, *A Close Look at 401(k) Plans*, at 9, available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "ICI Study").

-11-

42.     Fiduciaries are obligated to assemble a diversified menu of investment options.   29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii).   Each investment option is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class.   ICI Study at 7; Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").   The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate.   Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments.   Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the credit risk associated with the particular borrower.   Equity, or stock, investments, are generally defined by three characteristics: (1) where they invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of company they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e. growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks, and blend funds invest in a mix of both types of stocks).   Balanced funds are a type of fund that invests in a mix of stocks and bonds.   Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.   Target-date funds are typically invested in a portfolio of other mutual funds.

43.     Investment funds can be either passively or actively managed.   Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities

matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential is typically not realized). U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), available at http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

44. In addition to a core menu of investment options, many plans (including the Plan at issue here) also provide employees the option of opening a self-directed brokerage account ("SDBA"), giving them access to a broad array of stocks, bonds, and mutual funds. Ayres & Curtis, *Beyond Diversification* at 1524; Ex. A § 5.02(c). However, SDBAs have significant drawbacks. Participants that choose to utilize an SDBA are typically assessed an account fee and a fee for each trade. These fees often make an SDBA a much more expensive option compared to investing in the core options available within the Plan. Costs are also higher because employees investing in mutual funds within an SDBA must invest in retail mutual funds, rather than the lower-cost institutional shares typically available as core investment options within the plan that are only available because of the retirement plan's ability to leverage the negotiating power of the plan's assets. DOL Field Assistance Bulletin 2012-02R, July 30, 2012, available at http://www.dol.gov/ebsa/regs/fab2012-2R.html; Christopher Carosa, CTFA, *Is the Fiduciary Liability of Self-Directed Brokerage Options Too Great for 401k Plan Sponsors?*, Fiduciary News (June 11, 2013), available at

-13-

**EXHIBIT A -52-**

http://fiduciarynews.com/2013/06/is-the-fiduciary-liability-of-self-directed-brokerage-options-too-great-for-401k-plan-sponsors/ (last accessed Sept. 24, 2015). As a result, SDBAs are seldom used; only 2% of retirement plan assets are held in SDBAs. Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 15 (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf (hereinafter "ICI/Deloitte Study").

45. The existence of an SDBA option does not excuse plan fiduciaries from selecting a prudent and appropriate set of core investment options. For the reasons described above, "the performance is generally lower with self-directed accounts compared to managed portfolios. This translates into low real rates of return and higher retirement failure rates." Marijoyce Ryan, CPP, *Money Management: The Downside of Self-Directed Brokerage Accounts*, The Daily Record (June 26, 2012), available at http://nydailyrecord.com/blog/2012/06/26/money-management-the-downside-of-self-directed-brokerage-accounts/ (last accessed Sept. 24, 2015); Dr. Gregory Kasten, *Self-Directed Brokerage Accounts Reduce Success* (2004), at 1, 13–14, available at http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf.

### MINIMIZATION OF PLAN EXPENSES

46. At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Maximizing employees' retirement benefits is therefore heavily influenced by two critical, interrelated functions of plan fiduciaries: designing the menu of investment options and minimizing plan expenses.

47. There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses. ICI/Deloitte Study at 17. Investment management expenses are the fees that are

-14-

charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.* On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id.*

48. Administrative expenses (e.g., recordkeeping, trustee and custodial services, accounting) can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing." Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. These "revenue sharing" payments from investment managers to plan service providers typically happen on a quarterly basis based upon an agreed-upon contribution formula.

49. The Plan uses a combination of these methods—a portion of recordkeeping and trustee expenses are paid directly to the service providers, and a portion of these expenses are paid out of the investment expenses charged by the mutual funds within the Plan.

50. Fiduciaries exercising control over administration of a plan and the selection of core investment options can minimize plan expenses by hiring low-cost service providers and by selecting a menu of low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale generally lower administrative expenses on a per-participant or percentage-of-assets basis. ICI/Deloitte Study at 7, 21. Larger plans also can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors. *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), available at http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts

-15-

**EXHIBIT A -54-**

with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds"). Empirical evidence bears this out. In 2012, total plan fees in the average defined contribution plan were 0.91%, but this varied between an average of 1.27% in plans with $1 million to $10 million in assets, and an average of only 0.44% for plans with between $500 million and $1 billion in assets. ICI Study at 41.

51. Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment expenses should be determined by comparisons to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such mattes would use in the conduct of an *enterprise of a like character*") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, *6 n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

**SELECTION OF APPROPRIATE INVESTMENT OPTIONS FOR INCLUSION IN THE PLAN**

52. With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical

-16-

insights for fiduciaries to consider when selecting investments to be offered within a plan. The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments.

53. Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among the available funds. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Constribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001). Defendants are aware of this tendency among plan participants. On multiple occasions, Stacy Schaus, head of the Defined Contribution practice at PIMCO, has advocated designing defined-contribution menus in light of the naive-diversification heuristic. Stacy Schaus, Head of Defined Contribution Practice at PIMCO, *Designing Outcome-Focused Defined Contribution Plans: Building Sustainable Income for Retirees*, November 2012, https://www.pimco.com/insights/investment-strategies/featured-solutions/designing-outcomefocused-defined-contribution-plans-building-sustainable-income-for-retirees (advocating for core investment lineups whereby "even naive diversification . . . would result in a reasonable, risk-managed allocation"); Stacy Schaus & Ying Gao, *Designing Balanced DC Menus: Considering Diversified Fixed Income Choices*, April 2014, https://www.pimco.com/insights/investment-strategies/featured-solutions/dc-design/designing-balanced-dc-menus-considering-diversified-fixed-income-choices (concluding that defined-contribution plan investment menu should be designed such that "[i]n the event that participants evenly divide their assets across the investment menu (i.e. 1/n), the result should provide a reasonably balanced portfolio").

54.     Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should.  John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years).

55.     For all of these reasons, prudent fiduciaries will limit their menus to only those funds that represent sound long-term investments, and remove imprudent investments rather than trusting participants to move their money out of an imprudent investment.

56.     The second critical insight provided by academic and financial industry literature is that in selecting prudent investments, the most important consideration is low fees.  Numerous scholars have demonstrated that high expenses are not correlated with superior investment management.  Indeed, funds with high fees on average perform worse than less expensive funds, even on a *pre-fee basis*.  Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009); *see also* Fisch & Wilkinson-Ryan, *Costly Mistakes*, at 1993 (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

**EXHIBIT A  -57-**

[T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

57. Defendants have publicly acknowledged the importance of maintaining low fees. As Stacy Schaus, head of the Defined Contribution practice at PIMCO, has written, "a reduction in [annual] fees from 100 bps[3] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income." Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors* (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (emphasis added).

58. While high-cost mutual funds may exhibit positive, market-beating performance over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras *et al.*, *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring 31 years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). Any sustainable ability to

---

[3] The term "bps" is an abbreviation of the phrase "basis points." One basis point is equal to .01%, or 1/100th of a percent. Thus a fee level of 100 basis points translates into fees of 1% of the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last visited Sept. 25, 2015).

-19-

**EXHIBIT A  -58-**

1    beat the market that managers do demonstrate is nearly always dwarfed by mutual
2    fund expenses.  Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the*
3    *Cross-Section of Mutual Fund Returns*, 65 F. Fin. 1915, 1931–34 (2010); Russ
4    Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-*
5    *Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690
6    (2000).   The one exception to the general arbitrariness and unpredictability of
7    mutual fund returns is that the worst-performing mutual funds show a strong,
8    persistent tendency to continue their poor performance.  Carhart, *On Persistence in*
9    *Mutual Fund Performance*, at 57.  Therefore, regardless of where one comes down
10   on the issue of active versus passive investing, a prudent investor should choose
11   only index funds and low-cost actively managed funds whose long-term
12   performance history permits a fiduciary to realistically conclude that the fund is
13   likely to outperform its benchmark index in the future, after accounting for
14   investment expenses.  *See* Restatement (Third) of Trusts § 90 cmt. h(2).

## **DEFENDANTS' VIOLATIONS OF ERISA**

### I. IMPROPER SELECTION AND RETENTION OF HIGH-COST INVESTMENTS FROM WITHIN THE ALLIANZ FAMILY

18   59.   Throughout the statutory period, the only "core" investment options
19   offered within the Plan have been investments managed by either PIMCO or
20   Allianz Global Investors, both of which are subsidiaries of AAM.

21   60.   In 2009, Plan participants were offered 43 proprietary mutual funds
22   and an SDBA.  The "core" mutual fund options included 11 target-date mutual
23   funds, 3 balanced funds, 12 domestic equity funds, 7 global/international equity
24   funds, 3 domestic bond funds, 3 international bond funds, 1 money market fund,
25   and 3 specialty funds (a technology, commodities, and real estate fund).  A list of
26   investment options available as of the end of 2009, taken from the account
27   statement of Plaintiff Marfice, is attached as **Exhibit C**.

