KABATECK BROWN KELLNER LLP
Richard L. Kellner, CA Bar No. 171416
rlk@kbklawyers.com
644 South Figueroa Street
Engine Company No. 28 Building
Los Angeles, CA  90017
Telephone: (213) 217-5000
Facsimile: (213) 217-5010

NICHOLS KASTER, PLLP
Adam W. Hansen, CA Bar No. 264241
ahansen@nka.com
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Phone: (612) 256-3200
Fax: (612) 338-4878

Attorneys for Plaintiffs and the Proposed Class
[*Additional Counsel Listed on Signature Page*]

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Aleksandr Urakhchin and Nathan Marfice, individually, as representatives of the class, and on behalf of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan, <br><br> Plaintiffs, <br><br> v. <br><br> Allianz Asset Management of America, L.P., Allianz Asset Management of America, LLC, Committee of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan, John Maney, Allianz Global Investors Fund Management LLC, Pacific Investment Management Company LLC, Allianz Global Investors U.S. LLC, NFJ Investment Group LLC, and John Does 1–30, <br><br> Defendants. | **Case No.** 8:15-cv-01614-JVS-JCG <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND EQUITABLE RELIEF** <br><br> **(1)  Breach of Fiduciary Duties under ERISA (29 U.S.C. § 1104)** <br><br> **(2)  Failure to Monitor Fiduciaries** <br><br> **(3)  Equitable Relief Based on Receipt of Ill-Gotten Proceeds (29 U.S.C. § 1132(a)(3)** |

**NATURE OF THE ACTION**

1.     Plaintiffs Aleksandr Urakhchin and Nathan Marfice ("Plaintiffs"), individually and as representatives of the class described herein, and on behalf of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan ("Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2.     Plaintiffs assert their class claims against two sets of Defendants:

(a)     the Plan's fiduciaries – Allianz Asset Management of America, L.P. ("AAM-LP"), Allianz Asset Management of America, LLC ("AAM-LLC"), the Committee of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan ("Committee"), John Maney ("Maney"), and John Does 1–30 (together, the "Fiduciary Defendants") – who improperly managed Plan assets for the benefit of themselves and their affiliates instead of the Plan and its participants; and

(b)     several participating employers in the Plan – AAM-LP and AAM-LLC (collectively, "AAM"), Allianz Global Investors Fund Management LLC, Pacific Investment Management Company LLC ("PIMCO"), Allianz Global Investors U.S. LLC, and NFJ Investment Group LLC (together, the "Employer Defendants")[1] – who improperly received Plan assets as profits at the expense of the Plan and its participants.

3.     To remedy the breaches of fiduciary duties and unlawful self-dealing as described herein, Plaintiffs seek to recover the financial losses suffered by the Plan and to obtain injunctive and other equitable relief from Defendants, as provided by ERISA.

---

[1] The Employer Defendants and their affiliates are collectively referred to herein as the "Allianz Family".

**PRELIMINARY STATEMENT**

4.     ERISA imposes strict duties of loyalty and prudence upon plan fiduciaries.  29 U.S.C. § 1104(a)(1).  These fiduciary duties are "the highest known to law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quotation omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).

5.     The Fiduciary Defendants do not act in the best interest of the Plan and its participants.  Instead, the Fiduciary Defendants treat the Plan as an opportunity to promote the Allianz Family's mutual fund business and maximize profits at the expense of the Plan and its participants.  The Fiduciary Defendants have loaded the Plan exclusively with mutual funds from the Allianz Family, without investigating whether Plan participants would be better served by investments managed by unaffiliated companies.  The retention of these proprietary mutual funds costs Plan participants millions of dollars in excess fees every year.  For example, in 2013, the Plan's total expenses were 75% higher than the average retirement plan with between $500 million and $1 billion in assets (the Plan had $772 million in assets as of the end of 2013), costing Plan participants over $2.5 million in excess fees in 2013 alone.  Among the 551 defined-contribution plans in the United States with between $500 million and $1 billion in assets as of the end of 2013, the Plan was one of only eight plans that had total plan costs that were 0.74% (of total plan assets) or higher.  The Plan's high costs are attributable entirely to the Fiduciary Defendants' retention of high-cost proprietary mutual funds as investment options within the Plan.

6.     To make matters worse, many of the proprietary funds selected and/or retained by the Plan have little or no track record.  The Fiduciary Defendants have a pattern and practice of including new and unproven mutual funds as investment options within the Plan shortly after the new funds are launched, and even use the Plan's default investment option as a mechanism for providing seed money to these

-2-

funds.  While this may benefit the Allianz Family, helping it to achieve economies of scale for new funds and market those new funds to other investors, it has not been beneficial for the Plan and the Plan's participants.  To the contrary, these new and untested funds have consistently underperformed, yet have continued to be retained in the Plan's investment lineup.

7.     The Fiduciary Defendants' prioritization of Allianz Family profits over prudent management of Plan assets constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.

8.     Based on this conduct, Plaintiffs assert claims against the Fiduciary Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and for failure to monitor fiduciaries (Count Two), and against the Employer Defendants for equitable restitution of ill-gotten proceeds (Count Three).

## JURISDICTION AND VENUE

9.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other unlawful conduct in violation of ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

10.     This case presents a federal question, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

11.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the District where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.  In addition, Plaintiffs also reside in this District.

## THE PARTIES

### Plaintiffs

12.    Plaintiff Aleksandr Urakhchin has participated in the Plan since 2011, and is a current participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3).  Plaintiff Urakhchin resides in Newport Beach, California.

13.    Plaintiff Nathan Marfice has participated in the Plan since before 2009, and is a current participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3).  Plaintiff Marfice resides in Orange, California.

### The Plan

14.    The Plan was established on January 1, 2003 via the merger of certain predecessor plans (the PIMCO Savings Plan, the PIMCO Retirement Plan, the NACM 401(k) Plan and the NACM Pension Plan).  Prior to 2011, the Plan was known as the "Allianz Global Investors of America L.P. 401(k) Savings and Retirement Plan."

15.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

16.    The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to as a "401(k) plan."

17.    The Plan has been amended and restated multiple times since it was established, most recently on October 29, 2012.  The most recent restatement of the Plan was executed by AAM-LLC.

18.    The Plan covers eligible employees and former employees of AAM and its various subsidiaries including Defendants Allianz Global Investors Fund Management LLC, PIMCO, Allianz Global Investors U.S. LLC, and NFJ Investment Group LLC, all of whom are participating employers in the Plan.  *See* Plan Document § 1.28, attached as **Exhibit A**.

**Defendants**

19.     Defendant AAM-LP is the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B).   AAM-LP is headquartered in Newport Beach, California.   AAM-LP is a fiduciary of the Plan pursuant to the actions of its directors and employees serving on the Defendant Committee.   As the employer of members of the Committee, AAM-LP exercises authority and control over the Committee through its ability to terminate the employment of Committee members, which under the terms of the Plan terminates Committee membership.   Ex. A § 10.01(b).   In addition, AAM-LP is a fiduciary of the Plan by virtue of the actions of its general partner, AAM-LLC.