**EXHIBIT A  -59-**

61. According to AAM's Form 5500, as of the end of 2009, the Plan had approximately $420 million in assets, consisting of $377 million in AAM's proprietary mutual funds, $40 million in SDBAs, and $3 million in loans to participants.

62. As of the end of 2010, the Plan's assets had increased to approximately $511 million.

63. In 2013, Plan participants were offered 45 proprietary mutual funds, 2 proprietary collective trust funds, and an SDBA option. The "core" investment options consisted of 12 target-date funds, 6 balanced funds, 12 domestic equity funds, 5 global/international equity funds, 6 domestic bond funds, 2 international bond funds, and 4 specialty funds (a technology, currency, commodities, and real estate fund).

64. By the end of 2013, the Plan's assets had increased to approximately $772 million, consisting of $628 million in proprietary mutual funds, $44 million in proprietary collective trust funds, $93 million in SDBAs, and $7 million in Plan participant loans.

65. Taking into account all administrative and investment expenses within the Plan, and using 2013 year-end balances (as reported on Form 5500 for 2013) and publicly available information regarding each investment's expenses, Plaintiffs estimate that total plan costs for 2013 were approximately $5,950,000, equal to 0.77% of the $772 million in Plan assets.

66. This total plan cost of 0.77% is outrageously high for a defined-contribution plan with over $500 million in assets. In 2013, the average total plan cost for plans with between $500 million and $1 billion in assets was 0.44%. ICI Study at 41. Ninety percent of plans with between $500 million and $1 billion in assets had total plan costs of less than 0.63% in 2013. ICI Study at 42. Indeed, among the **551** defined-contribution plans with between $500 million and $1 billion in assets as of the end of 2013, **only 8 plans** had total plan costs that were 0.74% or

-21-

**EXHIBIT A  -60-**

above, one of which was the Plan.

67.    Had the Plan limited its expenses to the average total cost of 0.44% for similarly-sized plans, Plan participants would have been saved approximately $2.55 million in fees in 2013 alone.

68.    These grossly excessive costs are attributable to the Fiduciary Defendants' selection of high-cost, proprietary mutual funds from within the Allianz Family.

69.    In 2012 (the most recent year this data is available), in plans with between $500 million and $1 billion in assets, the average expense ratio for domestic equity funds was 0.53%; for international equity funds it was 0.70%; for target-date funds it was 0.47%; for balanced funds it was 0.45%; for domestic bond funds it was 0.38%; for international bond funds it was 0.74%; for index funds it was 0.11%; and for other, miscellaneous funds the average was 0.78%. ICI Study at 45.

70.    The expenses for funds within the Plan are much higher. In 2013, the domestic equity funds in the Plan had expense ratios between 0.61% and 2.00%. The Plan did include one international fund with a below-average expense ratio of 0.61%, but the other three funds for which publicly-disclosed data is available had expense ratios between 1.21 and 1.42 percent. The target-date funds had expense ratios of between 0.57 and 0.70 percent, well above the 0.47% average. The balanced funds in the Plan had 2013 expense ratios of between 0.67% and 1.85%. The domestic bond funds averaged between 0.26% and 0.75%, although every fund but one had expenses above the category average of 0.38%. The only international bond fund with a publicly disclosed expense ratio cost 0.83% in 2013. The three index funds within the Plan had expense ratios of between 0.50 and 0.74 percent. And the specialty funds had expense ratios between 0.85 and 1.22 percent.

71.    Overall, 43 of the 45 proprietary mutual funds within the Plan in 2013 had expenses that were above the average for plans with between $500 million and

-22-

$1 billion in assets, and many of those funds had expenses that were 2 to 3 times higher than the average for similarly-sized plans.

72. Despite the high cost of these proprietary investments, the Fiduciary Defendants failed to consider, let alone investigate, the prudence of other investments (i.e., mutual funds or other investment products outside the Allianz Family). This failure to engage in a prudent investment selection and monitoring process constitutes a breach of the fiduciary duties of loyalty and prudence under ERISA.

73. Had the Fiduciary Defendants selected and monitored the Plan's investment options in a prudent manner, in a process that was not tainted by self-interest, and removed imprudent, high-cost funds, the Fiduciary Defendants would have populated the Plan with lower-cost investment options that exhibited similar or superior performance. Plan participants have paid millions of dollars in excess fees every year as a result of the Fiduciary Defendants' breaches of the duties of loyalty and prudence.