20.     Defendant AAM-LLC is the sole general partner of AAM-LP.   The October 29, 2012 Plan Restatement was executed by Defendant John Maney, signing on behalf of the "General Partner."   The Plan document gives AAM-LLC authority to appoint the Plan trustee and recordkeeper and appoint an investment manager, if it so chooses.   Ex. A § 10.01(b).   AAM-LLC also has authority to amend the Plan.   *Id.* § 11.01(a).   AAM-LLC is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21) because it exercised discretionary authority or control respecting management of the Plan and exercised authority or control respecting management or disposition of the Plan's assets.   In addition, AAM-LLC appointed the trustee, recordkeeper, and members of the Committee, and possessed the authority to remove and appoint Committee members.[2]

21.     The Defendant Committee was created pursuant to Section 10.01(a) of the Plan Document, which provides that "The General Partner shall appoint a Committee to administer the Plan.   The Committee may consist of directors, officers, [e]mployees, or any other individuals."

22.     The Committee and its members are designated in Section 8.1 of the

---

[2] Members of the Committee serve "at the pleasure of the General Partner."   Ex. A § 10.01(a).

Plan Document as the "administrator" of the Plan under 29 U.S.C. § 1002(16)(A). The Committee has "full discretionary authority and responsibility for the administration of the Plan." Ex. A § 10.03. This includes (among other things) the authority to make investment decisions. *Id.* §§ 1.11, 10.03(h).

23.     The Committee and its members are also designated as Plan fiduciaries in Section 10.06 of the Plan document, and are fiduciaries of the Plan under 29 U.S.C. § 1102(a). In addition, the Committee and its members are fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and/or discretionary control respecting the management of the Plan, administration of the Plan, and management and disposition of Plan assets. The current and previous members of the Committee are currently unknown to Plaintiffs, and those individuals are therefore collectively named as John Does 1–20.

24.     Defendant Maney is the Chief Operating Officer and Managing Director of AAM. He is the sole member of the management boards of both AAM-LP and AAM-LLC. Maney is also the CEO of Defendant Allianz Global Investors Fund Management LLC and the Managing Director of Defendant Allianz Global Investors U.S. LLC. Maney signed the Plan Document in his capacity as Managing Director and Chief Operating Officer of AAM. By virtue of his management and Board positions at AAM-LP and AAM-LLC, Maney has authority to appoint a recordkeeper and trustee, amend the Plan Document, and appoint and remove members of the Committee. This gives Maney discretionary authority and control over the administration and management of the Plan as well as discretionary control and authority regarding the management and disposition of Plan assets. Accordingly, Maney is a Plan fiduciary under 29 U.S.C. § 1002(21)(A).

25.     Any individual or entity to whom the Fiduciary Defendants delegated any fiduciary functions or responsibilities is also a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A). Because the individuals and/or entities that have been delegated fiduciary responsibilities by the Fiduciary Defendants are not currently

known to Plaintiffs, they are collectively named as John Does 21–30.

26.     Each of the Fiduciary Defendants are also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because they enabled other fiduciaries to commit breaches of fiduciary duties through their appointment powers, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of their duties, and failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

27.     Defendant Allianz Global Investors Fund Management LLC is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment advisor for 24 of the investment options offered within the Plan.

28.     Defendant PIMCO is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment advisor for 23 of the investment options offered within the Plan.

29.     Defendant Allianz Global Investors U.S. LLC is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment sub-advisor for 20 of the Plan's investment options.

30.     Defendant NFJ Investment Group LLC is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment sub-advisor for 4 of the Plan's investment options.

## ERISA FIDUCIARY DUTIES

31.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Fiduciary Defendants as fiduciaries of the Plan.  29 U.S.C. § 1104(a)(1) states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

    (A)   For the exclusive purpose of

        (i)   Providing benefits to participants and their beneficiaries; and

-7-

(ii)    Defraying reasonable expenses of administering the plan;

(B)    With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

32.    These ERISA fiduciary duties "are the highest known to the law.'" *Howard*, 100 F.3d at 1488; *accord Johnson v. Couturier*, 572 F.3d 1067, 1077 (9th Cir. 2009) ("[O]ur holding merely comports with congressional intent in establishing ERISA fiduciary duties as 'the highest known to the law.'") (quoting *Howard*).

### DUTY OF LOYALTY

33.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons."  *Id.* at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . .  A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan."  Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988) (emphasis added).

### DUTY OF PRUDENCE

34.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets."  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  This duty includes, but is not limited to, a duty to select prudent investments.  Under ERISA,

a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Therefore, "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically . . . create[d] a prudent portfolio." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (cited with approval in *Tibble v. Edison Int'l*, 729 F.3d 1110, 1122 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015)).

35. Failing to closely monitor and subsequently minimize administrative expenses wherever possible by surveying the competitive landscape and leveraging the plan's size to reduce fees constitutes a breach of fiduciary duty. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Similarly, selecting higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009); *Tibble v. Edison Int'l*, 729 F.3d at 1137–39.

## SOURCE AND CONSTRUCTION OF DUTIES

36. The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

37. Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment

-9-

responsibilities of the trusteeship."   Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function.").   The Introductory Note to the Restatement's chapter on the investment of trust assets further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule.  This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets.  In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles.  In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007).   Where markets are efficient, fiduciaries are encouraged to use low-cost index funds.  *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . .  [T]hese added costs . . . must be justified by realistically evaluated return expectations."  *Id.* § 90 cmt. h(2).

38.     In considering whether a fiduciary has breached the duties of prudence and loyalty, the Court considers both the "merits of the transaction" as well as "the thoroughness of the investigation into the merits of the transaction."  *Howard*, 100 F.3d at 1488 (quotation and citation marks omitted).  Mere "subjective good faith" in executing these duties is not a defense; "a pure heart and an empty head are not enough."  *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

## Co-Fiduciary Liability

39.    ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. § 1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

40.    The Plan is a defined-contribution or 401(k) plan, a type of employee retirement plan in which employees invest a percentage of their earnings on a pre-tax basis.  The Employer Defendants often match those contributions up to a certain percentage of the compensation contributed by the employee each pay period.  Within the Plan, employees may defer anywhere from 1% to 100% of their compensation on a pre-tax basis (subject to certain limits), and the Employer Defendants have the discretion to make matching contributions on top of the amounts that an employee contributes.  2015 AAM Summary Plan Description ("SPD") at 4, 6–7, attached as **Exhibit B**.  Participants direct the investment of these contributions, choosing from among a lineup of options offered by the Plan.  Investment Company Institute, *A Close Look at 401(k) Plans*, at 9, available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "ICI Study").

-11-

41.     Fiduciaries are obligated to assemble a diversified menu of investment options.   29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii).   Each investment option is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class.  ICI Study at 7; Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").  The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate.   Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments.  Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the credit risk associated with the particular borrower.  Equity, or stock, investments, are generally defined by three characteristics: (1) where they invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of company they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e. growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks, and blend funds invest in a mix of both types of stocks).  Balanced funds are a type of fund that invests in a mix of stocks and bonds.   Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.  Target-date funds are typically invested in a portfolio of other mutual funds.