## II. IMPROPER USE OF PLAN ASSETS TO SEED NEW AND UNTESTED MUTUAL FUNDS

74. The Fiduciary Defendants' imprudence in selecting unreasonably expensive funds is not the result of mere negligence. Rather, the Fiduciary Defendants intentionally exposed Plan participants to unreasonably high fees because doing so significantly benefited the Allianz Family.

75. This is perhaps best illustrated by the Fiduciary Defendants' improper use of the Plan to promote new and untested mutual funds for the purpose of furthering the Allianz Family's mutual fund business.

76. By way of background, mutual funds that have failed to attract assets (often due to underperformance) are often closed. A Vanguard study showed that a whopping 46 percent of the 5,108 funds that existed at the beginning of 1997 were

**EXHIBIT A -62-**

either liquidated or merged with another fund by the end of 2011.  Todd Schlanger & Christopher B. Philips, *The Mutual Fund Graveyard: An Analysis of Dead Funds*, Vanguard Funds, at 3 (January 2013), https://personal.vanguard.com/pdf/s362.pdf.  Liquidations are frequently the result of a prolonged period of underperformance that (1) will make it difficult for the fund to attract new assets in the foreseeable future and (2) drags down the firm's historical return data.  *Id.* at 1, 4, 6; Larry Swedroe, *How the Mutual Fund Graveyard Can Hurt Investors*, CBS Marketwatch (May 8, 2014), http://www.cbsnews.com/news/its-getting-crowded-in-the-mutual-fund-graveyard/ (last accessed Sept. 29, 2015).

77.     Defendants are certainly familiar with this phenomenon.  As of the end of June 2009, Allianz Global Investors managed 40 mutual funds that offered institutional shares.  Eighteen of those 40 funds had been either liquidated or merged with another fund by August 2015.

78.     Given the frequency with which funds are removed from a family's lineup, mutual fund families must frequently introduce new mutual funds to replace the funds that invariably will need to be closed or merged into another fund.  New funds also play a critical role in responding to a constantly-evolving investment marketplace.

79.     Defendants are familiar with the need to create new funds.  Allianz Global Investors has launched 28 new mutual funds since the beginning of 2008, while PIMCO has launched 57 new mutual funds during that time.

80.     Introducing new mutual funds imposes a large burden on a mutual fund company.  There are significant start-up costs.  Additionally, many of the expenses of running a mutual fund such as staff, marketing, and research are fixed overhead, and therefore account for a large percentage of a mutual fund's assets when the fund is new and still small.  Therefore, new mutual funds typically operate at a loss (to the fund company) until they have attracted sufficient assets to

-24-

achieve adequate economies of scale.

81.     This presents three powerful incentives to attract assets to a newer fund.  First, additional assets help lower the fund's expenses as a percentage of total assets, allowing the fund to lower its expenses and thereby attract new investors. Second, when a new fund attracts sufficient new assets, the mutual fund company no longer has to operate the fund at a loss.  Finally, mutual funds require assets to manage.  Prudent investors, however, are typically wary of investing in new funds. Therefore attracting investors early in a fund's life is a difficult but critical task to the survival of the fund.  Empirically, new funds that fail to attract sufficient assets are often closed.  Schlanger & Phillips, *The Mutual Fund Graveyard*, at 4, 4 n.5, 7.

### INCLUSION OF UNTESTED FUNDS WITHIN THE PLAN

82.     The Fiduciary Defendants have improperly used the Plan as a vehicle for providing seed money to the Allianz Family's newest mutual funds, and have a pattern of adding mutual funds to the Plan shortly after they are launched, despite the lack of a sufficient track record to determine whether the fund is a prudent investment.

83.     For example, in March 2008, PIMCO launched a series of target-date funds, the RealRetirement Funds.  Despite their lack of track record, high expenses, and a marketplace replete with competitive target-fund offerings from companies such as Vanguard, T. Rowe Price, and JPMorgan, the Fiduciary Defendants added five PIMCO RealRetirement Funds to the Plan less than a year after they were launched.

84.     Similarly, Allianz Global Investors launched its own series of target-date funds at the end of 2008 called the AllianzGI Retirement Funds, which were immediately added to the Plan in early 2009 despite their lack of track record, high expenses, and the existence of numerous competitive alternatives from other mutual fund families.