42.     Investment funds can be either passively or actively managed.  Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities

-12-

matching the composition of the index itself.  James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013).  By following this strategy, index funds produce returns that are very close to the market segment tracked by the index.  *Id.*  Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses.  *Id.*  Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection.  *Id.* at 485–86.  Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential is typically not realized).  U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), available at http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

43.    In addition to a core menu of designated investment alternatives, many plans (including the Plan at issue here) also provide employees the option of opening a self-directed brokerage account ("SDBA"), giving them access to a broad array of stocks, bonds, and mutual funds.  Ayres & Curtis, *Beyond Diversification* at 1524; Ex. A § 5.02(c).  However, SDBAs have significant drawbacks.  Participants that choose to utilize an SDBA are typically assessed a fee for each trade.  *See* Ex. B at 12 (stating that "there could be trading fees" for Plan participants who use the SDBA option).  These fees often make an SDBA a much more expensive option compared to investing in the designated investment alternatives available within the Plan.[3]  Costs are also higher because employees

_____

[3] A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants . . . may direct the investment of assets held in, or contributed to, their individual accounts."  29 C.F.R. § 2550.404a-5(h)(4).  This definition excludes assets held in a self-directed brokerage accounts.  *Id.*  Therefore, fiduciaries are under no obligation to disclose performance, benchmark, or fee information regarding the investments available within an SDBA.  *Id.* § 2550.404a-5(d).

-13-

investing in mutual funds within an SDBA must invest in retail mutual funds, rather than the lower-cost institutional shares typically available as core investment options within the plan that are only available because of the retirement plan's ability to leverage the negotiating power of the plan's assets.  DOL Field Assistance Bulletin 2012-02R, July 30, 2012, available at http://www.dol.gov/ebsa/regs/fab2012-2R.html; Christopher Carosa, CTFA, *Is the Fiduciary Liability of Self-Directed Brokerage Options Too Great for 401k Plan Sponsors?*, Fiduciary News (June 11, 2013), available at http://fiduciarynews.com/2013/06/is-the-fiduciary-liability-of-self-directed-brokerage-options-too-great-for-401k-plan-sponsors/ (last accessed Sept. 24, 2015). Furthermore, SDBA investors often invest in imprudent investments, because there is no fiduciary selecting or monitoring the investments within an SDBA.  29 C.F.R. § 2550.404a-5(f); *see* Ex. B at 12 ("Although the [SDBA] is available under the Plan, neither the Plan Administrator nor the Company have reviewed nor recommended any specific investment available through the [SDBA].")

44.    The existence of an SDBA option does not excuse plan fiduciaries from selecting a prudent and appropriate set of core investment options.  For the reasons described above, "the performance is generally lower with self-directed accounts compared to managed portfolios.  This translates into low real rates of return and higher retirement failure rates."  Marijoyce Ryan, CPP, *Money Management: The Downside of Self-Directed Brokerage Accounts*, The Daily Record (June 26, 2012), available at http://nydailyrecord.com/blog/2012/06/26/money-management-the-downside-of-self-directed-brokerage-accounts/ (last accessed Sept. 24, 2015); Dr. Gregory Kasten, *Self-Directed Brokerage Accounts Reduce Success* (2004), at 1, 13–14, available at http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf (discussing results of a study showing that self-directed brokerage accounts lagged the performance of a model portfolio of the plans's designated investment options by

-14-

1 │ an average of 4.70% per year).

2 │      45.    In addition to their high costs and poor investment outcomes, SDBAs

3 │ are quite difficult to set up, requiring Plan participants to complete additional

4 │ paperwork while also requiring a greater investment of time to choose among the

5 │ hundreds or thousands of investment options.   Due to their high costs and

6 │ administrative complexity, SDBAs are seldom used; only 2% of retirement plan

7 │ assets are held in SDBAs.   Investment Company Institute & Deloitte Consulting

8 │ LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 15

9 │ (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf

10 │ (hereinafter "ICI/Deloitte Study").   And while usage of the SDBA is higher within

11 │ the Plan, only 13% of the Plan's assets are held in SDBAs.

12 │ **MINIMIZATION OF PLAN EXPENSES**

13 │      46.    At retirement, employees' benefits "are limited to the value of their

14 │ own investment accounts, which is determined by the market performance of

15 │ employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

16 │ Maximizing employees' retirement benefits is therefore heavily influenced by two

17 │ critical, interrelated functions of plan fiduciaries: designing the menu of investment

18 │ options and minimizing plan expenses.

19 │      47.    There are two major categories of expenses within a defined

20 │ contribution plan: administrative expenses and investment management expenses.

21 │ ICI/Deloitte Study at 17.   Investment management expenses are the fees that are

22 │ charged by the investment manager, and participants "typically pay these asset-

23 │ based fees as an expense of the investment options in which they invest." *Id.*   On

24 │ average, 82% of overall fees within a plan are investment expenses, while

25 │ administrative fees on average make up only 18% of total fees. *Id.*

26 │      48.    Administrative expenses (e.g., recordkeeping, trustee and custodial

27 │ services, accounting) can be paid directly by employers, directly by the plan, or

28 │ indirectly as a built-in component of the fees charged for the investment products

offered in the plan in a practice known as "revenue sharing." Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. These "revenue sharing" payments from investment managers to plan service providers typically happen on a quarterly basis based upon an agreed-upon contribution formula.

49. The Plan uses a combination of these methods—a portion of recordkeeping and trustee expenses are paid directly to the service providers, and a portion of these expenses are paid out of the investment expenses charged by the mutual funds within the Plan.

50. Fiduciaries exercising control over administration of a plan and the selection of core investment options can minimize plan expenses by hiring low-cost service providers and by selecting a menu of low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale generally lower administrative expenses on a per-participant or percentage-of-assets basis. ICI/Deloitte Study at 7, 21. Larger plans also can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors. *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), available at http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds"). Empirical evidence bears this out. In 2012, total plan fees in the average defined contribution plan were 0.91%, but this varied between an average of 1.27% in plans with $1 million to $10 million in

assets, and an average of only 0.44% for plans with between $500 million and $1 billion in assets.  ICI Study at 41.

51.    Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment expenses should be determined by comparisons to other similarly-sized plans.  *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such mattes would use in the conduct of an *enterprise of a like character*") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, *6 n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

**SELECTION OF APPROPRIATE INVESTMENT OPTIONS FOR INCLUSION IN THE PLAN**

52.    With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan.  The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments.

53.    Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among

-17-

the available funds.  Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Constribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001).  Defendants are aware of this tendency among plan participants.  On multiple occasions, Stacy Schaus, head of the Defined Contribution practice at PIMCO, has advocated designing defined-contribution menus in light of the naive-diversification heuristic.  Stacy Schaus, Head of Defined Contribution Practice at PIMCO, *Designing Outcome-Focused Defined Contribution Plans: Building Sustainable Income for Retirees*, November 2012, https://www.pimco.com/insights/investment-strategies/featured-solutions/designing-outcomefocused-defined-contribution-plans-building-sustainable-income-for-retirees (advocating for core investment lineups whereby "even naive diversification . . . would result in a reasonable, risk-managed allocation"); Stacy Schaus & Ying Gao, *Designing Balanced DC Menus: Considering Diversified Fixed Income Choices*, April 2014, https://www.pimco.com/insights/investment-strategies/featured-solutions/dc-design/designing-balanced-dc-menus-considering-diversified-fixed-income-choices (concluding that defined-contribution plan investment menu should be designed such that "[i]n the event that participants evenly divide their assets across the investment menu (i.e. 1/n), the result should provide a reasonably balanced portfolio").

54.   Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should.  John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73

-18-

percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years).

55.    For all of these reasons, prudent fiduciaries will limit their menus to only those funds that represent sound long-term investments, and remove imprudent investments rather than trusting participants to move their money out of an imprudent investment.