**EXHIBIT A  -64-**

85.   In addition to the target-date funds, since 2009, the Plan has added at least four new mutual funds to the Plan that were in existence for less than two years.  In each case, the Fiduciary Defendants placed the Allianz Family's business objectives and profitability before the interests of Plan participants by adding an imprudent and unproven fund to the Plan and by subsequently failing to remove each imprudent, unproven investment from the Plan.

86.   The addition of these funds may have been beneficial for the Allianz Family's bottom line, but it has harmed Plan participants.  The five PIMCO RealRetirement target-date funds (now called RealPath Funds) added to the Plan in 2009 have performed poorly.  *See* **Exhibit D** (Morningstar investment detail reports for the PIMCO RealPath funds as of August 31, 2015).  All five of the RealPath funds have underperformed their benchmark index by at least 2 percent per year over the past five years, with four of the five producing returns that have underperformed their index by more than 5 percent per year.

87.   The six Allianz Global Investors target-path funds have produced similarly poor results.  All five funds have underperformed their benchmark index over the past five years by at least 1.5 percent per year, and four of the five funds have underperformed their benchmark index by at least 3 percent per year over the past five years.  *See* **Exhibit E** (Morningstar investment detail reports for the AllianzGI Retirement funds as of August 31, 2015).

88.   Several other new and untested mutual funds added to the Plan have also performed poorly.  The AllianzGI Disciplined Equity Fund, the PIMCO EqS Pathfinder Fund, and the PIMCO Global Multi-Asset Fund were each added to the Plan shortly after the fund was launched.  In each case, the fund has significantly underperformed its peers.  In fact, the Disciplined Equity and EqS Pathfinder funds no longer exist.

89.   The Fiduciary Defendants' pattern of adding new and untested mutual funds to the Plan to support the Allianz Family's business operations and the

-26-

**EXHIBIT A  -65-**

Fiduciary Defendants' failure to remove those funds at the earliest possible opportunity constitute breaches of the fiduciary duties of loyalty and prudence.

### USE OF THE "DEFAULT" INVESTMENT OPTION TO FUNNEL PLAN ASSETS INTO UNTESTED FUNDS

90.     In addition to including new and unproven funds in the Plan, the Fiduciary Defendants also have exposed participants to these imprudent new funds through the Plan's default investment fund.

91.     By way of background, new employees become eligible to participate in the Plan the month after they commence employment. Ex. A § 2.01(a). Newly-enrolled employees are then automatically deemed to have elected a contribution level of 4% of compensation unless they affirmatively opt out. *Id.* § 3.01(a). If the employee does not opt out of this default contribution, the contribution level increases by 2% each year until 10% of compensation is being contributed to the Plan. *Id.* § 3.01(b).

92.     Employees who fail to make an investment election automatically have their monies invested in the default investment fund, which is selected by the Committee.     Ex. A § 5.02(f).  Amounts contributed under the Plan's automatic enrollment provision are invested in the Plan's default investment fund unless a different election is made.  SPD, Ex. B at 4.

93.     The Committee has selected the AllianzGI Global Allocation Fund (the "Global Allocation Fund") as the Plan's default investment fund.  Plaintiff Urakhchin invested in the default Global Allocation Fund when he began working for PIMCO in 2011 and was automatically enrolled in the Plan, and on information and belief, the Global Allocation Fund continues to act as the Plan's default investment fund.

94.     As a result of the automatic enrollment provision and default investment provisions, a significant amount of Plan assets are directed into the

Global Allocation Fund. Approximately $57 million was invested in the Global Allocation Fund as of the end of 2013, making it one of the two largest holdings in the Plan along with the PIMCO Total Return Fund, which holds approximately $58 million in Plan assets.

95.    The Global Allocation Fund is a fund of funds, meaning that it invests in a portfolio of other mutual funds. The funds within the Global Allocation Fund consist entirely of proprietary mutual funds managed by Allianz Global Investors and PIMCO. As a result, the Global Allocation Fund (which is a so-called "balanced fund") has an expense ratio of 0.85%—almost twice as high as the average balanced fund found in retirement plans with between $500 million and $1 billion in assets. ICI Study at 45.

96.    The Global Allocation Fund has a history of making significant investments in newer funds within the Allianz Family. According to its SEC filings, as of November 2009, four of the largest equity fund holdings within the Global Allocation Fund were AllianzGI mutual funds that had been launched within the past three years, and two of those funds were only a year old. As of August 2011, three of the Global Allocation Fund's largest equity holdings were again AllianzGI mutual funds that had been launched within the past three years.