56.    The second critical insight provided by academic and financial industry literature is that in selecting prudent investments, the most important consideration is low fees.    Numerous scholars have demonstrated that high expenses are not correlated with superior investment management.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a *pre-fee basis*.    Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009); *see also* Fisch & Wilkinson-Ryan, *Costly Mistakes*, at 1993 (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios.  On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

57.    Defendants have publicly acknowledged the importance of maintaining low fees.  As Stacy Schaus, head of the Defined Contribution practice

at PIMCO, has written, "a reduction in [annual] fees from 100 bps[4] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income."   Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors* (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (emphasis added).

58.   While high-cost mutual funds may exhibit positive, market-beating performance over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future.   Laurent Barras *et al.*, *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring 31 years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns").   Any sustainable ability to beat the market that managers do demonstrate is nearly always dwarfed by mutual fund expenses.   Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000).   The one exception to the general arbitrariness and unpredictability of mutual fund returns is that the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance.   Carhart, *On Persistence in*

---

[4] The term "bps" is an abbreviation of the phrase "basis points."   One basis point is equal to .01%, or 1/100th of a percent.   Thus a fee level of 100 basis points translates into fees of 1% of the amount invested.   *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last visited Sept. 25, 2015).

*Mutual Fund Performance*, at 57.  Therefore, regardless of where one comes down on the issue of active versus passive investing, a prudent investor should choose only index funds and low-cost actively managed funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses.  *See* Restatement (Third) of Trusts § 90 cmt. h(2).

## DEFENDANTS' VIOLATIONS OF ERISA

**I.      IMPROPER SELECTION AND RETENTION OF HIGH-COST INVESTMENTS FROM WITHIN THE ALLIANZ FAMILY**

59.    Throughout the statutory period, the only "core" investment options offered within the Plan have been investments managed by either PIMCO or Allianz Global Investors, both of which are subsidiaries of AAM.

60.    In 2009, Plan participants were offered 43 proprietary mutual funds and an SDBA.  The "core" mutual fund options included 11 target-date mutual funds, 3 balanced funds, 12 domestic equity funds, 7 global/international equity funds, 3 domestic bond funds, 3 international bond funds, 1 money market fund, and 3 specialty funds (a technology, commodities, and real estate fund).  A list of investment options available as of the end of 2009, taken from the account statement of Plaintiff Marfice, is attached as **Exhibit C**.

61.    According to AAM's Form 5500, as of the end of 2009, the Plan had approximately $420 million in assets, consisting of $377 million in AAM's proprietary mutual funds, $40 million in SDBAs, and $3 million in loans to participants.

62.    As of the end of 2010, the Plan's assets had increased to approximately $511 million.

63.    In 2013, Plan participants were offered 45 proprietary mutual funds, 2 proprietary collective trust funds, and an SDBA option.  The "core" investment

options consisted of 12 target-date funds, 6 balanced funds, 12 domestic equity funds, 5 global/international equity funds, 6 domestic bond funds, 2 international bond funds, and 4 specialty funds (a technology, currency, commodities, and real estate fund).

64.     By the end of 2013, the Plan's assets had increased to approximately $772 million, consisting of $628 million in proprietary mutual funds, $44 million in proprietary collective trust funds, $93 million in SDBAs, and $7 million in Plan participant loans.

65.     Taking into account all administrative and investment expenses within the Plan, and using 2013 year-end balances (as reported on Form 5500 for 2013) and publicly available information regarding each investment's expenses, Plaintiffs estimate that total plan costs for 2013 were approximately $5,950,000, equal to 0.77% of the $772 million in Plan assets.

66.     This total plan cost of 0.77% is outrageously high for a defined-contribution plan with over $500 million in assets.  In 2013, the average total plan cost for plans with between $500 million and $1 billion in assets was 0.44%.  ICI Study at 41.  Ninety percent of plans with between $500 million and $1 billion in assets had total plan costs of less than 0.63% in 2013.  ICI Study at 42.  Indeed, among the **551** defined-contribution plans with between $500 million and $1 billion in assets as of the end of 2013, **only 8 plans** had total plan costs that were 0.74% or above, one of which was the Plan.

67.     Had the Plan limited its expenses to the average total cost of 0.44% for similarly-sized plans, Plan participants would have been saved approximately $2.55 million in fees in 2013 alone.

68.     These grossly excessive costs are attributable to the Fiduciary Defendants' retention of high-cost, proprietary mutual funds from within the Allianz Family.

69.     In 2012 (the most recent year this data is available), in plans with

-22-

between $500 million and $1 billion in assets, the average expense ratio for domestic equity funds was 0.53%; for international equity funds it was 0.70%; for target-date funds it was 0.47%; for balanced funds it was 0.45%; for domestic bond funds it was 0.38%; for international bond funds it was 0.74%; for index funds it was 0.11%; and for other, miscellaneous funds the average was 0.78%. ICI Study at 45.

70.    The expenses for funds within the Plan are much higher. In 2013, the domestic equity funds in the Plan had expense ratios between 0.61% and 2.00%. The Plan did include one international fund with a below-average expense ratio of 0.61%, but the other three funds for which publicly-disclosed data is available had expense ratios between 1.21 and 1.42 percent. The target-date funds had expense ratios of between 0.57 and 0.70 percent, well above the 0.47% average. The balanced funds in the Plan had 2013 expense ratios of between 0.67% and 1.85%, 50 to 300 percent above the category average. The domestic bond funds averaged between 0.26% and 0.75%, although every fund but one had expenses above the category average of 0.38%. The only international bond fund with a publicly disclosed expense ratio cost 0.83% in 2013. The three index funds within the Plan had expense ratios of between 0.50 and 0.74 percent. And the specialty funds had expense ratios between 0.85 and 1.22 percent.

71.    Overall, 43 of the 45 proprietary mutual funds within the Plan in 2013 had expenses that were above the average for plans with between $500 million and $1 billion in assets, and many of those funds had expenses that were 2 to 3 times higher than the average for similarly-sized plans.

72.    The above comparisons actually understate the excessiveness of the investment management fees paid by the Plan's participants. As an example, the fees in the Plan were many times higher than the fees in comparable institutional mutual funds that were frequently used by other plans. As shown by the chart below, the fees for specific funds within the Plan as of the end of 2014 were up to

-23-

*24 times more expensive* than alternatives in the same investment style:

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| AllianzGI Global Allocation I (PALLX) | 85 bps | American Funds Capital Income Builder R6 (RIRGX) | 30 bps | World Allocation | 183% |
| Allianz GI Ret 2015 R6 (AZGIX) | 57 bps | Vanguard Trgt Retire 2015 Inv (VTXVX) | 16 bps | Target Date 2011–2015 | 256% |
| Allianz GI Ret 2020 R6 (AGNIX) | 59 bps | Vanguard Trgt Retire 2020 Inv (VTWNX) | 16 bps | Target Date 2016–2020 | 269% |
| Allianz GI Ret 2030 R6 (ABLIX) | 63 bps | Vanguard Trgt Retire 2030 Inv (VTHRX) | 17 bps | Target Date 2026–2030 | 271% |
| Allianz GI Ret 2040 R6 (AVTIX) | 69 bps | Vanguard Trgt Retire 2040 Inv (VFORX) | 18 bps | Target Date 2036–2040 | 283% |
| Allianz GI Ret 2050 R6 (ASNIX) | 70 bps | Vanguard Trgt Retire 2050 Inv (VFIFX) | 18 bps | Target Date 2046–2050 | 289% |
| Allianz GI Ret Income R6 (AVRIX) | 55 bps | Vanguard Trgt Retire Income Inv  (VTINX) | 16 bps | Retirement Income | 244% |
| Allianz GI Focus Grth Instl (PGFIX) | 76 bps | Vanguard Growth Index I (VIGIX) | 8 bps | Large Growth | 850% |