97.    By selecting the Global Allocation Fund as the Plan's default investment option, Defendants have created a mechanism whereby Plan assets are not just invested—but continually *reinvested*—in a steady stream of new and unproven funds.

98.    The Fiduciary Defendants' pattern and practice of using the default investment fund to promote the Allianz Family's new mutual fund offerings and thereby reduce the subsidization of its newer funds has been particularly pronounced over the past year. As of November 2014, four of the fourteen equity fund holdings within the Global Allocation Fund were AllianzGI funds that had been launched within the past three years.

-28-

99.   One blatant example relates to the "Best Styles" funds.  Over the past two years, Allianz Global Investors has released a series of mutual funds that it calls the "Best Styles" funds: these include AllianzGI Best Styles Global Equity (launched December 2013), Best Styles International Equity (launched December 2014), and Best Styles U.S. Equity (launched December 2014).  Allianz Global Investors has made a significant investment in these funds.  To ensure that its investment pays off, and curtail its subsidization of the BestSyles funds, Allianz Global Investors is using the Global Allocation Fund and its target-date funds to channel significant assets into the Best Styles funds.

100.  As of May 31, 2015, the top two equity fund holdings in every AllianzGI target-date fund were the Best Styles International Equity Fund and the Best Styles U.S. Equity Fund, despite the fact that these funds had only been in existence for six months.  And of the $202 million invested in the Global Allocation Fund (over thirty percent of which constitutes Plan assets), a whopping $107 million was invested in the Best Styles Global Equity Fund, constituting more than half of the Global Allocation Fund's assets, despite the fact that the Best Styles Global Equity Fund had only existed for eighteen months.  This is a staggering percentage of assets to have in one mutual fund, let alone a new and unproven mutual fund.  The Global Allocation Fund's $107 million investment in the Best Styles Global Fund constitutes 73% of the assets currently invested in the Best Styles Global Fund.

101.  This pattern of using the Global Allocation Fund to promote new and unproven funds demonstrates the Fiduciary Defendants' real purpose in choosing the Global Allocation Fund as the default investment option within the Plan.  The Global Allocation Fund provides a significant opportunity to use Plan assets to support newer proprietary funds, thereby curtailing or ending the subsidization of these newer funds.  This constitutes a breach of the Fiduciary Defendants' duties of

**EXHIBIT A  -68-**

loyalty and prudence. A prudent fiduciary acting solely in the interests of Plan participants would not retain a mutual fund in the Plan because it benefits the Plan sponsor's business operations (or those of its affiliates). Furthermore, a prudent fiduciary acting solely in the interest of Plan participants would not use the AllianzGI Global Allocation Fund—a high-cost fund that has under-performed its benchmark over the prior one, three, five, and ten-year periods and in three of the past four calendar years—as the Plan's default investment fund.

### III. PLAINTIFFS HAVE SUFFERED DAMAGES AS A RESULT OF EACH FORM OF MISCONDUCT IDENTIFIED IN THE COMPLAINT

102. Plaintiffs have suffered from the breaches of fiduciary duties and other unlawful conduct identified in Sections I and II above.

103. Plaintiff Aleksander Urakhchin ("Urakhchin") has been a participant in the Plan from 2011 to the present. During that time, he has at various times had funds invested in the AllianzGI Global Allocation Fund and the PIMCO Stocks Plus Fund. Because the value of his account is less than it would have been had Defendants honored their fiduciary duties and refrained from self-dealing, Urakhchin has statutory and Article III standing to bring the present action. *Harris v. Amgen, Inc.*, 573 F.3d 728, 732–36 (9th Cir. 2009).

104. Plaintiff Nathan Marfice ("Marfice") has been a participant in the Plan from on or before 2009 to the present. During that time, he has at various times had funds invested in the AllianzGI Retirement 2040 Fund, the PIMCO RealPath 2040 Fund, the AllianzGI NFJ Dividend Value Fund, the AllianzGI Focused Growth Fund, the PIMCO Stocks Plus Fund, the AllianzGI Micro Cap Fund, the AllianzGI Mid-Cap Fund, the PIMCO Real Return Fund, the PIMCO Short Asset Investment Fund, and the PIMCO Total Return Fund. Because the value of his account is less than it would have been had Defendants honored their fiduciary duties and refrained from self-dealing, Marfice has statutory and Article III standing to bring

the present action. *Harris*, 573 F.3d at 732–36.