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Allianz GI Income & Growth Inst (AZNIX) | 97 bps | Vanguard Institutional Index I (VINIX) | 4 bps | Large Blend | 2325% |
| Allianz GI Int'l MGD Volty Instl (NAISX) | 61 bps | Vanguard Total Int'l Stock Mkt Idx I (VTSNX) | 12 bps | Foreign Large Blend | 408% |
| Allianz GI U.S. Mgd Volatility Inst (NGFIX) | 61 bps | Vanguard Institutional Index I (VINIX) | 4 bps | Large Blend | 1425% |
| Allianz GI Mid-Cap Instl (DRMCX) | 78 bps | Vanguard Mid Cap Index Instl (VMCIX) | 8 bps | Mid Cap Blend | 875% |
| Allianz GI NFJ Midcap Value Instl (DRMCX) | 91 bps | Vanguard Mid-Cap Value Index Adm (VMVAX) | 9 bps | Mid Cap Value | 911% |
| Allianz GI NFJ Small Cap Val I (PSVIX) | 77 bps | Vanguard Small Cap Value Index I (VSIIX) | 8 bps | Small Cap Value | 863% |
| Allianz GI Global Small-Cap Instl (DGSCX) | 126 bps | American Funds SMALLCAP World R6 (RLLGX) | 71 bps | Global Small Cap | 77% |
| Allianz GI Technology Instl (DRGTX) | 126 bps | Vanguard Info Tech Index Adm (VITAX) | 10 bps | Technology | 1160% |
| Allianz GI Ultra Micro Cap Instl (AUMIX) | 200 bps | DFA US Micro Cap I (DFSCX) | 52 bps | Micro Cap | 285% |

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Allianz GI US Emrg Grth I (aka Sm Cap Grwth) (AEMIX) | 116 bps | Vanguard Small Cap Growth Idx I (VSGIX) | 8 bps | Small Cap Growth | 1350% |
| Allianz GI Emerg Mkt Opps Instl (AOTIX) | 96 bps | Vanguard Emerging Mkts Stk Idx I | 12 bps | Emerging Market Equities | 800% |
| Allianz GI Int'l Sml Cap Instl (ALOIX) | 121 bps | Oppenheimer Int'l Small-Mid Co I (OSCIX) | 76 bps | Foreign Small/Mid Growth | 59% |
| Allianz GI Micro Cap Instl (AMCIX) | 154 bps | DFA US Micro Cap I (DFSCX) | 52 bps | Micro Cap | 196% |
| PIMCO All Asset All Auth Instl (PAUIX) | 178 bps | BlackRock Multi-Asset Income Instl (BIICX) | 59 bps | Technology | 202% |
| PIMCO All Asset Instl (PAAIX) | 88 bps | BlackRock Multi-Asset Income Instl (BIICX) | 59 bps | Industrials | 49% |
| PIMCO Commodity Real Ret Instl (PCRIX) | 74 bps | DFA Commodity Strategy Instl (DCMSX) | 33 bps | Commodities | 124% |
| PIMCO Emrg Mkts Currency Instl (PLMIX) | 85 bps | Lord Abbett Emerg Mkts Currency R6 (LDMVX) | 75 bps | Emerging Markets Currency | 13% |

-26-

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| PIMCO Diversified Inc Instl (PDIIX) | 75 bps | Vanguard Total Bond Market Index I (VBTIX) | 6 bps | Diversified Bond | 1150 % |
| PIMCO Emerg Mkt Bond Instl (PEBIX) | 83 bps | Vang Emerg Mkts Govt Bd Idx Instl (VGIVX) | 30 bps | World Stock | 177% |
| PIMCO Global Multi Asset Instl (PGAIX) | 97 bps | American Funds Global Balanced R6 (RGBGX) | 54 bps | World Allocation | 80% |
| PIMCO High Yield Fund Instl (PHIYX) | 55 bps | Vanguard High Yield Corporate Adm (VWEAX) | 13 bps | High Yield Bond | 323% |
| PIMCO Income Instl (PIMIX) | 45 bps | Vanguard Total Bond Market Index I (VBTIX) | 6 bps | Diversified Bond | 650% |
| PIMCO Infl Respons Multi Asset (PIRMX) | 77 bps | Vanguard Inflation-Protected Secs I (VIPIX) | 7 bps | World Stock | 1000 % |
| PIMCO Real Estate Ret Strat I (PRRSX) | 74 bps | DFA Real Estate Securities I (DFREX) | 18 bps | Real Estate | 311% |
| PIMCO Real Return Fund-Instl (PRRIX) | 45 bps | Vanguard Inflation-Protected Securities I (VIPIX) | 7 bps | High-Yield Bond | 543% |

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| PIMCO RealPath Income I (PRIEX) | 58 bps | Vanguard Trgt Retire Income Inv (VTINX) | 16 bps | Retirement Income | 263% |
| PIMCO RealPath 2020 Inst (PRWIX) | 61 bps | Vanguard Trgt Retire 2020 Inv (VTWNX) | 16 bps | Target Date 2016–2020 | 281% |
| PIMCO RealPath 2030 Instl (PRLIX) | 67 bps | Vanguard Trgt Retire 2030 Inv (VTHRX) | 17 bps | Target Date 2026–2030 | 294% |
| PIMCO RealRetirement 2040 Inst (PROIX) | 69 bps | Vanguard Trgt Retire 2040 Inv (VFORX) | 18 bps | Target Date 2036–2040 | 283% |
| PIMCO RealRetirement 2050 Inst (PRMIX) | 71 bps | Vanguard Trgt Retire 2050 Inv (VFIFX) | 18 bps | Target Date 2046–2050 | 294% |
| PIMCO Short Asset Investment Instl (PAIDX) | 24 bps | DFA One-Year Fixed Income I (DFIHX) | 17 bps | Ultrashort-Term Bond | 41% |
| PIMCO Stocks Plus Fund Instl (PSTKX) | 50 bps | Vanguard Institutional Index I (VINIX) | 4 bps | Large Blend | 1150% |
| PIMCO Total Return Fund Instl (PTTRX) | 46 bps | Vanguard Total Bond Market Index I (VBTIX) | 6 bps | Intermediate-Term Bond | 667% |

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| AllianzGI NFJ International Value CIT | 80 bps | Vanguard International Value Inv (VTRIX) | 44 bps | Foreign Large Value | 82% |
| Allianz NFJ Dividend Value CIT | 55 bps | Vanguard Value Index I (VIVIX) | 8 bps | Large Value | 588% |
| PIMCO Global Advantage Strategy CIT | 55 bps | Vanguard Total Int'l Bond Index I | 12 bps | World Bond | 358% |

73.     Despite the high cost of the proprietary investments within the Plan, the Fiduciary Defendants failed to consider, let alone investigate, the prudence of other investments (i.e., mutual funds or other investment products outside the Allianz Family).   This failure to engage in a prudent investment selection and monitoring process and the subsequent failure to remove these imprudent investments constitutes a breach of the fiduciary duties of loyalty and prudence under ERISA.

74.     Had the Fiduciary Defendants prudently monitored the investments within the Plan to ensure that the Plan's designated investment options were not charging excessive fees, in a process that was not tainted by self-interest, the Fiduciary Defendants would have removed the Plan's investments in favor of investments such as the non-Allianz funds listed above that offered similar or superior performance at significantly less expense.   As a result of these breaches of the duties of loyalty and prudence, Plan participants have paid millions of dollars in excess fees every year.