105. Plaintiffs did not have actual knowledge of any of the foregoing breaches of fiduciary duty or other unlawful conduct in violation of ERISA until Defendants' misconduct was uncovered shortly before this action was filed.

## **CLASS ACTION ALLEGATIONS**

106. Plaintiffs bring this action on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

107. Plaintiffs assert their claims in Counts I and II on behalf of the following class:[4]

> All participants and beneficiaries of the Plan at any time on or after October 7, 2009. Excluded from this class are Defendants, their directors, and any employees with responsibility for the Plan's investment or administrative functions.

108. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan has had between approximately 3,000 and 3,900 participants during the applicable statutory period.

109. Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Plan, who have suffered injuries as a result of Defendants' mismanagement of the Plan and self-dealing. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions and self-dealing affected all Plan participants similarly.

110. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class, as their interests are aligned with the Class that they seek to represent and they have retained counsel experienced in complex class action litigation. Plaintiffs

---

[4] Plaintiffs reserve the right to revise their class definition, and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND RESTITUTION

**EXHIBIT A  -70-**

do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

111. Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a. Whether the Fiduciary Defendants breached their duties of prudence and loyalty by offering only proprietary investments within the Plan;

    b. Whether the Fiduciary Defendants breached their duties of prudence and loyalty by failing to monitor and remove the Plan's investments in proprietary investments managed by PIMCO and Allianz Global Investors;

    c. Whether the receipt of investment management fees by the Employer Defendants in excess of the cost of providing services to the Plan constitutes an illegal inurement of benefits to a Plan employer in violation of 29 U.S.C. § 1103;

    d. Whether the Fiduciary Defendants failed to exercise appropriate skill, care, loyalty, and diligence, by failing to investigate and attempt to negotiate lower-cost alternatives to the proprietary investments within the Plan from investment managers who were not affiliated with the Allianz Family;

    e. Whether the Fiduciary Defendants breached their duty of loyalty, their duty to make prudent investment decisions, and their duty to monitor plan investments and subsequently remove imprudent investments by adding new and untested proprietary mutual funds to the Plan and failing to remove those funds at the earliest available opportunity;

    f. Whether the Fiduciary Defendants breached their duty of loyalty, their duty to make prudent investment decisions, and their duty to monitor plan investments and subsequently remove imprudent investments by retaining the Global Allocation Fund within the Plan and designating the Global Allocation Fund as the default investment option in light of the Fund's pattern and

-32-

**EXHIBIT A  -71-**

practice of investing in new and unproven mutual funds and the Fund's track record of poor performance;

g. The proper measure of monetary relief; and

h. The proper form of equitable and injunctive relief.

112. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. Separate lawsuits would establish incompatible standards to govern Defendants' conduct.

113. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Plan participants, as a practical matter, would be dispositive of the interests of other Plan participants or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court such as removal of particular Plan investments or removal of a Plan fiduciary would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

114. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint has applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of

1    individual prosecution, and Plaintiffs are unaware of any similar claims brought

2    against Defendants by any Class members on an individual basis.    Class

3    certification also will obviate the need for unduly duplicative litigation that might

4    result in inconsistent judgments concerning Defendants' practices.    Moreover,

5    management of this action as a class action will not present any likely difficulties.

6    In the interests of justice and judicial efficiency, it would be desirable to

7    concentrate the litigation of all Class members' claims in a single forum.

### COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

115.   29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty on the Fiduciary Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

116.   As described throughout this Complaint, the Fiduciary Defendants breached their fiduciary duties of prudence and loyalty with respect to the selection and management of the Plan's investment options by, *inter alia*:

a.  Selecting and retaining investments in the Plan because they were affiliated with the Allianz Family and would contribute to the Allianz Family's bottom line;

b.  Failing to monitor Plan investments and investigate whether the investment management services provided by the Allianz Family could be provided at lower cost, with comparable or superior performance, by an investment manager not affiliated with the Allianz Family;

c.  Adding new and untested mutual funds within the Plan to support the business objectives of the Allianz Family, despite these funds' lack of a sufficient track record to warrant their addition and retention by the Plan;

d.  Selecting and maintaining the AllianzGI Global Allocation Fund as the default investment fund because of the fund's ability to support the Allianz Family's business objectives despite the Global Allocation Fund's high costs and poor performance;