## II.   IMPROPER USE OF PLAN ASSETS TO SEED NEW AND UNTESTED MUTUAL FUNDS

75.   The Fiduciary Defendants' imprudence in selecting and retaining unreasonably expensive funds is not the result of mere negligence.  Rather, the Fiduciary Defendants intentionally exposed Plan participants to unreasonably high fees because doing so significantly benefited the Allianz Family.

76.   This is perhaps best illustrated by the Fiduciary Defendants' improper use of the Plan to promote new and untested mutual funds for the purpose of furthering the Allianz Family's mutual fund business.

77.   By way of background, mutual funds that have failed to attract assets (often due to underperformance) are often closed.  A Vanguard study showed that a whopping 46 percent of the 5,108 funds that existed at the beginning of 1997 were either liquidated or merged with another fund by the end of 2011.  Todd Schlanger & Christopher B. Philips, *The Mutual Fund Graveyard: An Analysis of Dead Funds*, Vanguard Funds, at 3 (January 2013), https://personal.vanguard.com/pdf/s362.pdf.  Liquidations are frequently the result of a prolonged period of underperformance that (1) will make it difficult for the fund to attract new assets in the foreseeable future and (2) drags down the firm's historical return data.  *Id.* at 1, 4, 6; Larry Swedroe, *How the Mutual Fund Graveyard Can Hurt Investors*, CBS Marketwatch (May 8, 2014), http://www.cbsnews.com/news/its-getting-crowded-in-the-mutual-fund-graveyard/ (last accessed Sept. 29, 2015).

78.   Defendants are certainly familiar with this phenomenon.  As of the end of June 2009, Allianz Global Investors managed 40 mutual funds that offered institutional shares.  Eighteen of those 40 funds had been either liquidated or merged with another fund by August 2015.

79.   Given the frequency with which funds are removed from a family's lineup, mutual fund families must frequently introduce new mutual funds to replace

the funds that invariably will need to be closed or merged into another fund. New funds also play a critical role in responding to a constantly-evolving investment marketplace.

80.    Defendants are familiar with the need to create new funds. Allianz Global Investors has launched 28 new mutual funds since the beginning of 2008, while PIMCO has launched 57 new mutual funds during that time.

81.    Introducing new mutual funds imposes a large burden on a mutual fund company. There are significant start-up costs. Additionally, many of the expenses of running a mutual fund such as staff, marketing, and research are fixed overhead, and therefore account for a large percentage of a mutual fund's assets when the fund is new and still small. Therefore, new mutual funds typically operate at a loss (to the fund company) until they have attracted sufficient assets to achieve adequate economies of scale.

82.    This presents three powerful incentives to attract assets to a newer fund. First, additional assets help lower the fund's expenses as a percentage of total assets, allowing the fund to lower its expenses and thereby attract new investors. Second, when a new fund attracts sufficient new assets, the mutual fund company no longer has to operate the fund at a loss. Finally, mutual funds require assets to manage.    Therefore attracting investors early in a fund's life is a difficult but critical task to the survival of the fund. Empirically, new funds that fail to attract sufficient assets are often closed.    Schlanger & Phillips, *The Mutual Fund Graveyard*, at 4, 4 n.5, 7.

83.    Prudent investors, however, are typically wary of investing in new funds. New funds are generally imprudent selections for a retirement plan for two reasons. *First*, there is no track record of success that might justify inclusion within the plan. *Second*, new funds are typically quite expensive.

### INCLUSION OF UNTESTED FUNDS WITHIN THE PLAN

84.    The Fiduciary Defendants have improperly used the Plan as a vehicle

for providing seed money to the Allianz Family's newest mutual funds, and have a pattern of adding mutual funds to the Plan shortly after they are launched, despite the lack of a sufficient track record to determine whether the fund is a prudent investment.

85.     For example, in March 2008, PIMCO launched a series of target-date funds, the RealRetirement Funds.  Despite their lack of track record, high expenses, and a marketplace replete with competitive target-fund offerings from companies such as Vanguard, T. Rowe Price, and JPMorgan, the Fiduciary Defendants added five PIMCO RealRetirement Funds to the Plan less than a year after they were launched.

86.     Similarly, Allianz Global Investors launched its own series of target-date funds at the end of 2008 called the AllianzGI Retirement Funds, which were immediately added to the Plan in early 2009 despite their lack of track record, high expenses, and the existence of numerous competitive alternatives from other mutual fund families.

87.     In addition to the target-date funds, since 2009, the Plan has added at least four new mutual funds to the Plan that were in existence for less than two years.  In each case, the Fiduciary Defendants placed the Allianz Family's business objectives and profitability before the interests of Plan participants by adding an imprudent and unproven fund to the Plan and by subsequently failing to remove each imprudent, unproven investment from the Plan.

88.     The addition of these funds may have been beneficial for the Allianz Family's bottom line, but it has harmed Plan participants.   The five PIMCO RealRetirement target-date funds (now called RealPath Funds) added to the Plan in 2009 have performed poorly.  *See* **Exhibit D** (Morningstar investment detail reports for the PIMCO RealPath funds as of August 31, 2015).  All five of the RealPath funds have underperformed their benchmark index by at least 2 percent per year over the past five years, with four of the five producing returns that have

-32-

underperformed their index by more than 5 percent per year.

89.     The six Allianz Global Investors target-path funds have produced similarly poor results.  All five funds have underperformed their benchmark index over the past five years by at least 1.5 percent per year, and four of the five funds have underperformed their benchmark index by at least 3 percent per year over the past five years.  *See* **Exhibit E** (Morningstar investment detail reports for the AllianzGI Retirement funds as of August 31, 2015).

90.     Several other new and untested mutual funds added to the Plan have also performed poorly.  The AllianzGI Disciplined Equity Fund, the PIMCO EqS Pathfinder Fund, and the PIMCO Global Multi-Asset Fund were each added to the Plan shortly after the fund was launched.  In each case, the fund has significantly underperformed its peers.  In fact, the Disciplined Equity and EqS Pathfinder funds no longer exist.

91.     The Fiduciary Defendants' pattern of adding new and untested mutual funds to the Plan to support the Allianz Family's business operations and the Fiduciary Defendants' failure to remove those funds at the earliest possible opportunity constitute breaches of the fiduciary duties of loyalty and prudence.

## USE OF THE "DEFAULT" INVESTMENT OPTION TO FUNNEL PLAN ASSETS INTO UNTESTED FUNDS

92.     In addition to including new and unproven funds in the Plan, the Fiduciary Defendants also have exposed participants to these imprudent new funds through the Plan's default investment fund.

93.     By way of background, new employees become eligible to participate in the Plan the month after they commence employment. Ex. A § 2.01(a).  Newly-enrolled employees are then automatically deemed to have elected a contribution level of 4% of compensation unless they affirmatively opt out.  *Id.* § 3.01(a).  If the employee does not opt out of this default contribution, the contribution level

increases by 2% each year until 10% of compensation is being contributed to the Plan. *Id.* § 3.01(b).

94.    Employees who fail to make an investment election automatically have their monies invested in the default investment fund, which is selected by the Committee.    Ex. A § 5.02(f).   Amounts contributed under the Plan's automatic enrollment provision are invested in the Plan's default investment fund unless a different election is made.  SPD, Ex. B at 4.