-34-

117. Each Fiduciary Defendant performing investment-related duties knowingly participated in the breaches of the other Defendants performing such duties, knowing that other Defendants were breaching their fiduciary duties, and enabling commission of these breaches by failing to lawfully discharge their own fiduciary duties or make any reasonable effort under the circumstances to remedy other Defendants' breaches. For these reasons, the Fiduciary Defendants are also liable as co-fiduciaries under 29 U.S.C. § 1105.[5]

118. Each Fiduciary Defendant is personally liable, and the Fiduciary Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

119. On behalf of the Plan, Plaintiffs are also entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3) (including the equitable relief described in the Prayer for Relief), recovery of pre-judgment interest, *see Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007), and attorney fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine.

---

[5] AAM and Maney are also liable as co-fiduciaries under 29 U.S.C. § 1105 given the General Partner's authority, acting on behalf of the Plan Sponsor, to appoint and remove members of the Committee and to amend the Plan, AAM and Maney's knowledge of each Defendant's breaches of fiduciary duties, and AAM and Maney's failure to exercise their authority to take reasonable steps to prevent these breaches.

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND RESTITUTION

**EXHIBIT A -74-**

## COUNT II
### Anti-Inurement Provision
### 29 U.S.C. § 1103

120.   The Employer Defendants are each employers of participants of the Plan as defined by 29 U.S.C. § 1002(5).

121.   29 U.S.C. § 1103(c)(1) provides that the assets of an employee benefit plan "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries."

122.   The purpose of this provision "is to apply the law of trusts to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others."   *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 23 (2004).

123.   Plan assets improperly inured to the benefit of the Employer Defendants as a result of the Plan's investments in Allianz Family mutual funds and the subsequent assessment of investment management expenses against the accounts of Plan participants.

124.   Pursuant to 29 U.S.C. § 1132(a)(3), the Employer Defendants should be required to disgorge all Plan assets that have inured to them as a result of their self-dealing.   These assets should be restored to the Plan under principles of equitable restitution.

125.   Plaintiffs also seek any other equitable relief the Court deems appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; removal of proprietary investments from the Plan's core investment options; transfer of Plan assets in proprietary investments to prudent alternative investments; removal of Plan fiduciaries deemed to have breached their fiduciary duties, and imposition of a constructive trust as necessary for administration of some or all of the aforementioned remedies.

**EXHIBIT A  -75-**

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Urakhchin and Marfice, individually and as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that the Fiduciary Defendants have breached their fiduciary duties in the manner described in the Complaint;

D.    A declaration that Plan assets inured to the benefit of the Employer Defendants in violation of 29 U.S.C. § 1103;

E.    An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties and self-dealing described above and to restore the Plan to the position it would have been in but for such breaches and self-dealing;

F.    An order requiring Defendants to disgorge all revenues received from, or in respect of, the Plan;

G.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

H.    An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

I.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; removal of imprudent mutual funds as core investment options; transfer of Plan assets in imprudent mutual funds to prudent alternative investments; and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

-37-

J.   An award of pre-judgment interest;

K.   An award of attorneys' fees and costs pursuant to 29 U.S.C. §
     1132(g) and/or the common fund doctrine;

L.   An award of such other and further relief as the Court deems
     equitable and just.

Dated: October 7, 2015                    **KABATECH BROWN KELLNER LLP**

                                          By:    /s/ Richard L. Kellner
                                          Richard L. Kellner, CA Bar No. 171416
                                          KABATECK BROWN KELLNER LLP
                                          rlk@kbklawyers.com
                                          644 South Figueroa Street
                                          Engine Company No. 28 Building
                                          Los Angeles, CA 90017
                                          Telephone: (213) 217-5000
                                          Facsimile: (213) 217-5010

                                          NICHOLS KASTER, PLLP
                                          Kai H. Richter, MN Bar No. 0296545*
                                          krichter@nka.com
                                          Carl F. Engstrom, MN Bar No. 0396298*
                                          cengstrom@nka.com
                                          Adam W. Hansen, CA Bar No. 264241
                                          ahansen@nka.com
                                          4600 IDS Center
                                          80 South 8th Street
                                          Minneapolis, MN 55402
                                          Phone: (612) 256-3200
                                          Fax: (612) 338-4878
                                          *pro hac vice applications forthcoming

                                          ATTORNEYS FOR INDIVIDUAL AND
                                          REPRESENTATIVE PLAINTIFFS

**EXHIBIT A -77-**