95.    The Committee has selected the AllianzGI Global Allocation Fund (the "Global Allocation Fund") as the Plan's default investment fund.   Plaintiff Urakhchin invested in the default Global Allocation Fund when he began working for PIMCO in 2011 and was automatically enrolled in the Plan, and on information and belief, the Global Allocation Fund continues to act as the Plan's default investment fund.

96.    As a result of the automatic enrollment provision and default investment provisions, a significant amount of Plan assets are directed into the Global Allocation Fund.   Approximately $57 million was invested in the Global Allocation Fund as of the end of 2013, making it one of the two largest holdings in the Plan along with the PIMCO Total Return Fund, which holds approximately $58 million in Plan assets.

97.    The Global Allocation Fund is a fund of funds, meaning that it invests in a portfolio of other mutual funds.  The funds within the Global Allocation Fund consist entirely of proprietary mutual funds managed by Allianz Global Investors and PIMCO.   As a result, the Global Allocation Fund (which is a so-called "balanced fund") has an expense ratio of 0.85%—almost twice as high as the average balanced fund found in retirement plans with between $500 million and $1 billion in assets.  ICI Study at 45.

98.    The Global Allocation Fund has a history of making significant investments in newer funds within the Allianz Family.   According to its SEC

filings, as of November 2009, four of the largest equity fund holdings within the Global Allocation Fund were AllianzGI mutual funds that had been launched within the past three years, and two of those funds were only a year old. As of August 2011, three of the Global Allocation Fund's largest equity holdings were again AllianzGI mutual funds that had been launched within the past three years.

99.     By using the Global Allocation Fund as the Plan's default investment option, Defendants have created a mechanism whereby Plan assets are not just invested—but continually *reinvested*—in a steady stream of new and unproven funds.

100.   The Fiduciary Defendants' pattern and practice of using the default investment fund to promote the Allianz Family's new mutual fund offerings and thereby reduce the subsidization of its newer funds has been particularly pronounced over the past few years. As of November 2014, four of the fourteen equity fund holdings within the Global Allocation Fund were AllianzGI funds that had been launched within the past three years.

101.   One blatant example relates to the "Best Styles" funds. Over approximately the past two years, Allianz Global Investors has released a series of mutual funds that it calls the "Best Styles" funds: these include AllianzGI Best Styles Global Equity (launched December 2013), Best Styles International Equity (launched December 2014), and Best Styles U.S. Equity (launched December 2014). Allianz Global Investors has made a significant investment in these funds. To ensure that its investment pays off, and curtail its subsidization of the BestStyles funds, Allianz Global Investors is using the Global Allocation Fund and its target-date funds to channel significant assets into the Best Styles funds.

102.   As of May 31, 2015, the top two equity fund holdings in every AllianzGI target-date fund were the Best Styles International Equity Fund and the Best Styles U.S. Equity Fund, despite the fact that these funds had only been in existence for six months. And of the $202 million invested in the Global

Allocation Fund (over thirty percent of which constitutes Plan assets), a whopping $107 million was invested in the Best Styles Global Equity Fund, constituting more than half of the Global Allocation Fund's assets, despite the fact that the Best Styles Global Equity Fund had only existed for eighteen months.  This is a staggering percentage of assets to have in one mutual fund, let alone a new and unproven mutual fund.  The Global Allocation Fund's $107 million investment in the Best Styles Global Fund constitutes 73% of the assets currently invested in the Best Styles Global Fund.

103.  This pattern of using the Global Allocation Fund to promote new and unproven funds demonstrates the Fiduciary Defendants' real purpose in choosing the Global Allocation Fund as the default investment option within the Plan.  The Global Allocation Fund provides a significant opportunity to use Plan assets to support newer proprietary funds, thereby curtailing or ending company subsidization of these newer funds.  This constitutes a breach of the Fiduciary Defendants' duties of loyalty and prudence.  A prudent fiduciary acting solely in the interests of Plan participants would not retain a mutual fund in the Plan because it benefits the Plan sponsor's business operations (or those of its affiliates).  Furthermore, a prudent fiduciary acting solely in the interest of Plan participants would not use the AllianzGI Global Allocation Fund—a high-cost fund that has under-performed its benchmark over the prior three-, five-, and ten-year periods— as the Plan's default investment fund, when lower-cost options with superior performance were available.[5]

---

[5] For example, the American Funds Capital Income Builder Fund (Ticker RIRGX) is a global allocation fund held by a number of plans similar in size to the Plan, but carries an expense ratio of only 0.30% (versus 0.85% for the Global Allocation Fund) and has outperformed the Global Allocation Fund over the prior three-, five-, and ten-year periods as of December 31, 2015.

**III.  PLAINTIFFS HAVE SUFFERED DAMAGES AS A RESULT OF EACH FORM OF MISCONDUCT IDENTIFIED IN THE COMPLAINT**

104.  Plaintiffs have suffered from the breaches of fiduciary duties and other unlawful conduct identified in Sections I and II above.

105.  Plaintiff Aleksander Urakhchin ("Urakhchin") has been a participant in the Plan from 2011 to the present.  During that time, he has at various times had funds invested in the AllianzGI Global Allocation Fund and the PIMCO Stocks Plus Fund.  Because the value of his account is less than it would have been had Defendants honored their fiduciary duties and refrained from self-dealing, Urakhchin has statutory and Article III standing to bring the present action.  *Harris v. Amgen, Inc.*, 573 F.3d 728, 732–36 (9th Cir. 2009).

106.  Plaintiff Nathan Marfice ("Marfice") has been a participant in the Plan from on or before 2009 to the present.  During that time, he has at various times had funds invested in the AllianzGI Retirement 2040 Fund, the PIMCO RealPath 2040 Fund, the AllianzGI NFJ Dividend Value Fund, the AllianzGI Focused Growth Fund, the PIMCO Stocks Plus Fund, the AllianzGI Micro Cap Fund, the AllianzGI Mid-Cap Fund, the PIMCO Real Return Fund, the PIMCO Short Asset Investment Fund, and the PIMCO Total Return Fund.  Because the value of his account is less than it would have been had Defendants honored their fiduciary duties and refrained from self-dealing, Marfice has statutory and Article III standing to bring the present action.  *Harris*, 573 F.3d at 732–36.

107.  Plaintiffs did not have knowledge of all material facts (including, among other things, comparisons of Plan costs and investment performance versus other available alternatives, comparisons to other similarly-sized plans, and the underlying holdings of the Plan's default investment option and target-date funds) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed.  Further, Plaintiffs do not have actual knowledge of the specifics of

Defendants' decision-making processes with respect to the Plan, including Defendants' processes and motivations for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

108. Plaintiffs bring this action on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

109. Plaintiffs assert their claims in Counts I - III on behalf of the following class: [6]

> All participants and beneficiaries of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan at any time on or after October 7, 2009. Excluded from this class are Defendants, their directors, and any employees with responsibility for the Plan's investment or administrative functions.

110. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan has had between approximately 3,000 and 3,900 participants during the applicable statutory period.

111. Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Plan, who have suffered injuries as a result of Defendants' mismanagement of the Plan and self-dealing. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants managed the Plan as a single

---

[6] Plaintiffs reserve the right to revise their class definition, and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

entity, and therefore Defendants' imprudent decisions and self-dealing affected all Plan participants similarly.

112.  Adequacy:   Plaintiffs will fairly and adequately protect the interests of the Class, as their interests are aligned with the Class that they seek to represent and they have retained counsel experienced in complex class action litigation.  Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

113.  Commonality:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.  Whether the Fiduciary Defendants breached their duties of prudence and loyalty by offering only proprietary investments within the Plan;

b.  Whether the Fiduciary Defendants breached their duties of prudence and loyalty by failing to monitor and remove the Plan's investments in proprietary investments managed by PIMCO and Allianz Global Investors;

c.  Whether the Fiduciary Defendants failed to exercise appropriate skill, care, loyalty, and diligence, by failing to investigate and attempt to negotiate lower-cost alternatives to the proprietary investments within the Plan from investment managers who were not affiliated with the Allianz Family;

d.  Whether the Fiduciary Defendants breached their duty of loyalty, their duty to make prudent investment decisions, and their duty to monitor plan investments and subsequently remove imprudent investments, by adding new and untested proprietary mutual funds to the Plan and failing to remove those funds at the earliest available opportunity;

e.  Whether the Fiduciary Defendants breached their duty of loyalty, their duty to make prudent investment decisions, and their duty to monitor plan investments and subsequently remove imprudent investments, by retaining the Global Allocation Fund

-39-

within the Plan and designating the Global Allocation Fund as the default investment option in light of the Fund's pattern and practice of investing in new and unproven mutual funds and the Fund's track record of poor performance;

f.  The proper measure of monetary relief; and

g.  The proper form of equitable and injunctive relief.

114.  Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. Separate lawsuits would establish incompatible standards to govern Defendants' conduct.

115.  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Plan participants, as a practical matter, would be dispositive of the interests of other Plan participants or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court such as removal of particular Plan investments or removal of a Plan fiduciary would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

116.  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint has applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's

individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

<u>**COUNT I**</u>
**Breach of Duties of Loyalty and Prudence**
**29 U.S.C. § 1104(a)(1)(A)–(B)**

117. 29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty on the Fiduciary Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

118. As described throughout this Complaint, the Fiduciary Defendants breached their fiduciary duties of prudence and loyalty with respect to the selection, retention, and management of the Plan's investment options by, *inter alia*:

    a. Selecting and retaining investments in the Plan because they were affiliated with the Allianz Family and would contribute to the Allianz Family's bottom line;

    b. Failing to monitor Plan investments and investigate whether the investment management services provided by the Allianz Family could be provided at lower cost, with comparable or superior performance, by an investment manager not affiliated with the Allianz Family;

    c. Adding new and untested mutual funds within the Plan to support the business objectives of the Allianz Family, despite these funds' lack of a sufficient track record to warrant their addition by the Plan, and subsequently failing to promptly remove these new and untested mutual funds when they underperformed;

    d. Selecting and retaining the AllianzGI Global Allocation Fund as the

default investment fund because of the fund's ability to support the Allianz Family's business objectives despite the Global Allocation Fund's high costs and poor performance;

119. Each Fiduciary Defendant performing investment-related duties knowingly participated in the breaches of the other Defendants performing such duties, knowing that other Defendants were breaching their fiduciary duties, and enabling commission of these breaches by failing to lawfully discharge their own fiduciary duties or make any reasonable effort under the circumstances to remedy other Defendants' breaches. For these reasons, the Fiduciary Defendants are also liable as co-fiduciaries under 29 U.S.C. § 1105.[7]

120. Each Fiduciary Defendant is personally liable, and the Fiduciary Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

121. On behalf of the Plan, Plaintiffs are also entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3) (including the equitable relief described in the Prayer for Relief), recovery of pre-judgment interest, *see Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007), and attorney fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine.

---

[7] AAM and Maney are also liable as co-fiduciaries under 29 U.S.C. § 1105 given the General Partner's authority, acting on behalf of the Plan Sponsor, to appoint and remove members of the Committee and to amend the Plan, AAM and Maney's knowledge of each Defendant's breaches of fiduciary duties, and AAM and Maney's failure to exercise their authority to take reasonable steps to prevent these breaches.

<u>COUNT II</u>
**Failure to Monitor Fiduciaries**

122.   As alleged throughout the Complaint, AAM and Maney are fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21).

123.   AAM and Maney are responsible for appointing and removing members of the Committee, appointing and removing trustees, and for appointing and removing the Plan's recordkeeper.

124.   Given that AAM and Maney had overall oversight responsibility for the Plan, and the explicit fiduciary responsibility to appoint and remove members of the Committee, AAM and Maney had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Committee.

125.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

126.   To the extent that AAM or Maney's fiduciary monitoring responsibilities were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

127.   AAM and Maney breached their fiduciary monitoring duties by, among other things:

      a.   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

      b.   failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein in violation of ERISA;

-43-

c. failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

128. As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had AAM and Maney discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan, the named Plaintiffs, and other Class members lost millions of dollars of retirement savings.

129. AAM and Maney are personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Complaint, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate. Each of these Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches, and thus each Defendant is liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

## COUNT III
### Other Equitable Relief Based on Ill-Gotten Proceeds
### 29 U.S.C. § 1132(a)(3)

130. Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under that section regardless of whether it is a fiduciary. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had

-44-

actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

131. The Employer Defendants knew or should have known that the act or practice of using exclusively Allianz Family mutual funds as the Plan's designated investment options allowed the Employer Defendants to benefit financially through excessive fees paid by the Plan and at the expense of the Plan's participants, in breach of the Fiduciary Defendants' duties of prudence and loyalty.

132. Each of the Employer Defendants participated in the Fiduciary Defendants' breaches of their fiduciary duties, and knowingly received excessive fees paid from Plan assets.

133. Therefore, to the extent any ill-gotten proceeds and profits are not disgorged under the fiduciary relief provisions of 29 U.S.C. § 1109(a), the Court should order restitution or disgorgement as appropriate equitable relief under 29 U.S.C. § 1132(a)(3) to restore these monies to the Plan.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Urakhchin and Marfice, individually and as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.  Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.  A declaration that the Fiduciary Defendants have breached their fiduciary duties in the manner described in the Complaint;

D.  An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties and self-dealing described above and to restore the

Plan to the position it would have been in but for such breaches and self-dealing;

E.    An order imposing a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duties described herein, and directing Defendants to disgorge such monies and return them to the Plan;

F.    An order granting equitable restitution and other appropriate equitable monetary relief against the Employer Defendants for knowingly participating in the Fiduciary Defendants' fiduciary breaches;

G.    An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; removal of imprudent mutual funds as core investment options; transfer of Plan assets in imprudent mutual funds to prudent alternative investments; and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

K.    An award of such other and further relief as the Court deems equitable and just.

Dated: January 6, 2016                    **NICHOLS KASTER, PLLP**

By:    /s/ Kai H. Richter
Kai H. Richter, MN Bar No. 0296545*
NICHOLS KASTER, PLLP
krichter@nka.com
Carl F. Engstrom, MN Bar No. 0396298*

-46-

cengstrom@nka.com
Adam W. Hansen, CA Bar No. 264241
ahansen@nka.com
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Phone: (612) 256-3200
Fax: (612) 338-4878
*admitted pro hac vice

KABATECK BROWN KELLNER LLP
Richard L. Kellner, CA Bar No. 171416
rlk@kbklawyers.com
644 South Figueroa Street
Engine Company No. 28 Building
Los Angeles, CA  90017
Telephone: (213) 217-5000
Facsimile: (213) 217-5010

ATTORNEYS   FOR   INDIVIDUAL   AND
REPRESENTATIVE PLAINTIFFS