Christina Queiros Bouchot (SBN 289701)
cbouchot@goodwinprocter.com
**GOODWIN PROCTER LLP**
601 S Figueroa Street, 41st Floor
Los Angeles, CA  90017
Tel.:  213.426.2500
Fax.:  213.623.1673

James O. Fleckner (*pro hac vice*)
jfleckner@goodwinprocter.com
David Rosenberg (*pro hac vice*)
drosenberg@goodwinprocter.com
**GOODWIN PROCTER LLP**
53 State Street
Boston, MA  02109
Tel.:  617.570.1000
Fax.:  617.523.1231

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEKSANDR URAKHCHIN AND NATHAN MARFICE, INDIVIDUALLY, AS REPRESENTATIVES OF THE CLASS, AND ON BEHALF OF THE ALLIANZ ASSET MANAGEMENT OF AMERICA, L.P. 401(K) SAVINGS AND RETIREMENT PLAN, <br><br> Plaintiffs, <br><br> v. <br><br> ALLIANZ ASSET MANAGEMENT OF AMERICA, L.P., ALLIANZ ASSET MANAGEMENT OF AMERICA, LLC, COMMITTEE OF THE ALLIANZ ASSET MANAGEMENT OF AMERICA, L.P. 401(K) SAVINGS AND RETIREMENT PLAN, JOHN MANEY, ALLIANZ GLOBAL INVESTORS FUND MANAGEMENT LLC, PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, ALLIANZ GLOBAL INVESTORS U.S. LLC, NFJ INVESTMENT GROUP LLC, AND JOHN DOES 1-30, <br><br> Defendants. | Case No. 8:15-cv-01614-JVS-JCG <br><br> **CLASS ACTION** <br><br> **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> Date:     May 9, 2016 <br> Time:     1:30 PM <br> Courtroom:  10C <br> Judge:    Hon. James V. Selna <br><br> Filed Concurrently with: <br> 1. Notice of Motion and Motion to Dismiss <br> 2. Declaration of David Rosenberg <br> 3. Request for Judicial Notice <br> 4. Proposed Order |

# Table of Contents

Page

INTRODUCTION ........................................................................................... 1

FACTUAL BACKGROUND............................................................................ 3

    I.    The Successful and Generous Plan ................................................... 3

    II.    Plaintiffs' Allegations ....................................................................... 7

ARGUMENT..................................................................................................... 8

    I.    Plaintiffs' Claims Are Barred by ERISA's Three-Year Statute of Limitations. ...................................................................................... 8

    II.    Each Count of the Complaint Fails to State a Claim. ...................... 11

        A.    Governing Standards Under Rule 12(b)(6) and ERISA. ........... 11

        B.    Count I Fails to State a Claim for Breach of Fiduciary Duty. ...................................................................................... 12

            1.    The Complaint is Devoid of Well-Pleaded Allegations Regarding the Investment Selection Process. .................................................................... 12

            2.    The Complaint's Allegations Do Not Support An Inference that the Alleged Fiduciary Defendants Violated their Duties. ............................................... 14

                (a)  The Allegation that the Plan Invested in PIMCO and Allianz Global Investors Funds Does Not Support an Inference of Imprudence or Disloyalty. ............................................... 14

                (b)  The Complaint's Other Allegations Do Not Support an Inference of Imprudence or Disloyalty. ............................................... 17

        C.    Counts II and III Should Be Dismissed. .................................. 24

            1.    Counts II and III Fail Because Plaintiffs Have Not Adequately Pleaded a Primary Breach of Duty ............ 24

            2.    Count II Fails Because the Complaint Contains No Well-Pleaded Facts Regarding the Fiduciary Monitoring Process............................................... 25

            3.    Count III Fails Because It Seeks Relief from Non-fiduciaries that Is Not Allowed under ERISA............... 26

    III.    Plaintiffs Lack Standing to Sue Regarding Investment Options in Which They Did Not Invest. ................................................... 28

CONCLUSION................................................................................................ 30

i

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                                                        **Page(s)**

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
   464 F.3d 338 (2d Cir. 2006) ................................................................................ 18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................3, 11, 16, 17, 22, 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................11, 16, 17

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) ................................................................................................ 29

*Cafasso v. General Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) .............................................................................. 12

*Chilko v. Lorren*,
   No. 07-cv-1316, 2008 WL 3154734 (E.D. Cal. Aug. 3, 2008) ............................ 27

*CIGNA Corp. v. Amara*,
   563 U.S. 421 (2011) ................................................................................................ 27

*Conkright v. Frommert*,
   559 U.S. 506 (2010) ................................................................................................ 12

*David v. Alphin*,
   817 F. Supp. 2d 764 (W.D.N.C. 2011) ................................................................ 30

*DeFazio v. Hollistor Employee Share Ownership Trust*,
   406 F. Supp. 2d 1085 (E.D. Cal. 2005) ............................................................ 8, 10

*Dupree v. The Prudential Ins. Co. of Am.*,
   No. 99-8837, 2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) ............................ 16, 22

*Edes v. Verizon Commcn's, Inc.*,
   417 F.3d 133 (1st Cir. 2005) ................................................................................... 9

*Fifth Third Bancorp v. Dudenhoeffer*,
   134 S. Ct. 2459 (2014) ..................................................................................... 12, 16

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*,
    493 U.S. 331 (1990) ........................................................................ 28

*Fuller v. SunTrust Banks, Inc.*,
    Civ. A. No. 11-cv-784, 2012 WL 1432306 (N.D. Ga. Mar. 20, 2012) ............... 29

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002) ........................................................................ 26

*Harris v. Amgen, Inc.*,
    788 F.3d 916 (9th Cir. 2014) ............................................................. 12

*Harris Trust and Sav. Bank v. Salomon Smith Barney*,
    530 U.S. 238 (2000) ........................................................................ 27

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ................................................ 14, 18, 19

*In re Bank of Am. Corp. Sec.*,
    756 F. Supp. 2d 330 (S.D.N.Y. 2010) .................................................. 24

*In re Calpine Corp. ERISA Litig.*,
    No. C-03-1685, 2005 WL 1431506 (N.D. Cal. 2005) ............................... 25

*In re Citigroup ERISA Litig.*,
    104 F. Supp. 3d 599 (S.D.N.Y. May 13, 2015) ......................................... 9

*In re Franklin Mut. Funds Fee Litig.*,
    478 F. Supp. 2d 677 (D.N.J. 2007) ..................................................... 21

*In re McKesson HBOC, Inc. ERISA Litig*,
    No. C00-20030, 2002 WL 31431588 (N.D. Cal. Sept. 30, 2002) .................... 25

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
    712 F. Supp. 2d 958 (N.D. Cal. 2010) .................................................. 29

*Kenseth v. Dean Health Plan, Inc.*,
    722 F.3d 869 (7th Cir. 2013) ............................................................. 27

*Lazy Y Ranch Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) ............................................................. 11

*Leber v. Citigroup, Inc.*,
    No. 07 Civ. 9329, 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ..................... 20

*Lewis v. Casey*,
    518 U.S. 343 (1996) ........................................................................ 29

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
    722 F. Supp. 2d 1157 (C.D. Cal. 2010) ........................................ 29

*Montanile v. Bd. of Trs. of the Nat'l Elevator Industry Health Benefit Plan*,
    136 S. Ct. 651(2016) ..................................................................... 26

*Nalbandian v. Lockheed Martin Corp.*,
    No. 10-cv-1242, 2011 WL 338809 (N.D. Cal. Feb. 1, 2011) ............. 25

*Nechis v. Oxford Health Plans, Inc.*,
    328 F. Supp. 2d 469 (S.D.N.Y. 2004) ........................................ 27

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*,
    712 F.3d 705 (2d Cir. 2013) ........................................................ 13

*Pfeil v. State Street Bank & Trust Co.*,
    806 F.3d 377 (6th Cir. 2015) ....................................................... 13

*Reso Artisan Int'l Fund v. Artisan Partners Ltd. P'ship*,
    No. 11-CV-873-JPS, 2011 WL 5826034 (E.D. Wis. Nov. 18, 2011)................. 18

*Rivera v. Peri & Sons Farms, Inc.*,
    735 F.3d 892 (9th Cir. 2013) ......................................................... 8

*Romero v. Nokia, Inc.*,
    No. 12-cv-6260, 2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) ......... 24

*Sereboff v. Mid Atl. Med. Servs.*,
    547 U.S. 356 (2006) ..................................................................... 26

*Siemers v. Wells Fargo & Co.*,
    No. C 05-04518, 2006 WL 3041090 (N.D. Cal. Oct. 24, 2006) ......... 29

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ....................................................... 11

*Tibble v. Edison Int'l*,
    No. CV 07-5359, 2010 WL 2757153 (C.D. Cal. July 8, 2010) ......... 13

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015) ........................................................................ 11

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................... 28

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ............................................................ 28

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    550 F. Supp. 2d 416 (S.D.N.Y. 2008) ................................... 8, 9, 10, 11

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    325 F. App'x 31 (2d Cir. 2009) .......................................................... 19

**Statutes**

15 U.S.C. § 77e(b)(2) .............................................................................. 10

29 U.S.C. § 1108(b)(5) (ERISA § 408(b)(5)) ......................................... 15

29 U.S.C. § 1108(b)(8) (ERISA § 408(b)(8)) ......................................... 15

29 U.S.C. § 1109 (ERISA § 409) ............................................................ 16

29 U.S.C. § 1113(2) (ERISA § 413(2)) ..................................................... 8

29 U.S.C. § 1132(a)(2) (ERISA § 502(a)(2)) .......................................... 26

29 U.S.C. § 1132(a)(3) (ERISA § 502(a)(3)) ............................... 26, 27, 28

**Other Authorities**

17 C.F.R. § 274.11A (1994) .................................................................... 10

26 C.F.R. § 1.401(a)(17)-1 (2004) ............................................................. 4

29 C.F.R. § 2550.404c-1(b)(3)(i) (2010) .................................................... 5

Allianz Global Investors, Awards,
    http://www.allianzglobalinvestors.co.uk/en/AboutUs/Pages/Awards.
    aspx (last visited Feb. 3, 2016) ............................................................. 4

Allianz Group 2014 Annual Report,
   https://www.allianz.com/en/investor_relations/results_reports/annua
   l-reports.html ........................................................................................ 3

Board of Governors of the Federal Reserve System, Historical Rates for
   the EU Euro,
   http://www.federalreserve.gov/releases/h10/hist/dat00_eu.htm (last
   visited Feb. 3, 2016) .......................................................................... 3

Class Exemption Involving Mutual Fund In-House Plans Requested by
   the Investment Company Institute, 42 Fed. Reg. 18734 (Mar. 31,
   1977) ............................................................................................ 2, 15, 16

Department of Labor, Study of 401(k) Plan Fees and Expenses (April
   13, 1998), https://www.dol.gov/ebsa/pdf/401kRept.pdf ..................... 19

Fed. R. Civ. P. 12(b)(1) ................................................................. 1, 28

Fed. R. Civ. P. 12(b)(6) ..................................................... 1, 10, 16, 27

H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974), *reprinted in* 1974
   U.S.C.C.A.N. 5038 .............................................................................. 15

Morningstar.com,
   http://performance.morningstar.com/fund/performance-
   return.action?t=PALLX (last visited Feb. 3, 2016) .......................... 20

Notice of Proposed Rule-Making, Participant Directed Individual
   Account Plans, 56 Fed. Reg. 10724 (Mar. 13, 1991) ..................... 2, 15

PIMCO, Awards & Accolades, https://www.pimco.com/our-
   firm/awards-and-accolades (last visited Feb. 3, 2016) ........................ 4

Pensions & Investments, Target-date Rush Pushes Assets of DC Money
   Managers to Record (August 10, 2015),
   http://www.pionline.com/article/20150810/PRINT/308109997/targe
   t-date-rush-pushes-assets-of-dc-money-managers-to-record. ............... 4

Schwab Personal Choice Retirement Account Pricing Summary
   (February 1, 2015), http://www.schwab.com/public/file/P-
   5166587/PCRA_Pricing_ ...................................................................... 6

Defendants Allianz Asset Management of America L.P. ("AAM LP"), Allianz Asset Management of America LLC ("AAM LLC"), Allianz Global Investors Fund Management LLC ("AGIFM"), Pacific Investment Management Company LLC ("PIMCO"), Allianz Global Investors U.S. LLC ("AGI US"), NFJ Investment Group LLC ("NFJ,"[1] collectively, the "AAM Entities"), the Committee of the Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan ("the Committee") and John Maney ("Maney," collectively, "Defendants") submit this Memorandum of Points and Authorities in Support of their Motion to Dismiss Plaintiffs' First Amended Class Action Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## **INTRODUCTION**

In response to Defendants' motion to dismiss Plaintiffs' original complaint (ECF No. 26), Plaintiffs filed the First Amended Class Action Complaint ("Complaint") (ECF No. 28), removing one claim from their original pleading and adding two additional claims.[2]  However, the amendment does not cure the fatal infirmity in the recurring claim, nor do the new counts state claims upon which relief can be granted.  As such, and given that this is Plaintiffs' second bite at the apple, the Complaint should be dismissed with prejudice.

Plaintiffs, who are current participants in the Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan (the "Plan"), assert that Defendants violated the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), by offering funds managed by PIMCO and AGI—and only those funds—as "core" investment options under the Plan.  The Complaint asserts that the fiduciary process for selecting the Plan's investment options was improperly tainted by a desire to enrich the AAM Entities by increasing the advisory fees at the

---

[1] AGIFM, AGI US, and NFJ are referred to collectively herein as "Allianz Global Investors" or "AGI."

[2] The Complaint is attached to this Memorandum as Exhibit A.

1   expense of Plan participants.

2   But the Complaint pleads no facts—as opposed to conclusions—

3   demonstrating that the process was deficient or that fiduciaries had an improper

4   motivation.  Nor is such inference warranted by the entirely innocuous pleaded

5   facts.  Indeed, the United States Department of Labor ("DOL") has expressly

6   authorized financial services company plans such as the Plan to include mutual

7   funds affiliated with the sponsoring employer, finding that it would run "contrary to

8   normal business practice for a company whose business is financial management to

9   seek financial management services from a competitor."[3]  It is thus implausible to

10  suggest that offering a lineup of all PIMCO and AGI funds reflects any ERISA

11  violation.  But, in any event, Plan participants were not limited solely to PIMCO and

12  AGI funds.  Rather, the lineup also includes a very popular self-directed brokerage

13  account through which participants can select from a large universe of stocks,

14  bonds, exchange-traded funds ("ETFs"), and mutual funds—including low-fee funds

15  and thousands of funds not advised by PIMCO, AGI, or any of their affiliates—

16  many of which can be purchased without commission and with low expense ratios.

17  Further, Plaintiffs' claims are implausible in light of the exceptionally

18  generous contributions that the employers make to the Plan.  The public record

19  demonstrates that the AAM Entities contributed over $245 million of their own

20  money to the accounts of Plan participants from 2009 through 2014.  Those

21  employer contributions significantly exceeded the amounts contributed by

22  employees and vastly exceeded the amounts of alleged excessive fees.  Indeed, the

23  Plan's public filings show that the employer contributions were approximately

24  *twenty times* greater in 2013 than the amount of "excess" fees alleged in that year

25  (the only year for which Plaintiffs quantify this number), entirely negating any

26  _____

27  [3] Notice of Proposed Rule-Making, Participant Directed Individual Account Plans, 56 Fed. Reg. 10724, 10730 (Mar. 13, 1991) (discussing Prohibited Transaction Exemption 77-3); *see also* Class Exemption Involving Mutual Fund In-House Plans, 42 Fed. Reg. 18734, 18735 (Mar. 31, 1977).

28

1  inference that the Plan operates to generate corporate profit at employees' expense.

2  Instead, there is an "obvious alternative explanation" for the challenged

3  conduct, *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009):  the Plan is designed to help

4  participants achieve their individualized retirement goals and objectives in a manner

5  authorized by the DOL using the same low-fee and high-quality investments that

6  Defendants make available to the public.  Because the factual allegations do not give

7  rise to any plausible inference of disloyal conduct in the face of the public data and

8  such an "obvious alternative explanation," the Complaint should be dismissed.

9  In addition, the Complaint suffers from numerous other fatal defects:

10  • ERISA's three-year statute of limitations bars the Complaint because
11  the pleaded facts (as opposed to legal conclusions) were, without
   dispute, known or knowable to Plaintiffs more than three years ago.

12  • The Complaint cannot establish a failure to monitor claim because it
13  contains no well-pleaded facts regarding the monitoring process, and
14  fails to raise a plausible inference of deficient monitoring.

15  • The equitable relief sought in Count III is not allowed under ERISA.

16  • Plaintiffs lack standing to sue with respect to funds in which they never
   invested because they have not pleaded, and could not plead, any
17  personalized injury with respect to those funds.

18  In light of these defects, the Court should grant Defendants' motion to dismiss

19  the Complaint in its entirety.

20  **FACTUAL BACKGROUND**

21  **I.    The Successful and Generous Plan**

22  PIMCO and AGI are large, well-respected asset managers that sponsor and

23  manage high-quality funds.  They, and their worldwide affiliates, had a combined

24  $2.16 trillion in total assets under management as of December 31, 2014.[4]  PIMCO

25

26  _____
   [4] *See* Allianz Group 2014 Annual Report at 6,
27  https://www.allianz.com/en/investor_relations/results_reports/annual-reports.html/;
   *see also* Board of Governors of the Federal Reserve System, Historical Rates for the
   EU Euro, http://www.federalreserve.gov/releases/h10/hist/dat00_eu.htm (last visited
28  Feb. 3, 2016).

3

was named the Asset Management Firm of the Year by Global Investor Magazine in 2011.[5]  As of December 31, 2014, it was the ninth largest manager of defined contribution assets.[6]  AGI's global family has received several prestigious awards, including Capital Magazine's Best Asset Management Firm in 2011.[7]  The Plan is among the benefits that the AAM Entities provide to their employees—including the employees who deliver award-winning investment management services.[8]  The Plan has over $840 million in assets and 4,000 participants.[9]

Participating employees can elect how much, if any, of their salary to contribute to the Plan.[10]  In addition, the AAM Entities make contributions to eligible employees' accounts.  These contributions are exceptionally generous.  For example, the AAM Entities make retirement contributions equal to at least 5.4% of each eligible employee's total compensation.[11]  For certain employees whose compensation exceeds the Social Security taxable wage base, the AAM Entities contribute an additional 5.4% of the amount of the compensation that exceeds that wage base, up to an annual contribution limit set by the Internal Revenue Service.[12]  Additionally, the AAM Entities match eligible employee contributions to the Plan, dollar for dollar, up to 5% of each eligible participant's compensation.[13]  The AAM

---

[5] PIMCO, Awards & Accolades, https://www.pimco.com/our-firm/awards-and-accolades (last visited Feb. 3, 2016).

[6] Pensions & Investments, Target-date Rush Pushes Assets of DC Money Managers to Record (August 10, 2015), http://www.pionline.com/article/20150810/PRINT/308109997/target-date-rush-pushes-assets-of-dc-money-managers-to-record.

[7] Allianz Global Investors, Awards, http://www.allianzglobalinvestors.co.uk/en/AboutUs/Pages/Awards.aspx (last visited Feb. 3, 2016).

[8] Compl. ¶ 2(b).  *Accord* 2012 Restatement of the Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan ("Plan Document"), Declaration of David Rosenberg (Feb. 3, 2015) ("Rosenberg Decl."), Ex. 1.

[9] 2014 Form 5500 at MTD2-108, 110, Rosenberg Decl. Ex. 2.

[10] Plan Document § 3.01(c)(i), MTD2-029, Rosenberg Decl. Ex. 1.

[11] *Id.* § 3.05(c)(i), MTD2-033.

[12] *Id.* § 3.05(c)(ii), MTD2-033; *see* 26 C.F.R. § 1.401(a)(17)-1 (2004).

[13] *See* Plan Document § 3.05(a)(i), MTD2-033, Rosenberg Decl. Ex. 1; 2014 Form

Entities may also make further matching contributions and discretionary contributions on top of these retirement and matching contributions.[14]  In total, the AAM Entities contributed approximately $245 million to the Plan from 2009 through 2014—averaging approximately $41 million per year.[15]

The investment of the Plan's assets is entirely participant-directed, meaning that each participant can allocate the amounts credited to her Plan account into any investment option that has been made available under the Plan.  The "core" options as of December 31, 2014 consist of a broad array of more than forty mutual funds and two collective investment trusts advised by PIMCO and AGI.[16]  Approximately seventy funds advised by PIMCO and AGI have been offered during the putative class period.[17]  These funds represent a wide range of asset categories, including stocks, bonds, real assets, and domestic and international funds.[18]

The Plan also makes available a self-directed brokerage window offered by an unaffiliated entity (the "Schwab Personal Choice Retirement Account") through which participants can invest up to 100% of their Plan account balance in an even larger universe of stocks, bonds, ETFs, and mutual funds, including low-fee index funds, funds available for purchase without transaction costs, and thousands of

---

5500 at MTD2-112, Rosenberg Decl. Ex. 2.

[14] Plan Document §§ 3.05(b)(i), (d)(i), MTD2-033-34, Rosenberg Decl. Ex. 1.

[15] *See* 2014 Form 5500 at MTD2-110, Rosenberg Decl. Ex. 2; 2013 Form 5500 at MTD2-119, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD2-127, Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD2-134, Rosenberg Decl. Ex. 5; 2010 Form 5500 at MTD2-141, Rosenberg Decl. Ex. 6; 2009 Form 5500 at MTD2-148, Rosenberg Decl. Ex. 7.

[16] 2014 Form 5500 at MTD2-114-15, Rosenberg Decl. Ex. 2; Compl. ¶ 63.  The breadth of investment options available far exceeds that blessed by the DOL, which has stated that plans "offer[] a broad range of investment alternatives" if they allow participants to "[c]hoose from at least three investment alternatives."  *See* 29 C.F.R. § 2550.404c-1(b)(3)(i) (2010).

[17] 2014 Form 5500 at MTD2-114-15, Rosenberg Decl. Ex. 2; 2013 Form 5500 at MTD2-121-22, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD2-129-30, Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD2-136-37, Rosenberg Decl. Ex. 5; 2010 Form 5500 at MTD2-143-44, Rosenberg Decl. Ex. 6; 2009 Form 5500 at MTD2-151-52, Rosenberg Decl. Ex. 7.

[18] *See* Compl. ¶ 63.

funds not advised by PIMCO, AGI, or any of their affiliates.[19]  The Schwab Personal Choice Retirement Account has proven to be popular with Plan participants; as of December 31, 2014, attracting over 13% of Plan assets, more than were invested in any single one of the "core" investment options.[20]

The AAM Entities also offer several different programs to assist participants with fund selection.  For example, the AAM Entities offer a free portfolio advisory service, Schwab Personal Retirement Planning, that is provided by "an independent investment advisor" who will recommend "how much to save, which investment funds to select from within the Plan and how much to invest in each of these funds."[21]  Also, a participant can choose to invest in the AllianzGI Global Allocation Fund ("Global Allocation Fund"), a balanced fund that offers exposure to stocks and bonds, or, if she failed to select any funds, her assets were defaulted into that fund.[22]

Not surprisingly, the Plan is very popular with participants:  employees contributed over $162 million to the Plan and rolled over an additional $32 million *into* the Plan from prior employers' plans from 2009 through 2014.[23]  Further, although participants can withdraw their account from the Plan when they are no longer employed by the AAM Entities, over 1,300 retired or separated

---

[19] Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan Summary Plan Description ("Summary Plan Description") at 12, Compl. Ex. B; Schwab Personal Choice Retirement Account Pricing Summary (February 1, 2015), http://www.schwab.com/public/file/P-5166587/PCRA_Pricing_ Summary_2015.pdf.

[20] 2014 Form 5500 at MTD2-114-15, Rosenberg Decl. Ex. 2.  Plaintiffs state that, generically, "only 2% of retirement plan assets are held in [self-directed brokerage accounts]."  Compl. ¶ 45.  Participation in the Schwab Personal Choice Retirement Account by the financially sophisticated AAM Entities' employees far exceeds this generic number, rendering Plaintiffs' generic challenge inapplicable here.

[21] Summary Plan Description at 12, Compl. Ex. B.

[22] Compl. ¶¶ 95, 97.

[23] 2014 Form 5500 at MTD2-110, Rosenberg Decl. Ex. 2; 2013 Form 5500 at MTD2-119, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD2-127, Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD2-134, Rosenberg Decl. Ex. 5; 2010 Form 5500 at MTD2-141, Rosenberg Decl. Ex. 6; 2009 Form 5500 at MTD2-148, Rosenberg Decl. Ex. 7.

1   participants—over one-fourth of the total number of Plan participants—have
2   decided to leave their assets in the Plan as of December 31, 2014.[24]   As a result of
3   the Plan's design, funding and operation, the AAM Entities' employees are doing
4   far better than most in accumulating assets for retirement:  the average participant
5   account balance in the Plan is more than three times the national average.[25]

6   **II.     Plaintiffs' Allegations**

7           Plaintiffs, two current Plan participants, purport to bring their claims on
8   behalf of "[a]ll participants and beneficiaries of the Plan at any time on or after
9   October 7, 2009."[26]   The Complaint alleges that AAM LP, AAM LC, the
10  Committee, unnamed Committee members, and Maney—the Chief Operating
11  Officer and Managing Director of AAM LP and AAM LLC—(collectively, the
12  "Alleged Fiduciary Defendants") are ERISA fiduciaries and that they breached their
13  fiduciary obligations by choosing proprietary funds as the "core" investment options
14  for the Plan to enrich the AAM Entities at the expense of Plan participants.[27]

15          Specifically, Count I alleges that the Alleged Fiduciary Defendants (i)
16  "select[ed] and retain[ed] [proprietary] investments in the Plan," (ii) "fail[ed] to
17  monitor Plan investments" and remove or replace the investment options offered
18  with non-proprietary options that "could be provided at [a] lower cost with
19  comparable or superior performance," (iii) "add[ed] new and untested [proprietary]
20  funds within the Plan" to "seed" those funds, and (iv) selected the Global Allocation
21  Fund "as the default investment option" to invest Plan assets "in a steady stream of
22  new and unproven [proprietary] funds."[28]   Count II alleges that a sub-set of these

23  _____
    [24] 2014 Form 5500 at MTD2-108, Rosenberg Decl. Ex. 2.
24  [25] *Compare* 2012 Form 5500 at MTD2-125, 127 (average balance, determined by
    plan assets divided by number of participants, of approximately $175,000),
25  Rosenberg Decl. Ex. 4 *with* Investment Company Institute, A Close Look at 401(k)
    Plans (December 2014) at MTD2-234, Rosenberg Decl. Ex. 20 (hereinafter "ICI
26  Study") (national average plan account balance was $61,168 as of 2012).
    [26] Compl. ¶ 109.
27  [27] *See id.* ¶¶ 20-25, 118.
28  [28] *Id.* ¶¶ 84, 98-99, 118.

7

1   Defendants—AAM LP, AAM LLC, and Maney—breached ERISA monitoring

2   obligations by "failing to monitor [the Committee members'] fiduciary processes,

3   which would have alerted" them to the alleged breaches, and by "failing to remove

4   [Committee members] whose performance was inadequate in that they continued to

5   maintain imprudent" investment options for the Plan.[29]  Count III seeks recovery

6   from the AAM Entities of amounts they received as a result of the Alleged Fiduciary

7   Defendants' supposed breaches of duty.

8   <center>**ARGUMENT**</center>

9       Plaintiffs' claims fail because (i) they are barred by the statute of limitations,

10  (ii) each Count fails to state a claim, and (iii) Plaintiffs lack standing to bring all of

11  their claims.

12  **I.    Plaintiffs' Claims Are Barred by ERISA's Three-Year Statute of**
13  **Limitations.**

14      The Complaint should be dismissed in its entirety because it is barred by

15  ERISA's three year statute of limitations.

16      ERISA § 413(2) precludes claims that are filed more than "three years after

17  the earliest date on which the plaintiff had actual knowledge of the breach or

18  violation." 29 U.S.C. § 1113(2).  In applying this provision, courts have "focused

19  on whether documents provided to plan participants sufficiently disclosed the

20  alleged breach of fiduciary duty, not whether the individual plaintiffs actually saw

21  or read the documents."  *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d

22  416, 419 n.3 (S.D.N.Y. 2008), *aff'd on other grounds*, 325 F. App'x 31 (2d Cir.

23  2009).[30]  As the Ninth Circuit has held, affirmative defenses such as ERISA's statute

24  of limitations may be raised on a motion to dismiss if the facts establishing the

25  defense "are apparent on the face of the complaint."  *Rivera v. Peri & Sons Farms,*

---

26  [29] *Id.* ¶ 127.

27  [30] S*ee also DeFazio v. Hollister Employee Share Ownership Trust*, 406 F. Supp. 2d
1085, 1093 (E.D. Cal. 2005) (dismissing claim, given that "[a]ctual knowledge is
28  obtained when a person reasonably should have known of the breach").

<center>8</center>

1    *Inc.*, 735 F.3d 892, 902 (9th Cir. 2013).

2         Indeed, courts have dismissed as time-barred ERISA claims similar to these

3    that challenge the selection of funds as investment options for a retirement plan

4    where those funds were all fully disclosed.  *See, e.g.*, *Young*, 550 F. Supp. 2d at 419.

5    As one court explained, because it was "undisputed that Plaintiffs had actual

6    knowledge that the Plans offered the [challenged] Funds as investment options"

7    more than three years before they filed suit, and because information concerning

8    "the fees and expenses associated with the . . . Funds" had indisputably been made

9    available to participants, plaintiffs' claims were time-barred.  *Id.*[31]

10        Here, the Complaint alleges that the Plan made available PIMCO and AGI

11   funds to "contribute to the Allianz Family's bottom line"[32]—a practice that the

12   Complaint admits has existed for longer than three years.[33]  Plaintiffs do not and

13   cannot deny that the Plan lineup was fully disclosed to all participants and the public

14   alike, and that Plaintiffs themselves knew more than three years ago, that only funds

15   advised by PIMCO and AGI were offered as "core" investment options.[34]  Plaintiffs

16   acknowledge that they each first participated in the Plan more than three years prior

17   to bringing this suit.[35]  Their claims are accordingly time-barred.

18        Attempting to overcome this bar, the Complaint asserts in conclusory fashion

19

20   [31] *See also In re Citigroup ERISA Litig.*, 104 F. Supp. 3d 599, 610-12 (S.D.N.Y. 2015) (dismissing similar ERISA claims that were based on information publicly available more than three years prior to the date the plaintiffs filed suit); *Edes v. Verizon Commc'n's, Inc.*, 417 F.3d 133, 142 (1st Cir. 2005) (ERISA does not permit a defense of "willful blindness").

21

22

23   [32] Compl. ¶ 118(a).  Notwithstanding the conclusory assertion that decisions were made to enrich the AAM Entities, the Complaint pleads no facts that there is any benefit to the Committee or its members, or that the Committee or its members benefit, if the AAM Entities' bottom line increases.  *See generally id.*

24

25   [33] *See, e.g., id.* ¶¶ 59-60, 85-86, 96.

26   [34] *See, e.g., id.* ¶ 59; Investment Performance, Compl. Ex. C (disclosure to Plaintiff Marfice listing funds available as of December 31, 2009); 2011 Form 5500 at MTD2-136-37 (listing funds available as of December 31, 2011), Rosenberg Decl. Ex. 5.

27

28   [35] Compl. ¶¶ 105-06.

9

that Plaintiffs did not have actual knowledge of their claims until "shortly before this action was filed" because they did not have knowledge of "comparisons of Plan costs and investment performance versus other available alternatives, comparisons to other similarly sized-plans, and the underlying holdings of the [Global Allocation Fund] and target date-funds."[36]  This purported justification—added for the first time in Plaintiffs' amended pleading—fails to salvage their claims for two reasons.

**First**, ERISA's statute of limitations is not tolled until a plaintiff has knowledge of every conceivable fact that can arguably constitute a breach; instead, it begins when a plaintiff has knowledge of the "essential" facts underlying her claims.[37]  In challenges to plan investments, like here, it is enough that Plaintiffs had knowledge of the Plan's investments and fees which, in the case of the mutual funds challenged here, are required under the Investment Company Act of 1940 to be publicly disclosed.  *See, e.g.*, *Young*, 550 F. Supp. 2d at 419.

**Second**, the disclosure documents attached to the Complaint along with the relevant public filings show that even the information Plaintiffs identify as being unknown to them was, in fact, available more than three years before filing the Complaint.  Information on fund fees and performance was provided to investors,[38] and similar data are publicly available for comparable funds and plans.[39]  Data on the underlying holdings of the available funds were similarly provided to investors,

---

[36] *Id.* ¶ 107.

[37] *See DeFazio*, 636 F. Supp. 2d at 1063-64 (actual knowledge requires that "a plaintiff [ ] know of the **essential** facts of the transaction or conduct constituting the violation") (emphasis added) (quoting *Martin v. Consultants & Admn'rs, Inc.*, 966 F.2d 1078, 1086 (7th Cir. 1992)).

[38] Participants were provided annual disclosures showing the fees.  Summary Plan Description at 11, Compl. Ex. B.  Information on fees and performance was also provided to investors in compliance with federal securities law.  *See* 15 U.S.C. § 77e(b)(2); 17 C.F.R. § 274.11A (1994); *see, e.g.*, PIMCO StocksPLUS Fund Prospectus at MTD2-154, 156-57 (July 31, 2011), Rosenberg Decl. Ex. 8.

[39] *See supra* n.38.  Other ERISA-governed plans would have filed publicly-available Forms 5000, as the Plan did.  Defendants disclosed some of the data on comparable funds to participants themselves.  A disclosure provided to Plaintiff Marfice dated December 31, 2009 disclosed the available funds' performance and compared many of the funds' performance to benchmarks.  Investment Performance, Compl. Ex. C.

1    as Plaintiffs themselves concede.[40]  Because all of the information Plaintiffs allege

2    would have provided them with actual knowledge was publicly available more than

3    three years ago, they cannot bypass ERISA's three year bar.  *See Young*, 550 F.

4    Supp. 2d at 419 (considering publicly-available fund prospectuses and disclosures

5    sent to plan participants in finding that the plaintiffs had actual knowledge more

6    than three years prior to the date of suit).[41]

7    **II.    Each Count of the Complaint Fails to State a Claim.**

8         Not only is the entire Complaint barred by the three year statute of

9    limitations, but each Count of the Complaint also fails to state a claim.

10        **A.    Governing Standards Under Rule 12(b)(6) and ERISA.**

11        A complaint must plead "enough facts to state a claim to relief that is

12   plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

13   "Conclusory statements . . . do not suffice" to state a claim.  *Iqbal*, 556 U.S. at 678;

14   *see Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (the court

15   need not "accept as true allegations that are merely conclusory").  Nor do allegations

16   contradicted by documents properly subject to judicial notice or referenced in the

17   complaint.  *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

18   "Determining whether a complaint states a plausible claim for relief will . . . be a

19   context-specific task that requires the reviewing court to draw on its judicial

20   experience and common sense."  *Iqbal*, 556 U.S. at 679.  Factual allegations that are

21   merely "consistent with" unlawful conduct do not state a plausible claim where

22   "more likely explanations" or "obvious alternative explanations" of lawful conduct

23   exist.  *Id.* at 682.[42]

24   _____

     [40] *See* Compl. ¶ 98; *see, e.g.*, Global Allocation Fund Schedule of Investments at
25   MTD2-160-61 (Aug. 31, 2015), Rosenberg Decl. Ex. 9.

26   [41] Although the Supreme Court addressed a separate timeliness question under
     ERISA earlier this year in *Tibble v. Edison International*, 135 S. Ct. 1823 (2015),
27   that case does not apply here as it concerned ERISA's six year statute of repose, not
     the three year statute of limitations.  *Id.* at 1827.

28   [42] For example, the Ninth Circuit affirmed dismissal where a plaintiff alleged that
     her former employer had improperly withheld inventions from business partners to

1    These principles apply to this action.  In enacting ERISA, "Congress sought

2    to create a system that is [not] so complex that administrative costs, or litigation

3    expenses, unduly discourage employers from offering [ERISA] plans in the first

4    place."  *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (internal quotation marks

5    omitted; alterations in original).  Accordingly, courts must avoid superimposing

6    their own views upon reasonable decisions reached by plan fiduciaries.  *Id.*  Rule

7    12(b)(6) is an "important mechanism for weeding out meritless claims" under

8    ERISA.  *See Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014).

**B.**    **Count I Fails to State a Claim for Breach of Fiduciary Duty.**

**1.**    **The Complaint is Devoid of Well-Pleaded Allegations Regarding the Investment Selection Process.**

12    Count I fails to state a claim because it is silent regarding the fiduciary

13    process actually employed to select or monitor the Plan's investment options.

14    ERISA's duties of prudence and loyalty regulate the process employed by,

15    and the motivation of, plan fiduciaries—not the results of fiduciary action.  The

16    Ninth Circuit focuses on fiduciary process in evaluating claims of imprudence;

17    because the "test of prudence is one of conduct, not results," "the proper question is

18    not whether the investment results were unfavorable, but whether the fiduciary used

19    appropriate methods to investigate the merits of the transaction."  *Harris v. Amgen,*

20    *Inc.*, 788 F.3d 916, 936 (9th Cir. 2014) (internal quotation marks omitted), *rev'd on*

21    *other grounds*, 2016 WL 280886 (U.S. Jan. 25, 2016).  Claims alleging breach of

22    the duty of loyalty likewise focus on the fiduciaries' process, and in particular on

23    their motivation:  "a breach of th[e] duty [of loyalty] requires some showing that the

24    fiduciaries' decisions were motivated by a desire to serve the interests of [the

25    company] over those of the beneficiaries."[43]

26    ──────────────────────

27    defraud them, given the "obvious alternative explanation" that the defendant had instead done so to "continue to use them as trade secrets."  *Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056-57 (9th Cir. 2011).

28    [43] *Tibble v. Edison Int'l*, No. CV 07-5359, 2010 WL 2757153, at *24 n.19 (C.D.

Here, the Complaint does not include any well-pleaded fact about the fiduciary process.  It asserts only in conclusory fashion that the Alleged Fiduciary Defendants "fail[ed] to monitor Plan investments and investigate whether" options could be chosen "at [a] lower cost, with comparable or superior performance, [managed] by an [unaffiliated] investment manager. . . ."[44]  Plaintiffs concede that they lack any knowledge of "Defendants' decision-making processes," including the processes for "selecting, monitoring, and removing Plan investments,"[45] and therefore cannot make any well-pleaded allegations regarding them.

Plaintiff's failure to make well-pleaded allegations regarding the process employed is fatal to their claim, regardless of any attempt to salvage their claim by suggesting that a relaxed pleading standard is appropriate because such knowledge "is solely within the possession of Defendants."[46]  The Second Circuit has already rejected a similar argument, holding that an ERISA claimant's lack of knowledge about a defendant's fiduciary process cannot justify a relaxed pleading standard, especially given the role that Rule 12(b)(6) plays in preventing expensive strike suits based on nothing more than speculation.  *See Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 720-24 (2d Cir. 2013) (affirming dismissal of ERISA claim where plaintiff's conclusory allegation that the defendants "failed to monitor" the plan investment lacked sufficient factual detail about the fiduciary's action to meet the plaintiff's burden to challenge the process employed).

Given the absence of any well-pleaded factual allegation about a deficient process, Count I fails.

---

Cal. July 8, 2010), *aff'd*, 711 F.3d at 1061, *aff'd en banc*, 729 F.3d 1110, *rev'd on other grounds*, 135 S. Ct. 1823 (2015).  Other circuits agree.  *See, e.g.*, *Pfeil v. State Street Bank & Trust Co.*, 806 F.3d 377, 384 (6th Cir. 2015) (citing *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014)).

[44] Compl. ¶ 118(b).

[45] *Id.* ¶ 107.

[46] *Id.*

13

2.      **The Complaint's Allegations Do Not Support An Inference that the Alleged Fiduciary Defendants Violated their Duties.**

Lacking any allegation regarding the actual process, Plaintiffs seek to imply a deficient process.  But Plaintiffs' allegations do not create a plausible inference that there was any deficiency in the fiduciary process.

(a)      **The Allegation that the Plan Invested in PIMCO and Allianz Global Investors Funds Does Not Support an Inference of Imprudence or Disloyalty.**

The Complaint first seeks to imply a deficient process because fiduciaries selected "investments managed by either PIMCO or Allianz Global Investors"—and only by PIMCO or AGI—as "'core' investment options."[47]  The Complaint concludes that this must have been done "to contribute to the Allianz Family's bottom line."[48]  But the allegations provide no support for such an inference.

*First*, Plaintiffs' allegations fail because they are contradicted by the Summary Plan Description that they attach to their Complaint.  That document makes clear that the Plan participants were not limited to the "core" investment options.  Instead, the Plan also made available a Schwab Personal Choice Retirement Account through which participants can invest up to 100% of their Plan accounts in a large universe of stocks, bonds, ETFs, and mutual funds, including unaffiliated mutual funds and investments at all fee levels, many of which can be bought without a commission and have very low fees.  *See supra* at 5-6.  As the Seventh Circuit has held, the investment options offered through a brokerage window should be considered when determining whether ERISA fiduciaries have breached their fiduciary duties.  *See Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (affirming dismissal where the brokerage window enabled participants to select from a large universe of additional, varied options).  Here, many Plan participants have taken advantage of the Schwab Personal Choice Retirement

---

[47] Compl. ¶¶ 59, 118(a).

[48] *Id.* at 118(a).

Account; indeed, over 13% of Plan assets are invested through it, more than in any one proprietary fund offered as a "core" investment option.  *See supra* at 6.  If, in selecting "core" investment options, Defendants were motivated by a desire to generate additional fees for the AAM Entities, the Plan would not have offered the Schwab Personal Choice Retirement Account as an option.

*Second*, a plan structure consisting solely of propriety funds cannot give rise to an inference that ERISA fiduciaries breached their duties.  Not only do financial services companies routinely utilize their own investment products for their plans, but this practice has been expressly anticipated and recognized by Congress and the DOL.  Congress has long recognized that it is "common practice" for financial services companies to invest their own plans' assets in their own investment funds.[49] And the DOL, which is the relevant federal regulator, has also recognized that it would be "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor."[50]

For this very reason, when ERISA was enacted, Congress created express exemptions to the ERISA "prohibited transaction" rules—provisions that were designed to protect against self-dealing and conflicts of interest—to allow plans sponsored by banks and insurance companies to offer their own investment products to their employees through plans they sponsor.  *See* ERISA §§ 408(b)(5), (8), 29 U.S.C. §§ 1108(b)(5), (8).  In 1977, the DOL extended this relief (retroactive to ERISA's January 1, 1975 effective date) to plans sponsored by mutual fund advisors and their affiliates to enable such plans to invest in their affiliated mutual funds pursuant to Prohibited Transaction Exemption ("PTE") 77-3.[51]  In so doing, the DOL recognized that allowing mutual fund companies to make proprietary funds

---

[49] H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5096.

[50] 56 Fed. Reg. at 10730.

[51] 42 Fed. Reg. at 18734-35.

1  available for employee plans is "in the interests of plans and of their participants and

2  beneficiaries" and "protective of the rights of participants and beneficiaries."[52]

3       Conformity with a commonplace practice that has long been acknowledged

4  and authorized by the relevant regulator and by Congress creates no inference of

5  wrongdoing.  As explained by one court in a case much like this one, that

6  defendants "followed such a practice—the very result Congress [and the DOL]

7  intended to approve by enacting the[se] exemptions—***does not give rise to an***

8  ***inference of disloyalty***."  *Dupree v. The Prudential Ins. Co. of Am.*, No. 99-8837,

9  2007 WL 2263892, at *45 (S.D. Fla. Aug. 7, 2007) (emphasis added).[53]

10       ***Third***, Plaintiffs' theory that Defendants have structured the Plan "to

11  contribute to the Allianz Family's bottom line" is further implausible because it

12  makes no economic sense.  Since 2009, the AAM Entities have voluntarily

13  contributed ***over $245 million of their own money*** into the Plan.  *See supra* at 5.  In

14  2013 alone, they contributed over $47 million—approximately ***twenty times*** greater

15  than the $2.5 million in alleged excessive fees for that year.[54]  If Defendants' intent

16  had been to ***improve*** their "bottom line," as Plaintiffs allege,[55] they would not have

17  ***reduced*** their bottom line through the expenditure of hundreds of millions of dollars

18  to recapture indirectly a small fraction of that amount.

19       ***Fourth***, Plaintiffs' suggestion that the fiduciaries' process was deficient, and

20  that they added proprietary funds without regard to the funds' performance or fees,

21  fails because publicly-filed documents show instead that the Plan offers less than a

22  third of the total AGI and PIMCO funds offered to the public.[56]  The "obvious

---

23  [52] *Id.* at 18735.

24  [53] While *Dupree* was decided after trial, its observation applies here.  *Dupree* was originally filed before the Supreme Court set forth the present pleading standards in

25  *Twombly* and *Iqbal*.  As the Supreme Court has later said, Rule 12(b)(6) requires courts to weed out "meritless, economically burdensome [ERISA] lawsuits."  *Fifth*

26  *Third Bancorp*, 134 S. Ct. at 2470-71.

27  [54] *See* Compl. ¶ 5.

   [55] *Id.* ¶ 118(a).

28  [56] *See* Allianz Funds Multi-Strategy Trust Prospectus at MTD2-165-66 (Apr. 1,

1   alternative explanation" to Plaintiffs' theory is that the fiduciaries carefully selected

2   those funds that would best meet participant needs.  *Iqbal*, 556 U.S. at 682.

3          Thus, the Plan's structure does not plausibly imply a deficient process.

4                    **(b)**     **The Complaint's Other Allegations Do Not Support an Inference of Imprudence or Disloyalty.**

5

6          Failing to plead any facts about the actual process employed, and failing to

7   create an inference of a deficient process based on the Plan structure, the Complaint

8   next asserts that the Court should draw a negative inference about the process

9   because other investment options "could be provided at lower cost, with comparable

10  or superior performance," and because the fiduciaries allegedly "add[ed] new and

11  untested [proprietary] mutual funds within the plan" to "seed" them.[57]  Like their

12  other allegations, these circumstantial facts are insufficient to "nudge" Plaintiffs'

13  claims of a deficient process "across the line from conceivable to plausible."  *Iqbal*,

14  556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).

15         ***First***, the Complaint fails to adequately allege that any of the Plan's funds

16  charged excessive fees, let alone that Plaintiffs personally were charged more than

17  the fair value of the services they received.  Instead, the public record reflects that

18  the Plan contained low-fee and high-quality investment options.

19         Plaintiffs allege that the aggregate Plan fees were higher than fees charged by

20  other plans, and cite as support a study conducted by the Investment Company

21  Institute ("ICI").[58]  However, the ICI acknowledged that its study is incomplete.[59]

22

23  2015), Rosenberg Decl. Ex. 10 (AGI offers forty-two funds to the public); PIMCO Funds Prospectus at MTD2-179-82 (Oct. 1, 2015), Rosenberg Decl. Ex. 11 (PIMCO offers eighty-eight funds to the public).

24

    [57] Compl. ¶¶ 82, 118(b)-(d).

25  [58] Compl. ¶¶ 66, 69.

26  [59] ICI Study at MTD2-236, Rosenberg Decl. Ex. 20.  Additionally, the average fees reported by the ICI are inapplicable because the study includes dissimilar plans that offer stable value, index, and company stock funds, options with low or no fees that are not offered as core options by the Plan.  *Id.* at MTD2-232, 239 (stable value, index and company stock comprise more than one-third of the assets in the study).

27

28

Moreover, aggregate fees do not reflect on the *fiduciary* process, but instead, because the Plan is participant-directed, the fees reflect *participant* decisions; some participants may choose to invest in higher-fee options for a host of reasons and, if they do, the aggregate fee level of the Plan would necessarily appear higher than in plans whose participants do not choose such options.  Indeed, Plan participants can choose to invest entirely in unaffiliated investments through the self-directed brokerage window, which results in no fees paid to the AAM Entities.

Additionally, Plaintiffs allege that the investment options available in the Plan were more expensive than "comparable institutional mutual funds" that they contend are "frequently used by other plans."[60]  However, as the Seventh Circuit has observed, "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."  *Hecker*, 556 F.3d at 586.  Here, the overwhelming majority of funds identified by Plaintiffs as "comparable . . . funds" are index funds affiliated with The Vanguard Group.[61]  Courts have specifically rejected analogous claims of fiduciary breach with respect to funds with higher expenses than Vanguard funds, a fund family noted for its low-cost services.  *See Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 345-46 (2d Cir. 2006) (upholding dismissal of Investment Company Act claims based on allegation that Vanguard offered a comparable fund with cheaper fees).[62]  That comparison is further attenuated here, where Plaintiff attempts to compare index and actively managed funds.  Indeed, the publicly-available Morningstar data upon which the Complaint itself otherwise relies demonstrates that approximately two-thirds of the "core" mutual fund options

---

[60] Compl. ¶ 72.

[61] *Id.*

[62] *See also Reso Artisan Int'l Fund v. Artisan Partners Ltd. P'ship*, No. 11-CV-873-JPS, 2011 WL 5826034, at *8 (E.D. Wis. Nov. 18, 2011) (comparisons to Vanguard "of little value").  While the Vanguard funds that Plaintiffs allege are "comparators" have expenses of between 4-44 basis points (one basis point = 0.01%), the non-Vanguard funds have expenses of between 17-76 basis points.  Compl. ¶ 72.

18

1   in the Plan—twenty-nine of the forty-five mutual funds offered as of December 31,

2   2014—have *lower than average fees* when compared to comparable mutual funds.[63]

3       Plaintiffs' allegations about fees also fail because Plaintiffs ignore entirely the

4   fact that the Plan's "core" investment options are not the only ones in which

5   participants may invest.  The brokerage window provides participants with the

6   opportunity to invest up to 100% of their account balance in a large universe of

7   stocks, bonds, ETFs, and additional mutual funds, including low-fee options.  *See*

8   *Hecker*, 556 F.3d at 586, 590 (affirming dismissal of claim challenging investment

9   options offered to the Plan where participants could "control the risk of loss from

10  fees" by investing in low-fee options through the brokerage window).[64]

11      Further, Plaintiffs' attempt to compare the Plan's aggregate fees to a supposed

12  benchmark also fails because the allegations nowhere compare the fees charged to

13  the services provided.  Defendants have made available at no cost to Plan

14  participants a wide variety of educational tools and services.  *See supra* at 6.  The

15  sources upon which the Complaint relies acknowledge that such "ancillary services"

16  provided to plan participants should be considered when determining if fees are

17  excessive.[65]  But the Complaint fails entirely to look at the service side of the

18  equation.  Plaintiffs' failure to allege that the fees charged "[a]re excessive in

19  relation to the services rendered" dooms their claim.  *Young*, 325 F. App'x at 33

20  (internal quotation marks omitted).

21      *Second*, the Complaint fails adequately to allege poor performance.  In fact,

22  Plaintiffs only allege that fifteen of the approximately seventy "core" funds offered

23

24  ---
  [63] Appendix A.

25  [64] Plaintiffs criticize the Schwab Personal Choice Retirement because the Summary
  Plan Description states "there could be trading fees," Compl. ¶ 43, but that same

26  source states that [t]here are no annual administrative fees" and that trading fees are
  only "potential," depending on the specific investment option chosen.  Summary

27  Plan Description at 12, Compl. Ex. B.

  [65] DOL, Study of 401(k) Plan Fees and Expenses, at MTD2-243 (April 13, 1998),

28  https://www.dol.gov/ebsa/pdf/401kRept.pdf, Rosenberg Decl. Ex. 21.

to the Plan between 2009 and 2014 performed poorly.[66]  But even their allegations regarding this minority of funds fail to state a claim.

For example, Plaintiffs allege that five PIMCO RealRetirement funds, six AGI target-date funds, and three other funds have "performed poorly," and "underperformed their benchmark index" or have "significantly underperformed [their] peers"[67]  These allegations are too conclusory.  Plaintiffs do not allege those funds' peers or benchmarks, or by how much or for what periods of time the funds have allegedly underperformed.  Plaintiffs also allege that the Global Allocation Fund has performed poorly over some periods.[68]  However, the institutional share class of the Global Allocation Fund, which is available under the Plan, has outperformed its benchmarks since the Fund's inception on September 30, 1998, and has outperformed an independently-assigned benchmark in three of the past six years.[69]

In *Leber v. Citigroup, Inc.*, No. 07 Civ. 9329, 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010), the court dismissed identical claims of a deficient process based on alleged underperformance of a portion of the proprietary investments, holding that "plaintiffs' allegation that the committee defendants breached duties of prudence and care by selecting affiliated mutual funds that 'substantially under-performed similar products available from unaffiliated investment managers' is supported by nothing beyond plaintiffs' bare assertion," and, thus, could not support a claim for breach of fiduciary duty.  *Id.* at *14.  As one court observed in a different context,

---

[66] *See generally* Compl.; 2014 Form 5500 at MTD2-114-15, Rosenberg Decl. Ex. 2; 2013 Form 5500 at MTD2-121-22, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD2-129-30, Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD2-136-37, Rosenberg Decl. Ex. 5; 2010 Form 5500 at MTD2-143-44, Rosenberg Decl. Ex. 6; 2009 Form 5500 at MTD2-151-52, Rosenberg Decl. Ex. 7

[67] Compl. ¶¶ 88-90.

[68] *Id.* ¶¶ 103, 118(d).

[69] Allianz Funds Multi-Strategy Trust Prospectus at MTD2-171 (Apr. 1, 2015), Rosenberg Decl. Ex. 10; Morningstar.com, http://performance.morningstar.com/fund/performance-return.action?t=PALLX (last visited Feb. 3, 2016) (showing 2010-15 performance).

alleged underperformance is not probative of fiduciary breach because mutual fund

performance is "cyclical[; a]n underachieving fund one year may be an

overachieving fund the next."  *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d

677, 687-88 (D.N.J. 2007) (dismissing claim based on alleged underperformance).

In addition, Plaintiffs cannot establish an inference of a deficient process

based on a small minority of investments.  Relatively few Plan assets are invested in

the funds highlighted by Plaintiffs.  In fact, between 2009 and 2014, only

approximately 5% of Plan assets in the aggregate were invested in fourteen of the

fifteen funds combined, putting aside the Global Allocation Fund, which has

performed well.[70]  By contrast, as of December 31, 2013, the date Plaintiffs use in

their Complaint,[71] over 6% of the Plan's assets were invested in the PIMCO

StocksPLUS Fund alone, which has outperformed its benchmark over the past year,

five years, and ten years.[72]  Similarly, the PIMCO Total Return Fund, which

accounted for over 7% of the Plan's assets on that date, has outperformed its

benchmarks over the past ten years.[73]

**Third**, and finally, Plaintiffs' allegations that Defendants added fifteen

PIMCO and AGI funds as Plan investment options to "seed" those funds likewise

fails to support the requisite inference.[74]  Plaintiffs' inference fails as a preliminary

matter because they elsewhere admit that AGI and PIMCO have launched ***eighty-***

***five*** funds since 2008.[75]  Had Defendants truly intended to add the new AGI and

---

[70] 2014 Form 5500 at MTD2-114-15, Rosenberg Decl. Ex. 2; 2013 Form 5500 at
MTD2-121-22, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD2-129-30,
Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD2-136-37, Rosenberg Decl. Ex. 5;
2010 Form 5500 at MTD2-143-44, Rosenberg Decl. Ex. 6; 2009 Form 5500 at
MTD2-151-52, Rosenberg Decl. Ex. 7.

[71] *See, e.g.*, Compl. ¶ 96.

[72] 2013 Form 5500 at MTD2-121-22, Rosenberg Decl. Ex. 3; PIMCO Funds
Prospectus at MTD2-177 (Oct. 1, 2015), Rosenberg Decl. Ex. 11.

[73] 2013 Form 5500 at MTD2-121-22, Rosenberg Decl. Ex. 3; PIMCO Total Return
Fund Prospectus at MTD2-188 (July 31, 2015), Rosenberg Decl. Ex. 12.

[74] Compl. ¶¶ 85-90.

[75] *Id.* ¶¶ 80, 87.

21

PIMCO funds to the Plan to "seed" them, they would have added far more than just fifteen of these eighty-five funds to the Plan.[76]

In any event, Plaintiffs have offered no support for their theory that a plan may not add any proprietary investment options that have been in existence for less than one or two years.[77]  Nor does such an allegation make sense here, where (1) the AAM Entities are mutual fund companies, with numerous employees who are sophisticated about the markets and may wish to invest in the very same innovative products they make available to their customers, and (2) the AAM Entities provide free advisory services through an independent investment advisor to assist less sophisticated participants in avoiding whatever unwanted risks Plaintiffs might perceive in investing in a smaller or less established fund.[78]

The Complaint's "seeding" allegations are further implausible in light of the public record, which demonstrates that the funds allegedly "seeded" were generally popular funds with no need for "seed" money from the Plan.  From 2009 to 2014, Plan investments constituted only ***one or two percent*** of the total assets invested in the allegedly seeded funds.[79]  There is a "common sense," "obvious alternative explanation," *Iqbal*, 556 U.S. at 679, 682, for the addition of these funds to the Plan lineup:  a wide array of funds advised by PIMCO and AGI provides the greatest participant choice.  *See Dupree*, 2007 WL 2263892, at *39 (that the plan added new investment products does not give rise to an inference that these products were added to benefit the plan sponsor).

Moreover, it defies logic that fiduciaries would believe that they could "seed"

---

[76] Plaintiffs' theory also fails in the first instance because any claim based on "seeding" is barred by the three-year limitations period, as all of the funds allegedly seeded were added to the Plan no later than December 31, 2011.  *See* 2011 Form 5500 at MTD2-136-37, Rosenberg Decl. Ex. 5; *supra* at 8-11.

[77] Compl. ¶¶ 84, 85-86.

[78] To the extent Plaintiffs' theory is focused instead on any alleged underperformance of the funds alleged to have been "seeded" in Complaint at ¶¶ 88-90, it fails for the reasons described above.  *See supra* at 19-21.

[79] *See* Appendix B.

22

1   a handful of funds by adding them to the Plan lineup.  Given that the Plan is entirely

2   participant directed, no fiduciary could direct Plan investments.  Participants had

3   complete discretion to choose whether to invest in the small number of new options,

4   or to remain invested in the much larger number of established funds.  And, in fact,

5   most participants did not select these newer funds.  Indeed, between 2009 and 2014,

6   Plan participants maintained, in total, only approximately 5% of their Plan assets in

7   the fourteen funds allegedly directly "seeded" during that time.[80]

8          And, in part because of its generally strong performance, Plaintiffs'

9   conclusory allegations that the Global Allocation Fund was selected as the default

10  investment option to indirectly "seed" other PIMCO and AGI funds[81] are less

11  plausible than the "obvious alternative explanation"—that the Global Allocation

12  Fund was selected as the default option because it was thought to be the best fund

13  for that purpose.  As Plaintiffs concede, the Global Allocation Fund is a "balanced

14  fund," meaning that it invests in both stocks and bonds.[82]  Morningstar rates it as

15  having below average fees.[83]  As explained above, the fund has had years of strong

16  performance.  Accordingly, it is more plausible that the Global Allocation Fund was

17  selected as the default investment option because it allowed Plan participants to

18  obtain favorable performance at a relatively low cost while exposed to a variety of

19  investments.  *See Iqbal*, 556 U.S. at 682.[84]

20

21  ────────────────

[80] 2014 Form 5500 at MTD2-114-15, Rosenberg Decl. Ex. 2; 2013 Form 5500 at MTD2-121-22, Rosenberg Decl. Ex. 3; 2012 Form 5500 at MTD2-129-30,

22  Rosenberg Decl. Ex. 4; 2011 Form 5500 at MTD2-136-37, Rosenberg Decl. Ex. 5; 2010 Form 5500 at MTD2-143-44, Rosenberg Decl. Ex. 6; 2009 Form 5500 at

23  MTD2-151-52, Rosenberg Decl. Ex. 7

24  [81] Compl. ¶¶ 98-99, 118(d).

[82] *Id.* ¶¶ 42, 97.

25  [83] Appendix A.

26  [84] Plaintiffs contend that, despite these facts, Defendants should have chosen a fund with lower costs and better performance as the default option, and specifically

27  propose the American Funds Capital Income Builder Fund.  Compl. ¶ 103 & n.5. As stated above, nothing in ERISA requires Defendants to "scour the market" for

28  lower-cost options, and performance can be cyclical.

1    In sum, Plaintiffs' conclusory allegations about allegedly high fees and poor

2 performance do not plausibly imply a deficient process, nor do their specious

3 allegations about "seeding."  Accordingly, Count I fails to state a claim, and the

4 Alleged Fiduciary Defendants should be dismissed from this action.

5    **C.    Counts II and III Should Be Dismissed.**

6       **1.    Counts II and III Fail Because Plaintiffs Have Not
             Adequately Pleaded a Primary Breach of Duty.**
7

8    Counts II and III are both premised on Count I's alleged breaches of fiduciary

9 duties regarding the selection and maintenance of investment options for the Plan.[85]

10 Because Plaintiffs have failed to adequately allege any primary breach of fiduciary

11 duty, their derivative and remedial claims in Counts II and III should be dismissed.

12    Specifically, Count II alleges that AAM LP, AAM LLC, and Maney breached

13 additional ERISA duties by "failing to monitor [the Committee members'] fiduciary

14 processes" and by "failing to remove [the Committee members]" who maintained

15 allegedly imprudent funds as investment options under the Plan.[86]  As Plaintiffs

16 have not adequately alleged underlying breaches of fiduciary duties by the

17 Committee members in Count I, their duty to monitor claim necessarily fails as well.

18 *See In re Bank of Am. Corp. Sec.,* 756 F. Supp. 2d 330, 359 (S.D.N.Y. 2010)

19 ("Where a claim rests on allegations that the appointed fiduciaries breached a duty

20 of prudence, a failure to monitor claim fails where the plaintiffs do not successfully

21 allege a breach of the duty of prudence.").[87]

22    Count III fails for the same reason.  That Count is entirely remedial in

23 nature—it seeks restitution or disgorgement from the AAM Entities of the

24

25 _____

[85] Compl. ¶¶ 127, 131-32.

26 [86] *Id.* ¶ 127.

27 [87] *See also Romero v. Nokia, Inc.*, No. 12-cv-6260, 2013 WL 5692324, at *5 (N.D.
Cal. Oct. 15, 2013) (dismissing failure to monitor fiduciaries claim where the claim
28 was "dependent" on a inadequately pleaded claim that the appointed fiduciaries
acted improperly).

1  compensation they received from investments that resulted from the Alleged

2  Fiduciary Defendants' supposed breach of duties.[88]  Because Plaintiffs have not

3  adequately alleged a separate violation of ERISA, their separate remedial claim

4  fails.  *See Nalbandian v. Lockheed Martin Corp.*, No. 10-cv-1242, 2011 WL

5  338809, at *4-5 (N.D. Cal. Feb. 1, 2011) (dismissing remedial claim where the

6  plaintiff had not adequately alleged an underlying ERISA breach).

2.  **Count II Fails Because the Complaint Contains No Well-Pleaded Facts Regarding the Fiduciary Monitoring Process.**

9  Count II also fails because it lacks a well-pleaded allegation regarding the

10  process employed to monitor the appointed fiduciaries.

11  Instead, Count II asks the Court to imply a deficient process based on the

12  same attributes of the "core" investments selected for the Plan that form the basis for

13  the claim in Count I.[89]  Because the Complaint lacks any well-pleaded allegations

14  "that support [their] claim that" AAM LP, AAM LLC, and Maney "failed to

15  periodically review the performance" of the appointed fiduciaries, Plaintiffs have

16  failed to state a claim for breach of the duty to monitor fiduciaries.  *See In re*

17  *Calpine Corp. ERISA Litig.*, No. C-03-1685, 2005 WL 1431506, at *6 (N.D. Cal.

18  Mar. 31, 2005).  Count II should therefore be dismissed.  *Id.* (dismissing claim); *In*

19  *re McKesson HBOC, Inc. ERISA Litig.*, No. C00-20030, 2002 WL 31431588, at *16

20  (N.D. Cal. Sept. 30, 2002) (same, where "there are no facts alleged to support the

21  allegation that the [defendants] failed to monitor the performance of the [appointed

22  fiduciaries]").  Further, for the same reasons that the structure and investments of

23  the Plan do not create a plausible inference that there was a deficient process leading

24  to their selection and review, those same facts cannot plausibly imply a further

25  inference that the monitoring fiduciaries employed a deficient process in reviewing

26  their appointees.  As such, Count II fails for this additional reason.

27  ───────────────
[88] Compl. ¶ 133.

28  [89] *See, e.g.*, Compl. ¶ 127.

25

**3.     Count III Fails Because It Seeks Relief from Non-fiduciaries that Is Not Allowed under ERISA.**

Even if Plaintiffs had adequately pleaded a breach of ERISA fiduciary obligations, Count III fails to state a claim because Plaintiffs do not state a claim for relief that is recoverable from non-fiduciaries under ERISA.

Count III seeks to recover from the AAM Entities, acting in non-fiduciary capacities, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).[90]   Unlike ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)—which is invoked as to Counts I and II, and allows a plan to recover damages from a breaching fiduciary[91]—ERISA § 502(a)(3) only permits recovery of "other appropriate equitable relief."  Given "that ERISA is a comprehensive and reticulated statute," the Supreme Court has held that § 502(a)(3) must be read to "mean *something* less than *all* relief."  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209-10 (2002) (emphasis in original). Specifically, the Court has ruled that "equitable relief in § 502(a)(3) must refer to those categories of relief that were *typically* available in equity."  *Id.* at 210 (internal quotation marks omitted) (emphasis in original).  Restitutionary remedies such as constructive trusts are only available in equity "where money or property identified as belonging in good conscience to the plaintiff c[an] clearly be traced to particular funds or property in the defendant's possession."  *Id.* at 213.[92]   Otherwise, they constitute requests for restitution in law or money damages that are not permitted under ERISA § 502(a)(3).  *Great-West Life*, 534 U.S. at 209-10.[93]   Accordingly,

---

[90] Compl. ¶ 133.

[91] ERISA § 502(a)(2) allows "for appropriate relief under" ERISA § 409(a), which, in turn, provides in relevant part that a breaching fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . ." 29 U.S.C. § 1109(a).

[92] The Supreme Court has reaffirmed these principles in recent years, repeating that § 502(a)(3) only permits the relief "typically available in equity," and only constructive trusts if the funds were "specifically identified." *Montanile v. Bd. of Trs. of the Nat'l Elevator Industry Benefit Plan*, 136 S. Ct. 651, 657 (2016); *Sereboff v. Mid Atl. Med. Servs.*, 547 U.S. 356, 361-63 (2006).

[93] Although the Supreme Court has suggested that this requirement can be relaxed for suits seeking surcharges from *fiduciaries* because such a remedy was considered

26

1    courts have dismissed claims against non-fiduciaries for disgorgement of "excessive

2    fees" where the revenue cannot "clearly be traced to particular funds or property" in

3    defendants' possession. *Nechis v. Oxford Health Plans, Inc.*, 328 F. Supp. 2d 469,

4    478 (S.D.N.Y. 2004) (dismissing ERISA § 502(a)(3) claim for restitution for failure

5    to allege that the funds sought "exist in a separately identifiable account"), *aff'd*,

6    421 F.3d 96 (2d Cir. 2005).[94]

7           Here, Count III seeks "equitable restitution" and "[a]n order imposing a

8    constructive trust."[95]  But Plaintiffs do not allege that any of the money sought to be

9    disgorged can be traced to particular funds or property in the AAM Entities'

10   possession.  Nor could they.  The funds sought by Plaintiffs are necessarily the

11   expenses of the mutual funds they have selected for their Plan accounts.  Plaintiffs

12   have not alleged, nor could they, that the advisers of the funds in which they invest

13   have segregated the fees received from their investments, or any of the Plans'

14   investments, from any other amount of fund fees.  Therefore, even though they style

15   their request as one for "equitable restitution" or a constructive trust, it is in fact a

16   request for restitution at law or money damages and therefore impermissible under

17   ERISA § 502(a)(3).  *See Nechis*, 328 F. Supp. 2d at 478.

18          Count III should be dismissed for the additional reason that Plaintiffs cannot

19   plead the requisite knowledge.  The Supreme Court explained that a plaintiff may

20   recover from non-fiduciaries under ERISA § 502(a)(3) only where the non-

21   fiduciaries "had actual or constructive knowledge of the circumstances that rendered

22   the transaction unlawful."  *Harris Trust and Sav. Bank v. Salomon Smith Barney*,

23

---

24   equitable under trust law, *CIGNA Corp. v. Amara*, 563 U.S. 421, 441-42 (2011), this

25   reasoning does not apply to claims against **non-fiduciaries**.  *See Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 878-89 (7th Cir. 2013).

26   [94] *See also Chilko v. Lorren*, No. 07-cv-1316, 2008 WL 3154734, at *5 (E.D. Cal. Aug. 3, 2008) (denying plaintiff's motion for default judgment under ERISA

27   § 502(a)(3) because plaintiff failed to allege "specifically identifiable property that is within the control or possession of the defendant").

28   [95] Compl. Prayer for Relief ¶¶ E-F.

530 U.S. 238, 251 (2000).  The conclusory allegation that the AAM Entities "knew or should have known" that the Alleged Fiduciary Defendants had breached their duties by selecting PIMCO and AGI funds[96] fails to satisfy Plaintiffs' burden, especially where investment in proprietary funds has been authorized by the DOL and Congress.  *See supra* at 15-16.

Because Count III cannot state a claim for relief under ERISA § 502(a)(3), it should be dismissed, and the AAM Entities should be dismissed from this action.[97]

## III.    Plaintiffs Lack Standing to Sue Regarding Investment Options in Which They Did Not Invest.

Not only does the Complaint fail to state a claim under Rule 12(b)(6), but Plaintiffs lack constitutional standing to seek redress with respect to Plan investment options in which they did not invest, divesting the Court of subject matter jurisdiction over much of this action pursuant to Rule 12(b)(1).

Whether a plaintiff has standing is a "threshold question in every federal case."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Where a plaintiff lacks standing, courts lack subject matter jurisdiction.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  To satisfy Article III's case and controversy requirement, a plaintiff must establish that she "personally has suffered some actual or threatened injury. . . ."  *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 335 (1990) (internal quotations omitted).  Even at the motion to dismiss stage, the burden is on the plaintiff to make this showing.  *See White*, 227 F.3d at 1242 (affirming dismissal where the plaintiff failed to establish standing).

The case law makes clear that Plaintiffs lack standing to assert any claim with respect to funds in which they did not invest.  As the Supreme Court explained:  "[a] plaintiff who has been subject to injurious conduct of one kind [does not] possess by

---

[96] Compl. ¶ 131.

[97] Although AAM LP and AAM LLC are also named in Counts I and II, those Counts should be dismissed for the reasons stated above.

virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982). "[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured" by the conduct charged. *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotations and citations omitted).

Applying these principles, courts in this Circuit, including in this District, have regularly granted motions to dismiss on standing grounds where named plaintiffs that invested in funds or securities sought to represent a class, and recover for violations, regarding funds or securities they did not own. *See, e.g.*, *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1163-64 (C.D. Cal. 2010) (granting motion to dismiss on standing to the extent that the named plaintiffs did not own the securities at issue).[98]  As one of these courts succinctly held, "[a] plaintiff has no Article III standing to sue [regarding] those [mutual] funds he did not personally own." *Siemers*, 2006 WL 304190, at *7-8.

These constitutional principles apply here.  Courts have dismissed similar ERISA claims challenging the use of proprietary investment funds as investment options for retirement plans where the plaintiffs only held some of the funds at issue.  For example, in *Fuller v. SunTrust Banks, Inc.*, Civ. A. No. 11-cv-784, 2012 WL 1432306 (N.D. Ga. Mar. 20, 2012), the court dismissed virtually identical ERISA claims to those brought here for lack of standing.  In ruling on the defendants' motion to dismiss, the court held that the named plaintiff lacked standing to raise her claims with respect to a fund in which she did not invest.  *Id.* at *8.[99]  The court explained that dismissal for lack of standing was required because the complaint did "not describe[] how the offering of a fund in which [plaintiff] did

[98] *See also In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 965 (N.D. Cal. 2010) (same); *Siemers v. Wells Fargo & Co.*, No. C 05-04518, 2006 WL 3041090, at *7-8 (N.D. Cal. Oct. 24, 2006) (same, to the extent that the named plaintiff did not own the mutual funds at issue).

[99] *Aff'd on different grounds*, 744 F.3d 685 (11th Cir. 2014), *abrogated on different grounds*, *Stargel v. SunTrust Banks, Inc.*, 791 F.3d 1309 (11th Cir. 2015).

1    not invest caused her a non-speculative injury." *Id.*  Similarly, in *David v. Alphin*,

2    817 F. Supp. 2d 764 (W.D.N.C. 2011), *aff'd on other grounds*, 704 F.3d 327 (4th

3    Cir. 2013), the court likewise dismissed, for lack of standing, a claim virtually

4    identical to those asserted in this case because the named plaintiff had not invested

5    in the challenged fund.  *Id.* at 781.

6         This Court should accordingly dismiss Plaintiffs' claims to the extent they

7    concern funds in which Plaintiffs did not invest, as Plaintiffs have no financial

8    interest in those funds.  From 2009 to the present, Plaintiffs have invested in only

9    eleven of the investment options offered under the Plan.[100]  They therefore lack

10   constitutional standing to sue regarding the remaining investment options offered

11   under the Plan, and their claims should be dismissed to the extent they relate to

12   those funds.  For example, Plaintiffs were invested in only three of the fifteen funds

13   that were allegedly "seeded" or incurred periods of alleged underperformance.[101]

14   And, although they allege that the investment options offered to the Plan generally

15   had high fees,[102] Plaintiffs only invested in two funds that were rated by

16   Morningstar as having higher than average fees (the AllianzGI Micro Cap Fund and

17   the AllianzGI Retirement 2040 Fund).[103]

18                           **CONCLUSION**

19        For the foregoing reasons, the Complaint should be dismissed with prejudice.

20

21

22

---

23   [100] Compl. ¶¶ 105-06 (Global Allocation Fund, PIMCO StocksPLUS Fund, AllianzGI Retirement 2040 Fund, PIMCO RealPath 2040 Fund, AllianzGI NFJ Dividend Value Fund, AllianzGI Focused Growth Fund, AllianzGI Micro Cap Fund, AllianzGI Mid-Cap Fund, PIMCO Real Return Fund, PIMCO Short Asset Investment Fund, and PIMCO Total Return Fund).

24

25

26   [101] *See id.* ¶¶ 88-90, 103, 105-06 (of these funds, Plaintiffs only invested in the PIMCO RealPath Fund, the AllianzGI Retirement 2040 Fund, and the Global Allocation Fund).

27   [102] *Id.* ¶¶ 69-70.

28   [103] *See id.* ¶¶ 105-06; Appendix A.

1   Dated:  February 5, 2016                    Respectfully submitted,

2                                               By:*/s/ James. O. Fleckner*

3                                               James O. Fleckner (*pro hac vice*)
                                                *jfleckner@goodwinprocter.com*
4                                               David Rosenberg (*pro hac vice*)
                                                *drosenberg@goodwinprocter.com*
5                                               **GOODWIN PROCTER LLP**

6                                               53 State Street
                                                Boston, Massachusetts 02109
7                                               Telephone:  (617) 570-1000
                                                Facsimile:  (617) 523-1231
8

9

10                                              Christina Queiros Bouchot (SBN 289701)
                                                *cbouchot@goodwinprocter.com*
11                                              **GOODWIN PROCTER LLP**

12                                              601 South Figueroa Street, 41st Floor
                                                Los Angeles, CA 90017
13                                              Telephone:  (213) 426-2500
                                                Facsimile:  (213) 623-1673
14

15                                              *Attorneys for Defendants*
                                                **ALLIANZ ASSET MANAGEMENT OF**
16                                              **AMERICA L.P.; ALLIANZ ASSET**
                                                **MANAGEMENT OF AMERICA LLC;**
17                                              **COMMITTEE OF THE ALLIANZ**
                                                **ASSET MANAGEMENT OF AMERICA**
18                                              **L.P. 401(K) SAVINGS AND**
19                                              **RETIREMENT PLAN; JOHN MANEY;**
                                                **ALLIANZ GLOBAL INVESTORS FUND**
20                                              **MANAGEMENT LLC; PACIFIC**
21                                              **INVESTMENT MANAGEMENT**
                                                **COMPANY LLC; ALLIANZ GLOBAL**
22                                              **INVESTORS U.S. LLC; and NFJ**
23                                              **INVESTMENT GROUP LLC**

24

25   LIB/84700712

26

27

28

*APPENDIX   A*

*APPENDIX   A*

## Appendix A: Mutual Funds with "Average," "Below Average," or "Low" Fees

| Mutual Fund Name | Fee Level |
|---|---|
| AllianzGI Focus Growth Fund[i] | Average |
| AllianzGI Mid Cap Fund[ii] | Below Average |
| AllianzGI Retirement Income Fund[iii] | Average |
| AllianzGI NFJ Dividend Value Fund[iv] | Below Average |
| AllianzGI NFJ Mid Cap Value Fund[v] | Average |
| AllianzGI NFJ Small Cap Value Fund[vi] | Low |
| AllianzGI US Managed Volatility Fund[vii] | Below Average |
| AllianzGI Global Allocation Fund[viii] | Below Average |
| AllianzGI International Managed Volatility Fund[ix] | Low |
| PIMCO All Asset Fund[x] | Low |
| PIMCO All Asset All Authority Fund[xi] | Average |
| PIMCO Commodity Real Return Strategy Fund[xii] | Below Average |
| PIMCO Diversified Income Fund[xiii] | Average |
| PIMCO Emerging Markets Bond Fund[xiv] | Below Average |
| PIMCO Emerging Markets Currency Fund[xv] | Low |
| PIMCO Global Multi Asset Fund[xvi] | Average |
| PIMCO High Yield Fund[xvii] | Low |
| PIMCO Income Fund[xviii] | Low |
| PIMCO Inflation Response Multi Asset Fund[xix] | Low |
| PIMCO Real Estate Real Return Strategy Fund[xx] | Low |
| PIMCO Real Return Fund[xxi] | Average |
| PIMCO RealPath Income Fund[xxii] | Average |
| PIMCO RealPath 2020 Fund[xxiii] | Below Average |
| PIMCO RealPath 2030 Fund[xxiv] | Below Average |
| PIMCO RealPath 2040 Fund[xxv] | Below Average |
| PIMCO RealPath 2050 Fund[xxvi] | Below Average |
| PIMCO Short Asset Investment Fund[xxvii] | Low |
| PIMCO StocksPLUS Fund[xxviii] | Low |
| PIMCO Total Return Fund[xxix] | Below Average |

[i] Morningstar.com, http://www.morningstar.com/funds/XNAS/PGFIX/quote.html (last visited Feb. 3, 2016).

[ii] Morningstar.com, http://www.morningstar.com/funds/XNAS/DRMCX/quote.html (last visited Feb. 3, 2016).

[iii] Morningstar.com, http://www.morningstar.com/funds/XNAS/AVRIX/quote.html (last visited Feb. 3, 2016).

[iv] Morningstar.com, http://www.morningstar.com/funds/XNAS/NFJEX/quote.html (last visited Feb. 3, 2016).

[v] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRNIX/quote.html (last visited Feb. 3, 2016).

[vi] Morningstar.com, http://www.morningstar.com/funds/XNAS/PSVIX/quote.html (last visited Feb. 3, 2016).

[vii] Morningstar.com, ttp://www.morningstar.com/funds/XNAS/NGFIX/quote.html (last visited Feb. 3, 2016).

[viii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PALLX/quote.html (last visited Feb. 3, 2016).

[ix] Morningstar.com, http://www.morningstar.com/funds/XNAS/NAISX/quote.html (last visited Feb. 3, 2016).

[x] Morningstar.com, http://www.morningstar.com/funds/XNAS/PAAIX/quote.html (last visited Feb. 3, 2016).

[xi] Morningstar.com, http://www.morningstar.com/funds/XNAS/PAUIX/quote.html (last visited Feb. 3, 2016).

[xii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PCRIX/quote.html (last visited Feb. 3, 2016).

[xiii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PDIIX/quote.html (last visited Feb. 3, 2016).

[xiv] Morningstar.com, http://www.morningstar.com/funds/XNAS/PEBIX/quote.html (last visited Feb. 3, 2016).

[xv] Morningstar.com, http://www.morningstar.com/funds/XNAS/PLMIX/quote.html (last visited Feb. 3, 2016).

ACTIVE/84911324.1

**APPENDIX A  -33-**

[xvi] Morningstar.com, http://www.morningstar.com/funds/XNAS/PGAIX/quote.html (last visited Feb. 3, 2016).

[xvii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PHIYX/quote.html (last visited Feb. 3, 2016).

[xviii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PIMIX/quote.html (last visited Feb. 3, 2016).

[xix] Morningstar.com, http://www.morningstar.com/funds/XNAS/PIRMX/quote.html (last visited Feb. 3, 2016).

[xx] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRRSX/quote.html (last visited Feb. 3, 2016).

[xxi] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRRIX/quote.html (last visited Feb. 3, 2016).

[xxii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRIEX/quote.html (last visited Feb. 3, 2016).

[xxiii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRWIX/quote.html (last visited Feb. 3, 2016).

[xxiv] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRLIX/quote.html (last visited Feb. 3, 2016).

[xxv] Morningstar.com, http://www.morningstar.com/funds/XNAS/PROIX/quote.html (last visited Feb. 3, 2016).

[xxvi] Morningstar.com, http://www.morningstar.com/funds/XNAS/PRMIX/quote.html (last visited Feb. 3, 2016).

[xxvii] Morningstar.com, http://www.morningstar.com/funds/XNAS/PAIDX/quote.html (last visited Feb. 3, 2016).

3

**APPENDIX A  -34-**

[xxviii]Morningstar.com, http://www.morningstar.com/funds/XNAS/PSTKX/quote.html (last visited Feb. 3, 2016).

[xxix] Morningstar.com, http://www.morningstar.com/funds/XNAS/PTTRX/quote.html (last visited Feb. 3, 2016).

4

**APPENDIX A  -35-**

*APPENDIX   B*

*APPENDIX   B*

### Appendix B.  Plan's Investment in an Allegedly "Seeded" Fund as a Percentage of the Fund's Total Assets

| Fund | 2009[xxx] | 2010[xxxi] | 2011[xxxii] | 2012[xxxiii] | 2013[xxxiv] | 2014[xxxv] |
|---|---|---|---|---|---|---|
| AllianzGI Retirement 2015 Fund[xxxvi] | 9.02% | 10.36% | 8.85% | 3.59% | 3.27% | 3.00% |
| AllianzGI Retirement 2020 Fund[xxxvii] | 8.32% | 10.14% | 11.44% | 6.58% | 3.53% | 1.62% |
| AllianzGI Retirement 2030 Fund[xxxviii] | 7.82% | 14.89% | 20.15% | 10.47% | 7.66% | 5.49% |
| AllianzGI Retirement 2040 Fund[xxxix] | 4.21% | 7.66% | 14.80% | 10.08% | 10.51% | 9.31% |
| AllianzGI Retirement 2050 Fund[xl] | 0.38% | 3.12% | 11.01% | 11.09% | 19.89% | 19.71% |
| AllianzGI Disciplined Equity Fund[xli] | 0.0% | 12.32% | 7.17% | 6.22% | 0.0% | N/A |
| AllianzGI Retirement Income Fund[xlii] | 4.26% | 7.95 | .77% | .63% | .91% | 1.13% |
| PIMCO Equities Pathfinder Fund[xliii] | N/A | 0.00% | 0.04% | 0.33% | 0.48% | 0.66% |
| PIMCO Global Multi Asset Fund[xliv] | 1.88% | 0.58% | 0.42% | 0.33% | 0.29% | 0.82% |
| PIMCO RealRetirement 2015 Fund[xlv] | N/A | N/A | N/A | 0.0% | 0.16% | 0.17% |
| PIMCO RealPath 2020 Fund[xlvi] | 12.30% | 5.18% | 3.98% | 1.93% | 1.09% | 1.09% |
| PIMCO RealPath 2030 Fund[xlvii] | 18.16% | 8.11% | 11.32% | 7.16% | 3.91% | 3.56% |
| PIMCO RealPath 2040 Fund[xlviii] | 8.83% | 8.06% | 12.63% | 6.35% | 4.32% | 3.85% |
| PIMCO RealPath 2050 Fund[xlix] | 6.52% | 6.68% | 7.43% | 9.54% | 6.72% | 6.38% |
| **Weighted Average** | **2.40%** | **0.89%** | **0.49%** | **0.52%** | **0.62%** | **1.36%** |

[xxx] 2009 Form 5500 at MTD2-150-51, Rosenberg Decl. Ex. 7.

[xxxi] 2010 Form 5500 at MTD2-143-44, Rosenberg Decl. Ex. 6.

[xxxii] 2011 Form 5500 at MTD2-136-37, Rosenberg Decl. Ex. 5.

[xxxiii] 2012 Form 5500 at MTD2-129-30, Rosenberg Decl. Ex. 4.

[xxxiv] 2013 Form 5500 at MTD2-121-22, Rosenberg Decl. Ex. 3.

[xxxv] 2014 Form 5500 at MTD2-114-15, Rosenberg Decl. Ex. 2.

[xxxvi] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-192 (Nov. 30, 2011), Rosenberg Decl. Ex. 13; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-199 (Nov. 30, 2014), Rosenberg Decl. Ex. 14.  Names of funds in this Appendix are listed as they appear in the Plan's 2014 Form 5500. "N/A" denotes that the fund was not active in that year.

[xxxvii] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-192 (Nov. 30, 2011), Rosenberg Decl. Ex. 13; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-199 (Nov. 30, 2014), Rosenberg Decl. Ex. 14.

[xxxviii] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-192 (Nov. 30, 2011), Rosenberg Decl. Ex. 13; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-200 (Nov. 30, 2014), Rosenberg Decl. Ex. 14.

[xxxix] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-193 (Nov. 30, 2011), Rosenberg Decl. Ex. 13; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-201 (Nov. 30, 2014), Rosenberg Decl. Ex. 14.

[xl] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-193 (Nov. 30, 2011), Rosenberg Decl. Ex. 13; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-202 (Nov. 30, 2014), Rosenberg Decl. Ex. 14.

[xli] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-195 (Nov. 30, 2011), Rosenberg Decl. Ex. 13; Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-206 (Nov. 30, 2013), Rosenberg Decl. Ex. 15.

[xlii] Allianz Funds Multi-Strategy Trust, Certified Shareholder Report, at MTD2-193 (Nov. 30, 2011), Rosenberg Decl. Ex. 13; Allianz Funds Multi-Strategy Trust,

ACTIVE/84911336.2

**APPENDIX B  -37-**

Certified Shareholder Report, at MTD2-202 (Nov. 30, 2014), Rosenberg Decl. Ex. 14.

[xliii] PIMCO Equity Series, Certified Shareholder Report, at MTD2-210 (June 30, 2012), Rosenberg Decl. Ex. 16; PIMCO Equity Series, Certified Shareholder Report, at MTD2-214-15 (June 30, 2014), Rosenberg Decl. Ex. 17.

[xliv] PIMCO Funds, Certified Shareholder Report, at MTD2-222 (March 31, 2011), Rosenberg Decl. Ex. 18; PIMCO Funds, Certified Shareholder Report, at MTD2-229 (March 31, 2014), Rosenberg Decl. Ex. 19.

[xlv] PIMCO Funds, Certified Shareholder Report, at MTD2-226 (March 31, 2014), Rosenberg Decl. Ex. 19.

[xlvi] PIMCO Funds, Certified Shareholder Report, at MTD2-219 (March 31, 2011), Rosenberg Decl. Ex. 18; PIMCO Funds, Certified Shareholder Report, at MTD2-226 (March 31, 2014), Rosenberg Decl. Ex. 19.

[xlvii] PIMCO Funds, Certified Shareholder Report, at MTD2-220 (March 31, 2011), Rosenberg Decl. Ex. 18; PIMCO Funds, Certified Shareholder Report, at MTD2-227 (March 31, 2014), Rosenberg Decl. Ex. 19.

[xlviii] PIMCO Funds, Certified Shareholder Report, at MTD2-220 (March 31, 2011), Rosenberg Decl. Ex. 18; PIMCO Funds, Certified Shareholder Report, at MTD2-227 (March 31, 2014), Rosenberg Decl. Ex. 19.

[xlix] PIMCO Funds, Certified Shareholder Report, at MTD2-220 (March 31, 2011), Rosenberg Decl. Ex. 18; PIMCO Funds, Certified Shareholder Report, at MTD2-228 (March 31, 2014), Rosenberg Decl. Ex. 19.

3

**APPENDIX B  -38-**

# EXHIBIT  A

# EXHIBIT  A

KABATECK BROWN KELLNER LLP
Richard L. Kellner, CA Bar No. 171416
rlk@kbklawyers.com
644 South Figueroa Street
Engine Company No. 28 Building
Los Angeles, CA 90017
Telephone: (213) 217-5000
Facsimile: (213) 217-5010

NICHOLS KASTER, PLLP
Adam W. Hansen, CA Bar No. 264241
ahansen@nka.com
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Phone: (612) 256-3200
Fax: (612) 338-4878

Attorneys for Plaintiffs and the Proposed Class
[*Additional Counsel Listed on Signature Page*]

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Aleksandr Urakhchin and Nathan Marfice, individually, as representatives of the class, and on behalf of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan,<br><br>                                    Plaintiffs,<br><br>        v.<br><br>Allianz Asset Management of America, L.P., Allianz Asset Management of America, LLC, Committee of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan, John Maney, Allianz Global Investors Fund Management LLC, Pacific Investment Management Company LLC, Allianz Global Investors U.S. LLC, NFJ Investment Group LLC, and John Does 1–30,<br><br>                                    Defendants. | **Case No.** 8:15-cv-01614-JVS-JCG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND EQUITABLE RELIEF**<br><br>**(1) Breach of Fiduciary Duties under ERISA (29 U.S.C. § 1104)**<br><br>**(2) Failure to Monitor Fiduciaries**<br><br>**(3) Equitable Relief Based on Receipt of Ill-Gotten Proceeds (29 U.S.C. § 1132(a)(3)** |

## **NATURE OF THE ACTION**

1.     Plaintiffs Aleksandr Urakhchin and Nathan Marfice ("Plaintiffs"), individually and as representatives of the class described herein, and on behalf of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan ("Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2.     Plaintiffs assert their class claims against two sets of Defendants:

(a)     the Plan's fiduciaries – Allianz Asset Management of America, L.P. ("AAM-LP"), Allianz Asset Management of America, LLC ("AAM-LLC"), the Committee of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan ("Committee"), John Maney ("Maney"), and John Does 1–30 (together, the "Fiduciary Defendants") – who improperly managed Plan assets for the benefit of themselves and their affiliates instead of the Plan and its participants; and

(b)     several participating employers in the Plan – AAM-LP and AAM-LLC (collectively, "AAM"), Allianz Global Investors Fund Management LLC, Pacific Investment Management Company LLC ("PIMCO"), Allianz Global Investors U.S. LLC, and NFJ Investment Group LLC (together, the "Employer Defendants")[1] – who improperly received Plan assets as profits at the expense of the Plan and its participants.

3.     To remedy the breaches of fiduciary duties and unlawful self-dealing as described herein, Plaintiffs seek to recover the financial losses suffered by the Plan and to obtain injunctive and other equitable relief from Defendants, as provided by ERISA.

---

[1] The Employer Defendants and their affiliates are collectively referred to herein as the "Allianz Family".

**EXHIBIT A  -40-**

# **PRELIMINARY STATEMENT**

4. ERISA imposes strict duties of loyalty and prudence upon plan fiduciaries. 29 U.S.C. § 1104(a)(1). These fiduciary duties are "the highest known to law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quotation omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

5. The Fiduciary Defendants do not act in the best interest of the Plan and its participants. Instead, the Fiduciary Defendants treat the Plan as an opportunity to promote the Allianz Family's mutual fund business and maximize profits at the expense of the Plan and its participants. The Fiduciary Defendants have loaded the Plan exclusively with mutual funds from the Allianz Family, without investigating whether Plan participants would be better served by investments managed by unaffiliated companies. The retention of these proprietary mutual funds costs Plan participants millions of dollars in excess fees every year. For example, in 2013, the Plan's total expenses were 75% higher than the average retirement plan with between $500 million and $1 billion in assets (the Plan had $772 million in assets as of the end of 2013), costing Plan participants over $2.5 million in excess fees in 2013 alone. Among the 551 defined-contribution plans in the United States with between $500 million and $1 billion in assets as of the end of 2013, the Plan was one of only eight plans that had total plan costs that were 0.74% (of total plan assets) or higher. The Plan's high costs are attributable entirely to the Fiduciary Defendants' retention of high-cost proprietary mutual funds as investment options within the Plan.

6. To make matters worse, many of the proprietary funds selected and/or retained by the Plan have little or no track record. The Fiduciary Defendants have a pattern and practice of including new and unproven mutual funds as investment options within the Plan shortly after the new funds are launched, and even use the Plan's default investment option as a mechanism for providing seed money to these

**EXHIBIT A  -41-**

funds.  While this may benefit the Allianz Family, helping it to achieve economies of scale for new funds and market those new funds to other investors, it has not been beneficial for the Plan and the Plan's participants.  To the contrary, these new and untested funds have consistently underperformed, yet have continued to be retained in the Plan's investment lineup.

7.     The Fiduciary Defendants' prioritization of Allianz Family profits over prudent management of Plan assets constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.

8.     Based on this conduct, Plaintiffs assert claims against the Fiduciary Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and for failure to monitor fiduciaries (Count Two), and against the Employer Defendants for equitable restitution of ill-gotten proceeds (Count Three).

## JURISDICTION AND VENUE

9.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other unlawful conduct in violation of ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

10.    This case presents a federal question, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

11.    Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the District where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.  In addition, Plaintiffs also reside in this District.

**EXHIBIT A  -42-**

**THE PARTIES**

**Plaintiffs**

12.    Plaintiff Aleksandr Urakhchin has participated in the Plan since 2011, and is a current participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3).  Plaintiff Urakhchin resides in Newport Beach, California.

13.    Plaintiff Nathan Marfice has participated in the Plan since before 2009, and is a current participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3).  Plaintiff Marfice resides in Orange, California.

**The Plan**

14.    The Plan was established on January 1, 2003 via the merger of certain predecessor plans (the PIMCO Savings Plan, the PIMCO Retirement Plan, the NACM 401(k) Plan and the NACM Pension Plan).  Prior to 2011, the Plan was known as the "Allianz Global Investors of America L.P. 401(k) Savings and Retirement Plan."

15.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

16.    The Plan is a qualified plan under 26 U.S.C. § 401, and is commonly referred to as a "401(k) plan."

17.    The Plan has been amended and restated multiple times since it was established, most recently on October 29, 2012.  The most recent restatement of the Plan was executed by AAM-LLC.

18.    The Plan covers eligible employees and former employees of AAM and its various subsidiaries including Defendants Allianz Global Investors Fund Management LLC, PIMCO, Allianz Global Investors U.S. LLC, and NFJ Investment Group LLC, all of whom are participating employers in the Plan.  *See* Plan Document § 1.28, attached as **Exhibit A**.

**Defendants**

19.    Defendant AAM-LP is the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B).   AAM-LP is headquartered in Newport Beach, California.  AAM-LP is a fiduciary of the Plan pursuant to the actions of its directors and employees serving on the Defendant Committee.  As the employer of members of the Committee, AAM-LP exercises authority and control over the Committee through its ability to terminate the employment of Committee members, which under the terms of the Plan terminates Committee membership.  Ex. A § 10.01(b).  In addition, AAM-LP is a fiduciary of the Plan by virtue of the actions of its general partner, AAM-LLC.

20.    Defendant AAM-LLC is the sole general partner of AAM-LP.  The October 29, 2012 Plan Restatement was executed by Defendant John Maney, signing on behalf of the "General Partner."  The Plan document gives AAM-LLC authority to appoint the Plan trustee and recordkeeper and appoint an investment manager, if it so chooses.  Ex. A § 10.01(b).  AAM-LLC also has authority to amend the Plan.  *Id.* § 11.01(a).  AAM-LLC is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21) because it exercised discretionary authority or control respecting management of the Plan and exercised authority or control respecting management or disposition of the Plan's assets.  In addition, AAM-LLC appointed the trustee, recordkeeper, and members of the Committee, and possessed the authority to remove and appoint Committee members.[2]

21.    The Defendant Committee was created pursuant to Section 10.01(a) of the Plan Document, which provides that "The General Partner shall appoint a Committee to administer the Plan.  The Committee may consist of directors, officers, [e]mployees, or any other individuals."

22.    The Committee and its members are designated in Section 8.1 of the

_____

[2] Members of the Committee serve "at the pleasure of the General Partner."  Ex. A § 10.01(a).

**EXHIBIT A  -44-**

1    Plan Document as the "administrator" of the Plan under 29 U.S.C. § 1002(16)(A).

2    The Committee has "full discretionary authority and responsibility for the

3    administration of the Plan."  Ex. A § 10.03.  This includes (among other things) the

4    authority to make investment decisions.  *Id.* §§ 1.11, 10.03(h).

5           23.    The Committee and its members are also designated as Plan fiduciaries

6    in Section 10.06 of the Plan document, and are fiduciaries of the Plan under 29

7    U.S.C. § 1102(a).  In addition, the Committee and its members are fiduciaries of the

8    Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority

9    and/or discretionary control respecting the management of the Plan, administration

10   of the Plan, and management and disposition of Plan assets.  The current and

11   previous members of the Committee are currently unknown to Plaintiffs, and those

12   individuals are therefore collectively named as John Does 1–20.

13          24.    Defendant Maney is the Chief Operating Officer and Managing

14   Director of AAM.  He is the sole member of the management boards of both AAM-

15   LP and AAM-LLC.  Maney is also the CEO of Defendant Allianz Global Investors

16   Fund Management LLC and the Managing Director of Defendant Allianz Global

17   Investors U.S. LLC.  Maney signed the Plan Document in his capacity as Managing

18   Director and Chief Operating Officer of AAM.  By virtue of his management and

19   Board positions at AAM-LP and AAM-LLC, Maney has authority to appoint a

20   recordkeeper and trustee, amend the Plan Document, and appoint and remove

21   members of the Committee.  This gives Maney discretionary authority and control

22   over the administration and management of the Plan as well as discretionary control

23   and authority regarding the management and disposition of Plan assets.

24   Accordingly, Maney is a Plan fiduciary under 29 U.S.C. § 1002(21)(A).

25          25.    Any individual or entity to whom the Fiduciary Defendants delegated

26   any fiduciary functions or responsibilities is also a fiduciary of the Plan under 29

27   U.S.C. § 1002(21)(A).  Because the individuals and/or entities that have been

28   delegated fiduciary responsibilities by the Fiduciary Defendants are not currently

**EXHIBIT A  -45-**

known to Plaintiffs, they are collectively named as John Does 21–30.

26.     Each of the Fiduciary Defendants are also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because they enabled other fiduciaries to commit breaches of fiduciary duties through their appointment powers, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of their duties, and failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

27.     Defendant Allianz Global Investors Fund Management LLC is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment advisor for 24 of the investment options offered within the Plan.

28.     Defendant PIMCO is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment advisor for 23 of the investment options offered within the Plan.

29.     Defendant Allianz Global Investors U.S. LLC is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment sub-advisor for 20 of the Plan's investment options.

30.     Defendant NFJ Investment Group LLC is a Plan employer within the meaning of 29 U.S.C. § 1002(5), and acts as the investment sub-advisor for 4 of the Plan's investment options.

## ERISA FIDUCIARY DUTIES

31.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Fiduciary Defendants as fiduciaries of the Plan.  29 U.S.C. § 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
>> (A)     For the exclusive purpose of
>>
>>> (i)     Providing benefits to participants and their beneficiaries; and

EXHIBIT A  -46-

(ii)     Defraying reasonable expenses of administering the plan;

(B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

32.     These ERISA fiduciary duties "are the highest known to the law.'" *Howard*, 100 F.3d at 1488; *accord Johnson v. Couturier*, 572 F.3d 1067, 1077 (9th Cir. 2009) ("[O]ur holding merely comports with congressional intent in establishing ERISA fiduciary duties as 'the highest known to the law.'") (quoting *Howard*).

## DUTY OF LOYALTY

33.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . .  A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan."  Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988) (emphasis added).

## DUTY OF PRUDENCE

34.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  This duty includes, but is not limited to, a duty to select prudent investments.  Under ERISA,

**EXHIBIT A  -47-**

a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Therefore, "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically . . . create[d] a prudent portfolio." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (cited with approval in *Tibble v. Edison Int'l*, 729 F.3d 1110, 1122 (9th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1823 (2015)).

35. Failing to closely monitor and subsequently minimize administrative expenses wherever possible by surveying the competitive landscape and leveraging the plan's size to reduce fees constitutes a breach of fiduciary duty. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Similarly, selecting higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009); *Tibble v. Edison Int'l*, 729 F.3d at 1137–39.

### SOURCE AND CONSTRUCTION OF DUTIES

36. The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

37. Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment

**EXHIBIT A -48-**

responsibilities of the trusteeship."   Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function.").   The Introductory Note to the Restatement's chapter on the investment of trust assets further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule.   This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets.   In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs.   The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles.   In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007).   Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . .   [T]hese added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

38.   In considering whether a fiduciary has breached the duties of prudence and loyalty, the Court considers both the "merits of the transaction" as well as "the thoroughness of the investigation into the merits of the transaction." *Howard*, 100 F.3d at 1488 (quotation and citation marks omitted).   Mere "subjective good faith" in executing these duties is not a defense; "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

## CO-FIDUCIARY LIABILITY

39.    ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. § 1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>     (1) If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
>     (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
>     (3) If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

40.    The Plan is a defined-contribution or 401(k) plan, a type of employee retirement plan in which employees invest a percentage of their earnings on a pre-tax basis.  The Employer Defendants often match those contributions up to a certain percentage of the compensation contributed by the employee each pay period. Within the Plan, employees may defer anywhere from 1% to 100% of their compensation on a pre-tax basis (subject to certain limits), and the Employer Defendants have the discretion to make matching contributions on top of the amounts that an employee contributes.  2015 AAM Summary Plan Description ("SPD") at 4, 6–7, attached as **Exhibit B**.  Participants direct the investment of these contributions, choosing from among a lineup of options offered by the Plan. Investment Company Institute, *A Close Look at 401(k) Plans*, at 9, available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "ICI Study").

-11-

41.     Fiduciaries are obligated to assemble a diversified menu of investment options.   29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii).   Each investment option is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class.  ICI Study at 7; Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").  The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate.   Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments.  Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the credit risk associated with the particular borrower.  Equity, or stock, investments, are generally defined by three characteristics: (1) where they invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of company they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e. growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks, and blend funds invest in a mix of both types of stocks).  Balanced funds are a type of fund that invests in a mix of stocks and bonds.   Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.  Target-date funds are typically invested in a portfolio of other mutual funds.

42.     Investment funds can be either passively or actively managed.  Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities

matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential is typically not realized). U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), available at http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

43. In addition to a core menu of designated investment alternatives, many plans (including the Plan at issue here) also provide employees the option of opening a self-directed brokerage account ("SDBA"), giving them access to a broad array of stocks, bonds, and mutual funds. Ayres & Curtis, *Beyond Diversification* at 1524; Ex. A § 5.02(c). However, SDBAs have significant drawbacks. Participants that choose to utilize an SDBA are typically assessed a fee for each trade. *See* Ex. B at 12 (stating that "there could be trading fees" for Plan participants who use the SDBA option). These fees often make an SDBA a much more expensive option compared to investing in the designated investment alternatives available within the Plan.[3] Costs are also higher because employees

---

[3] A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants . . . may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4). This definition excludes assets held in a self-directed brokerage accounts. *Id.* Therefore, fiduciaries are under no obligation to disclose performance, benchmark, or fee information regarding the investments available within an SDBA. *Id.* § 2550.404a-5(d).

-13-

1  investing in mutual funds within an SDBA must invest in retail mutual funds, rather
2  than the lower-cost institutional shares typically available as core investment
3  options within the plan that are only available because of the retirement plan's
4  ability to leverage the negotiating power of the plan's assets. DOL Field Assistance
5  Bulletin 2012-02R, July 30, 2012, available at
6  http://www.dol.gov/ebsa/regs/fab2012-2R.html; Christopher Carosa, CTFA, *Is the*
7  *Fiduciary Liability of Self-Directed Brokerage Options Too Great for 401k Plan*
8  *Sponsors?*, Fiduciary News (June 11, 2013), available at
9  http://fiduciarynews.com/2013/06/is-the-fiduciary-liability-of-self-directed-
10 brokerage-options-too-great-for-401k-plan-sponsors/ (last accessed Sept. 24, 2015).
11 Furthermore, SDBA investors often invest in imprudent investments, because there
12 is no fiduciary selecting or monitoring the investments within an SDBA. 29 C.F.R.
13 § 2550.404a-5(f); *see* Ex. B at 12 ("Although the [SDBA] is available under the
14 Plan, neither the Plan Administrator nor the Company have reviewed nor
15 recommended any specific investment available through the [SDBA].")

16      44.    The existence of an SDBA option does not excuse plan fiduciaries
17 from selecting a prudent and appropriate set of core investment options. For the
18 reasons described above, "the performance is generally lower with self-directed
19 accounts compared to managed portfolios. This translates into low real rates of
20 return and higher retirement failure rates." Marijoyce Ryan, CPP, *Money*
21 *Management: The Downside of Self-Directed Brokerage Accounts*, The Daily
22 Record (June 26, 2012), available at
23 http://nydailyrecord.com/blog/2012/06/26/money-management-the-downside-of-
24 self-directed-brokerage-accounts/ (last accessed Sept. 24, 2015); Dr. Gregory
25 Kasten, *Self-Directed Brokerage Accounts Reduce Success* (2004), at 1, 13–14,
26 available at http://etf.wi.gov/boards/agenda_items_2004/dc20040819item4.pdf (discussing
27 results of a study showing that self-directed brokerage accounts lagged the
28 performance of a model portfolio of the plans's designated investment options by

-14-

an average of 4.70% per year).

45.     In addition to their high costs and poor investment outcomes, SDBAs are quite difficult to set up, requiring Plan participants to complete additional paperwork while also requiring a greater investment of time to choose among the hundreds or thousands of investment options.   Due to their high costs and administrative complexity, SDBAs are seldom used; only 2% of retirement plan assets are held in SDBAs.   Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 15 (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf (hereinafter "ICI/Deloitte Study").   And while usage of the SDBA is higher within the Plan, only 13% of the Plan's assets are held in SDBAs.

### MINIMIZATION OF PLAN EXPENSES

46.     At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Maximizing employees' retirement benefits is therefore heavily influenced by two critical, interrelated functions of plan fiduciaries: designing the menu of investment options and minimizing plan expenses.

47.     There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses. ICI/Deloitte Study at 17.   Investment management expenses are the fees that are charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.*   On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id.*

48.     Administrative expenses (e.g., recordkeeping, trustee and custodial services, accounting) can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products

-15-

1  offered in the plan in a practice known as "revenue sharing." Ayres & Curtis,

2  *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. These "revenue sharing"

3  payments from investment managers to plan service providers typically happen on a

4  quarterly basis based upon an agreed-upon contribution formula.

5      49. The Plan uses a combination of these methods—a portion of

6  recordkeeping and trustee expenses are paid directly to the service providers, and a

7  portion of these expenses are paid out of the investment expenses charged by the

8  mutual funds within the Plan.

9      50. Fiduciaries exercising control over administration of a plan and the

10  selection of core investment options can minimize plan expenses by hiring low-cost

11  service providers and by selecting a menu of low-cost investment options. This

12  task is made significantly easier the larger a plan gets. Economies of scale

13  generally lower administrative expenses on a per-participant or percentage-of-assets

14  basis. ICI/Deloitte Study at 7, 21. Larger plans also can lower investment

15  management fees by selecting mutual funds only available to institutional investors

16  or by negotiating directly with the investment manager to obtain a lower fee than is

17  offered to mutual fund investors. *See* Consumer Reports, *How to Grow Your*

18  *Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug.

19  2013), available at http://www.consumerreports.org/cro/magazine/2013/09/how-to-

20  grow-your-savings/index.htm (instructing employees of large corporations that

21  "[y]our employer should be able to use its size to negotiate significant discounts

22  with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and*

23  *Expenses*, at 17 (April 13, 1998), https://www.dol.gov/ebsa/pdf/401kRept.pdf

24  (reporting that by using separate accounts and similar instruments, "[t]otal

25  investment management expenses can commonly be reduced to one-fourth of the

26  expenses incurred through retail mutual funds"). Empirical evidence bears this out.

27  In 2012, total plan fees in the average defined contribution plan were 0.91%, but

28  this varied between an average of 1.27% in plans with $1 million to $10 million in

-16-

assets, and an average of only 0.44% for plans with between $500 million and $1 billion in assets. ICI Study at 41.

51.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment expenses should be determined by comparisons to other similarly-sized plans.  *See* 29 U.S.C. § 1104(a)(1)(B) (requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting in a like capacity and familiar with such mattes would use in the conduct of an *enterprise of a like character*") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, *6 n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

**SELECTION OF APPROPRIATE INVESTMENT OPTIONS FOR INCLUSION IN THE PLAN**

52.     With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan.  The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments.

53.     Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among

the available funds. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Constribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001). Defendants are aware of this tendency among plan participants. On multiple occasions, Stacy Schaus, head of the Defined Contribution practice at PIMCO, has advocated designing defined-contribution menus in light of the naive-diversification heuristic. Stacy Schaus, Head of Defined Contribution Practice at PIMCO, *Designing Outcome-Focused Defined Contribution Plans: Building Sustainable Income for Retirees*, November 2012, https://www.pimco.com/insights/investment-strategies/featured-solutions/designing-outcomefocused-defined-contribution-plans-building-sustainable-income-for-retirees (advocating for core investment lineups whereby "even naive diversification . . . would result in a reasonable, risk-managed allocation"); Stacy Schaus & Ying Gao, *Designing Balanced DC Menus: Considering Diversified Fixed Income Choices*, April 2014, https://www.pimco.com/insights/investment-strategies/featured-solutions/dc-design/designing-balanced-dc-menus-considering-diversified-fixed-income-choices (concluding that defined-contribution plan investment menu should be designed such that "[i]n the event that participants evenly divide their assets across the investment menu (i.e. 1/n), the result should provide a reasonably balanced portfolio").

54. Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73

-18-

1  percent of participants made no change to the allocation of existing assets); Julie
2  Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer.
3  Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts
4  showed that 87 percent of 401(k) account holders made no trades in the average
5  year and that the average 401(k) investor makes one trade every 3.85 years).

6  55. For all of these reasons, prudent fiduciaries will limit their menus to
7  only those funds that represent sound long-term investments, and remove
8  imprudent investments rather than trusting participants to move their money out of
9  an imprudent investment.

10  56. The second critical insight provided by academic and financial
11  industry literature is that in selecting prudent investments, the most important
12  consideration is low fees. Numerous scholars have demonstrated that high
13  expenses are not correlated with superior investment management. Indeed, funds
14  with high fees on average perform worse than less expensive funds, even on a *pre-*
15  *fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee*
16  *Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org.
17  871, 873 (2009); *see also* Fisch & Wilkinson-Ryan, *Costly Mistakes*, at 1993
18  (summarizing numerous studies showing that "the most consistent predictor of a
19  fund's return to investors is the fund's expense ratio").

20  [T]he empirical evidence implies that superior management is not
21  priced through higher expense ratios. On the contrary, it appears that
     the effect of expenses on after-expense performance (even after
22  controlling for funds' observable characteristics) is more than one-to-
     one, which would imply that low-quality funds charge higher fees.
23  Price and quality thus seem to be inversely related in the market for
24  actively managed funds.

25  Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

26  57. Defendants have publicly acknowledged the importance of
27  maintaining low fees. As Stacy Schaus, head of the Defined Contribution practice

28

-19-

at PIMCO, has written, "a reduction in [annual] fees from 100 bps[4] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income." Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors* (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (emphasis added).

58.    While high-cost mutual funds may exhibit positive, market-beating performance over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras *et al.*, *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring 31 years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). Any sustainable ability to beat the market that managers do demonstrate is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000). The one exception to the general arbitrariness and unpredictability of mutual fund returns is that the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in*

---

[4] The term "bps" is an abbreviation of the phrase "basis points." One basis point is equal to .01%, or 1/100th of a percent. Thus a fee level of 100 basis points translates into fees of 1% of the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last visited Sept. 25, 2015).

-20-

*Mutual Fund Performance*, at 57. Therefore, regardless of where one comes down on the issue of active versus passive investing, a prudent investor should choose only index funds and low-cost actively managed funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses. *See* Restatement (Third) of Trusts § 90 cmt. h(2).

## DEFENDANTS' VIOLATIONS OF ERISA

### I.  IMPROPER SELECTION AND RETENTION OF HIGH-COST INVESTMENTS FROM WITHIN THE ALLIANZ FAMILY

59.    Throughout the statutory period, the only "core" investment options offered within the Plan have been investments managed by either PIMCO or Allianz Global Investors, both of which are subsidiaries of AAM.

60.    In 2009, Plan participants were offered 43 proprietary mutual funds and an SDBA. The "core" mutual fund options included 11 target-date mutual funds, 3 balanced funds, 12 domestic equity funds, 7 global/international equity funds, 3 domestic bond funds, 3 international bond funds, 1 money market fund, and 3 specialty funds (a technology, commodities, and real estate fund). A list of investment options available as of the end of 2009, taken from the account statement of Plaintiff Marfice, is attached as **Exhibit C**.

61.    According to AAM's Form 5500, as of the end of 2009, the Plan had approximately $420 million in assets, consisting of $377 million in AAM's proprietary mutual funds, $40 million in SDBAs, and $3 million in loans to participants.

62.    As of the end of 2010, the Plan's assets had increased to approximately $511 million.

63.    In 2013, Plan participants were offered 45 proprietary mutual funds, 2 proprietary collective trust funds, and an SDBA option. The "core" investment

options consisted of 12 target-date funds, 6 balanced funds, 12 domestic equity funds, 5 global/international equity funds, 6 domestic bond funds, 2 international bond funds, and 4 specialty funds (a technology, currency, commodities, and real estate fund).

64.     By the end of 2013, the Plan's assets had increased to approximately $772 million, consisting of $628 million in proprietary mutual funds, $44 million in proprietary collective trust funds, $93 million in SDBAs, and $7 million in Plan participant loans.

65.     Taking into account all administrative and investment expenses within the Plan, and using 2013 year-end balances (as reported on Form 5500 for 2013) and publicly available information regarding each investment's expenses, Plaintiffs estimate that total plan costs for 2013 were approximately $5,950,000, equal to 0.77% of the $772 million in Plan assets.

66.     This total plan cost of 0.77% is outrageously high for a defined-contribution plan with over $500 million in assets.  In 2013, the average total plan cost for plans with between $500 million and $1 billion in assets was 0.44%.  ICI Study at 41.  Ninety percent of plans with between $500 million and $1 billion in assets had total plan costs of less than 0.63% in 2013.  ICI Study at 42.  Indeed, among the **551** defined-contribution plans with between $500 million and $1 billion in assets as of the end of 2013, **only 8 plans** had total plan costs that were 0.74% or above, one of which was the Plan.

67.     Had the Plan limited its expenses to the average total cost of 0.44% for similarly-sized plans, Plan participants would have been saved approximately $2.55 million in fees in 2013 alone.

68.     These grossly excessive costs are attributable to the Fiduciary Defendants' retention of high-cost, proprietary mutual funds from within the Allianz Family.

69.     In 2012 (the most recent year this data is available), in plans with

**EXHIBIT A  -61-**

between $500 million and $1 billion in assets, the average expense ratio for domestic equity funds was 0.53%; for international equity funds it was 0.70%; for target-date funds it was 0.47%; for balanced funds it was 0.45%; for domestic bond funds it was 0.38%; for international bond funds it was 0.74%; for index funds it was 0.11%; and for other, miscellaneous funds the average was 0.78%.  ICI Study at 45.

70.    The expenses for funds within the Plan are much higher.  In 2013, the domestic equity funds in the Plan had expense ratios between 0.61% and 2.00%. The Plan did include one international fund with a below-average expense ratio of 0.61%, but the other three funds for which publicly-disclosed data is available had expense ratios between 1.21 and 1.42 percent.  The target-date funds had expense ratios of between 0.57 and 0.70 percent, well above the 0.47% average.  The balanced funds in the Plan had 2013 expense ratios of between 0.67% and 1.85%, 50 to 300 percent above the category average.  The domestic bond funds averaged between 0.26% and 0.75%, although every fund but one had expenses above the category average of 0.38%.  The only international bond fund with a publicly disclosed expense ratio cost 0.83% in 2013.  The three index funds within the Plan had expense ratios of between 0.50 and 0.74 percent.  And the specialty funds had expense ratios between 0.85 and 1.22 percent.

71.    Overall, 43 of the 45 proprietary mutual funds within the Plan in 2013 had expenses that were above the average for plans with between $500 million and $1 billion in assets, and many of those funds had expenses that were 2 to 3 times higher than the average for similarly-sized plans.

72.    The above comparisons actually understate the excessiveness of the investment management fees paid by the Plan's participants.  As an example, the fees in the Plan were many times higher than the fees in comparable institutional mutual funds that were frequently used by other plans.  As shown by the chart below, the fees for specific funds within the Plan as of the end of 2014 were up to

***24 times more expensive*** than alternatives in the same investment style:

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| AllianzGI Global Allocation I (PALLX) | 85 bps | American Funds Capital Income Builder R6 (RIRGX) | 30 bps | World Allocation | 183% |
| Allianz GI Ret 2015 R6 (AZGIX) | 57 bps | Vanguard Trgt Retire 2015 Inv (VTXVX) | 16 bps | Target Date 2011–2015 | 256% |
| Allianz GI Ret 2020 R6 (AGNIX) | 59 bps | Vanguard Trgt Retire 2020 Inv (VTWNX) | 16 bps | Target Date 2016–2020 | 269% |
| Allianz GI Ret 2030 R6 (ABLIX) | 63 bps | Vanguard Trgt Retire 2030 Inv (VTHRX) | 17 bps | Target Date 2026–2030 | 271% |
| Allianz GI Ret 2040 R6 (AVTIX) | 69 bps | Vanguard Trgt Retire 2040 Inv (VFORX) | 18 bps | Target Date 2036–2040 | 283% |
| Allianz GI Ret 2050 R6 (ASNIX) | 70 bps | Vanguard Trgt Retire 2050 Inv (VFIFX) | 18 bps | Target Date 2046–2050 | 289% |
| Allianz GI Ret Income R6 (AVRIX) | 55 bps | Vanguard Trgt Retire Income Inv (VTINX) | 16 bps | Retirement Income | 244% |
| Allianz GI Focus Grth Instl (PGFIX) | 76 bps | Vanguard Growth Index I (VIGIX) | 8 bps | Large Growth | 850% |

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND EQUITABLE RELIEF

**EXHIBIT A -63-**

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Allianz GI Income & Growth Inst (AZNIX) | 97 bps | Vanguard Institutional Index I (VINIX) | 4 bps | Large Blend | 2325% |
| Allianz GI Int'l MGD Volty Instl (NAISX) | 61 bps | Vanguard Total Int'l Stock Mkt Idx I (VTSNX) | 12 bps | Foreign Large Blend | 408% |
| Allianz GI U.S. Mgd Volatility Inst (NGFIX) | 61 bps | Vanguard Institutional Index I (VINIX) | 4 bps | Large Blend | 1425% |
| Allianz GI Mid-Cap Instl (DRMCX) | 78 bps | Vanguard Mid Cap Index Instl (VMCIX) | 8 bps | Mid Cap Blend | 875% |
| Allianz GI NFJ Midcap Value Instl (DRMCX) | 91 bps | Vanguard Mid-Cap Value Index Adm (VMVAX) | 9 bps | Mid Cap Value | 911% |
| Allianz GI NFJ Small Cap Val I (PSVIX) | 77 bps | Vanguard Small Cap Value Index I (VSIIX) | 8 bps | Small Cap Value | 863% |
| Allianz GI Global Small-Cap Instl (DGSCX) | 126 bps | American Funds SMALLCAP World R6 (RLLGX) | 71 bps | Global Small Cap | 77% |
| Allianz GI Technology Instl (DRGTX) | 126 bps | Vanguard Info Tech Index Adm (VITAX) | 10 bps | Technology | 1160% |
| Allianz GI Ultra Micro Cap Instl (AUMIX) | 200 bps | DFA US Micro Cap I (DFSCX) | 52 bps | Micro Cap | 285% |

-25-

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Allianz GI US Emrg Grth I (aka Sm Cap Grwth) (AEMIX) | 116 bps | Vanguard Small Cap Growth Idx I (VSGIX) | 8 bps | Small Cap Growth | 1350% |
| Allianz GI Emerg Mkt Opps Instl (AOTIX) | 96 bps | Vanguard Emerging Mkts Stk Idx I | 12 bps | Emerging Market Equities | 800% |
| Allianz GI Int'l Sml Cap Instl (ALOIX) | 121 bps | Oppenheimer Int'l Small-Mid Co I (OSCIX) | 76 bps | Foreign Small/Mid Growth | 59% |
| Allianz GI Micro Cap Instl (AMCIX) | 154 bps | DFA US Micro Cap I (DFSCX) | 52 bps | Micro Cap | 196% |
| PIMCO All Asset All Auth Instl (PAUIX) | 178 bps | BlackRock Multi-Asset Income Instl (BIICX) | 59 bps | Technology | 202% |
| PIMCO All Asset Instl (PAAIX) | 88 bps | BlackRock Multi-Asset Income Instl (BIICX) | 59 bps | Industrials | 49% |
| PIMCO Commodity Real Ret Instl (PCRIX) | 74 bps | DFA Commodity Strategy Instl (DCMSX) | 33 bps | Commodities | 124% |
| PIMCO Emrg Mkts Currency Instl (PLMIX) | 85 bps | Lord Abbett Emerg Mkts Currency R6 (LDMVX) | 75 bps | Emerging Markets Currency | 13% |

-26-

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| PIMCO Diversified Inc Instl (PDIIX) | 75 bps | Vanguard Total Bond Market Index I (VBTIX) | 6 bps | Diversified Bond | 1150 % |
| PIMCO Emerg Mkt Bond Instl (PEBIX) | 83 bps | Vang Emerg Mkts Govt Bd Idx Instl (VGIVX) | 30 bps | World Stock | 177% |
| PIMCO Global Multi Asset Instl (PGAIX) | 97 bps | American Funds Global Balanced R6 (RGBGX) | 54 bps | World Allocation | 80% |
| PIMCO High Yield Fund Instl (PHIYX) | 55 bps | Vanguard High Yield Corporate Adm (VWEAX) | 13 bps | High Yield Bond | 323% |
| PIMCO Income Instl (PIMIX) | 45 bps | Vanguard Total Bond Market Index I (VBTIX) | 6 bps | Diversified Bond | 650% |
| PIMCO Infl Respons Multi Asset (PIRMX) | 77 bps | Vanguard Inflation-Protected Secs I (VIPIX) | 7 bps | World Stock | 1000 % |
| PIMCO Real Estate Ret Strat I (PRRSX) | 74 bps | DFA Real Estate Securities I (DFREX) | 18 bps | Real Estate | 311% |
| PIMCO Real Return Fund-Instl (PRRIX) | 45 bps | Vanguard Inflation-Protected Securities I (VIPIX) | 7 bps | High-Yield Bond | 543% |

-27-

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| PIMCO RealPath Income I (PRIEX) | 58 bps | Vanguard Trgt Retire Income Inv (VTINX) | 16 bps | Retirement Income | 263% |
| PIMCO RealPath 2020 Inst (PRWIX) | 61 bps | Vanguard Trgt Retire 2020 Inv (VTWNX) | 16 bps | Target Date 2016–2020 | 281% |
| PIMCO RealPath 2030 Instl (PRLIX) | 67 bps | Vanguard Trgt Retire 2030 Inv (VTHRX) | 17 bps | Target Date 2026–2030 | 294% |
| PIMCO RealRetirement 2040 Inst (PROIX) | 69 bps | Vanguard Trgt Retire 2040 Inv (VFORX) | 18 bps | Target Date 2036–2040 | 283% |
| PIMCO RealRetirement 2050 Inst (PRMIX) | 71 bps | Vanguard Trgt Retire 2050 Inv (VFIFX) | 18 bps | Target Date 2046–2050 | 294% |
| PIMCO Short Asset Investment Instl (PAIDX) | 24 bps | DFA One-Year Fixed Income I (DFIHX) | 17 bps | Ultrashort-Term Bond | 41% |
| PIMCO Stocks Plus Fund Instl (PSTKX) | 50 bps | Vanguard Institutional Index I (VINIX) | 4 bps | Large Blend | 1150% |
| PIMCO Total Return Fund Instl (PTTRX) | 46 bps | Vanguard Total Bond Market Index I (VBTIX) | 6 bps | Intermediate-Term Bond | 667% |

-28-

| Fund in Plan | Expense ratio | Comparable Lower Cost Alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| AllianzGI NFJ International Value CIT | 80 bps | Vanguard International Value Inv (VTRIX) | 44 bps | Foreign Large Value | 82% |
| Allianz NFJ Dividend Value CIT | 55 bps | Vanguard Value Index I (VIVIX) | 8 bps | Large Value | 588% |
| PIMCO Global Advantage Strategy CIT | 55 bps | Vanguard Total Int'l Bond Index I | 12 bps | World Bond | 358% |

73.     Despite the high cost of the proprietary investments within the Plan, the Fiduciary Defendants failed to consider, let alone investigate, the prudence of other investments (i.e., mutual funds or other investment products outside the Allianz Family). This failure to engage in a prudent investment selection and monitoring process and the subsequent failure to remove these imprudent investments constitutes a breach of the fiduciary duties of loyalty and prudence under ERISA.

74.     Had the Fiduciary Defendants prudently monitored the investments within the Plan to ensure that the Plan's designated investment options were not charging excessive fees, in a process that was not tainted by self-interest, the Fiduciary Defendants would have removed the Plan's investments in favor of investments such as the non-Allianz funds listed above that offered similar or superior performance at significantly less expense. As a result of these breaches of the duties of loyalty and prudence, Plan participants have paid millions of dollars in excess fees every year.

**II.  IMPROPER USE OF PLAN ASSETS TO SEED NEW AND UNTESTED MUTUAL FUNDS**

75.  The Fiduciary Defendants' imprudence in selecting and retaining unreasonably expensive funds is not the result of mere negligence.  Rather, the Fiduciary Defendants intentionally exposed Plan participants to unreasonably high fees because doing so significantly benefited the Allianz Family.

76.  This is perhaps best illustrated by the Fiduciary Defendants' improper use of the Plan to promote new and untested mutual funds for the purpose of furthering the Allianz Family's mutual fund business.

77.  By way of background, mutual funds that have failed to attract assets (often due to underperformance) are often closed.  A Vanguard study showed that a whopping 46 percent of the 5,108 funds that existed at the beginning of 1997 were either liquidated or merged with another fund by the end of 2011.  Todd Schlanger & Christopher B. Philips, *The Mutual Fund Graveyard: An Analysis of Dead Funds*, Vanguard Funds, at 3 (January 2013), https://personal.vanguard.com/pdf/s362.pdf.  Liquidations are frequently the result of a prolonged period of underperformance that (1) will make it difficult for the fund to attract new assets in the foreseeable future and (2) drags down the firm's historical return data.  *Id.* at 1, 4, 6; Larry Swedroe, *How the Mutual Fund Graveyard Can Hurt Investors*, CBS Marketwatch (May 8, 2014), http://www.cbsnews.com/news/its-getting-crowded-in-the-mutual-fund-graveyard/ (last accessed Sept. 29, 2015).

78.  Defendants are certainly familiar with this phenomenon.  As of the end of June 2009, Allianz Global Investors managed 40 mutual funds that offered institutional shares.  Eighteen of those 40 funds had been either liquidated or merged with another fund by August 2015.

79.  Given the frequency with which funds are removed from a family's lineup, mutual fund families must frequently introduce new mutual funds to replace

1   the funds that invariably will need to be closed or merged into another fund. New

2   funds also play a critical role in responding to a constantly-evolving investment

3   marketplace.

4        80.   Defendants are familiar with the need to create new funds. Allianz

5   Global Investors has launched 28 new mutual funds since the beginning of 2008,

6   while PIMCO has launched 57 new mutual funds during that time.

7        81.   Introducing new mutual funds imposes a large burden on a mutual

8   fund company. There are significant start-up costs. Additionally, many of the

9   expenses of running a mutual fund such as staff, marketing, and research are fixed

10   overhead, and therefore account for a large percentage of a mutual fund's assets

11   when the fund is new and still small. Therefore, new mutual funds typically

12   operate at a loss (to the fund company) until they have attracted sufficient assets to

13   achieve adequate economies of scale.

14        82.   This presents three powerful incentives to attract assets to a newer

15   fund. First, additional assets help lower the fund's expenses as a percentage of total

16   assets, allowing the fund to lower its expenses and thereby attract new investors.

17   Second, when a new fund attracts sufficient new assets, the mutual fund company

18   no longer has to operate the fund at a loss. Finally, mutual funds require assets to

19   manage.   Therefore attracting investors early in a fund's life is a difficult but

20   critical task to the survival of the fund. Empirically, new funds that fail to attract

21   sufficient assets are often closed. Schlanger & Phillips, *The Mutual Fund*

22   *Graveyard*, at 4, 4 n.5, 7.

23        83.   Prudent investors, however, are typically wary of investing in new

24   funds. New funds are generally imprudent selections for a retirement plan for two

25   reasons. *First*, there is no track record of success that might justify inclusion within

26   the plan. *Second*, new funds are typically quite expensive.

27                **INCLUSION OF UNTESTED FUNDS WITHIN THE PLAN**

28        84.   The Fiduciary Defendants have improperly used the Plan as a vehicle

1  for providing seed money to the Allianz Family's newest mutual funds, and have a

2  pattern of adding mutual funds to the Plan shortly after they are launched, despite

3  the lack of a sufficient track record to determine whether the fund is a prudent

4  investment.

5         85.    For example, in March 2008, PIMCO launched a series of target-date

6  funds, the RealRetirement Funds. Despite their lack of track record, high expenses,

7  and a marketplace replete with competitive target-fund offerings from companies

8  such as Vanguard, T. Rowe Price, and JPMorgan, the Fiduciary Defendants added

9  five PIMCO RealRetirement Funds to the Plan less than a year after they were

10  launched.

11         86.    Similarly, Allianz Global Investors launched its own series of target-

12  date funds at the end of 2008 called the AllianzGI Retirement Funds, which were

13  immediately added to the Plan in early 2009 despite their lack of track record, high

14  expenses, and the existence of numerous competitive alternatives from other mutual

15  fund families.

16         87.    In addition to the target-date funds, since 2009, the Plan has added at

17  least four new mutual funds to the Plan that were in existence for less than two

18  years. In each case, the Fiduciary Defendants placed the Allianz Family's business

19  objectives and profitability before the interests of Plan participants by adding an

20  imprudent and unproven fund to the Plan and by subsequently failing to remove

21  each imprudent, unproven investment from the Plan.

22         88.    The addition of these funds may have been beneficial for the Allianz

23  Family's bottom line, but it has harmed Plan participants. The five PIMCO

24  RealRetirement target-date funds (now called RealPath Funds) added to the Plan in

25  2009 have performed poorly. *See* **Exhibit D** (Morningstar investment detail reports

26  for the PIMCO RealPath funds as of August 31, 2015). All five of the RealPath

27  funds have underperformed their benchmark index by at least 2 percent per year

28  over the past five years, with four of the five producing returns that have

-32-

1    underperformed their index by more than 5 percent per year.

2          89.    The six Allianz Global Investors target-path funds have produced

3    similarly poor results.  All five funds have underperformed their benchmark index

4    over the past five years by at least 1.5 percent per year, and four of the five funds

5    have underperformed their benchmark index by at least 3 percent per year over the

6    past five years.  *See* **Exhibit E** (Morningstar investment detail reports for the

7    AllianzGI Retirement funds as of August 31, 2015).

8          90.    Several other new and untested mutual funds added to the Plan have

9    also performed poorly.  The AllianzGI Disciplined Equity Fund, the PIMCO EqS

10   Pathfinder Fund, and the PIMCO Global Multi-Asset Fund were each added to the

11   Plan shortly after the fund was launched.  In each case, the fund has significantly

12   underperformed its peers.  In fact, the Disciplined Equity and EqS Pathfinder funds

13   no longer exist.

14         91.    The Fiduciary Defendants' pattern of adding new and untested mutual

15   funds to the Plan to support the Allianz Family's business operations and the

16   Fiduciary Defendants' failure to remove those funds at the earliest possible

17   opportunity constitute breaches of the fiduciary duties of loyalty and prudence.

18   **USE OF THE "DEFAULT" INVESTMENT OPTION TO FUNNEL PLAN ASSETS INTO**
19                          **UNTESTED FUNDS**

20         92.    In addition to including new and unproven funds in the Plan, the

21   Fiduciary Defendants also have exposed participants to these imprudent new funds

22   through the Plan's default investment fund.

23         93.    By way of background, new employees become eligible to participate

24   in the Plan the month after they commence employment. Ex. A § 2.01(a).  Newly-

25   enrolled employees are then automatically deemed to have elected a contribution

26   level of 4% of compensation unless they affirmatively opt out.  *Id.* § 3.01(a).  If the

27   employee does not opt out of this default contribution, the contribution level

28

increases by 2% each year until 10% of compensation is being contributed to the Plan. *Id.* § 3.01(b).

94. Employees who fail to make an investment election automatically have their monies invested in the default investment fund, which is selected by the Committee. Ex. A § 5.02(f). Amounts contributed under the Plan's automatic enrollment provision are invested in the Plan's default investment fund unless a different election is made. SPD, Ex. B at 4.

95. The Committee has selected the AllianzGI Global Allocation Fund (the "Global Allocation Fund") as the Plan's default investment fund. Plaintiff Urakhchin invested in the default Global Allocation Fund when he began working for PIMCO in 2011 and was automatically enrolled in the Plan, and on information and belief, the Global Allocation Fund continues to act as the Plan's default investment fund.

96. As a result of the automatic enrollment provision and default investment provisions, a significant amount of Plan assets are directed into the Global Allocation Fund. Approximately $57 million was invested in the Global Allocation Fund as of the end of 2013, making it one of the two largest holdings in the Plan along with the PIMCO Total Return Fund, which holds approximately $58 million in Plan assets.

97. The Global Allocation Fund is a fund of funds, meaning that it invests in a portfolio of other mutual funds. The funds within the Global Allocation Fund consist entirely of proprietary mutual funds managed by Allianz Global Investors and PIMCO. As a result, the Global Allocation Fund (which is a so-called "balanced fund") has an expense ratio of 0.85%—almost twice as high as the average balanced fund found in retirement plans with between $500 million and $1 billion in assets. ICI Study at 45.

98. The Global Allocation Fund has a history of making significant investments in newer funds within the Allianz Family. According to its SEC

-34-

filings, as of November 2009, four of the largest equity fund holdings within the Global Allocation Fund were AllianzGI mutual funds that had been launched within the past three years, and two of those funds were only a year old. As of August 2011, three of the Global Allocation Fund's largest equity holdings were again AllianzGI mutual funds that had been launched within the past three years.

99. By using the Global Allocation Fund as the Plan's default investment option, Defendants have created a mechanism whereby Plan assets are not just invested—but continually *reinvested*—in a steady stream of new and unproven funds.

100. The Fiduciary Defendants' pattern and practice of using the default investment fund to promote the Allianz Family's new mutual fund offerings and thereby reduce the subsidization of its newer funds has been particularly pronounced over the past few years. As of November 2014, four of the fourteen equity fund holdings within the Global Allocation Fund were AllianzGI funds that had been launched within the past three years.

101. One blatant example relates to the "Best Styles" funds. Over approximately the past two years, Allianz Global Investors has released a series of mutual funds that it calls the "Best Styles" funds: these include AllianzGI Best Styles Global Equity (launched December 2013), Best Styles International Equity (launched December 2014), and Best Styles U.S. Equity (launched December 2014). Allianz Global Investors has made a significant investment in these funds. To ensure that its investment pays off, and curtail its subsidization of the BestStyles funds, Allianz Global Investors is using the Global Allocation Fund and its target-date funds to channel significant assets into the Best Styles funds.

102. As of May 31, 2015, the top two equity fund holdings in every AllianzGI target-date fund were the Best Styles International Equity Fund and the Best Styles U.S. Equity Fund, despite the fact that these funds had only been in existence for six months. And of the $202 million invested in the Global

-35-

Allocation Fund (over thirty percent of which constitutes Plan assets), a whopping $107 million was invested in the Best Styles Global Equity Fund, constituting more than half of the Global Allocation Fund's assets, despite the fact that the Best Styles Global Equity Fund had only existed for eighteen months. This is a staggering percentage of assets to have in one mutual fund, let alone a new and unproven mutual fund. The Global Allocation Fund's $107 million investment in the Best Styles Global Fund constitutes 73% of the assets currently invested in the Best Styles Global Fund.

103. This pattern of using the Global Allocation Fund to promote new and unproven funds demonstrates the Fiduciary Defendants' real purpose in choosing the Global Allocation Fund as the default investment option within the Plan. The Global Allocation Fund provides a significant opportunity to use Plan assets to support newer proprietary funds, thereby curtailing or ending company subsidization of these newer funds. This constitutes a breach of the Fiduciary Defendants' duties of loyalty and prudence. A prudent fiduciary acting solely in the interests of Plan participants would not retain a mutual fund in the Plan because it benefits the Plan sponsor's business operations (or those of its affiliates). Furthermore, a prudent fiduciary acting solely in the interest of Plan participants would not use the AllianzGI Global Allocation Fund—a high-cost fund that has under-performed its benchmark over the prior three-, five-, and ten-year periods— as the Plan's default investment fund, when lower-cost options with superior performance were available.[5]

---

[5] For example, the American Funds Capital Income Builder Fund (Ticker RIRGX) is a global allocation fund held by a number of plans similar in size to the Plan, but carries an expense ratio of only 0.30% (versus 0.85% for the Global Allocation Fund) and has outperformed the Global Allocation Fund over the prior three-, five-, and ten-year periods as of December 31, 2015.

-36-

### III.   PLAINTIFFS HAVE SUFFERED DAMAGES AS A RESULT OF EACH FORM OF MISCONDUCT IDENTIFIED IN THE COMPLAINT

104.   Plaintiffs have suffered from the breaches of fiduciary duties and other unlawful conduct identified in Sections I and II above.

105.   Plaintiff Aleksander Urakhchin ("Urakhchin") has been a participant in the Plan from 2011 to the present. During that time, he has at various times had funds invested in the AllianzGI Global Allocation Fund and the PIMCO Stocks Plus Fund. Because the value of his account is less than it would have been had Defendants honored their fiduciary duties and refrained from self-dealing, Urakhchin has statutory and Article III standing to bring the present action. *Harris v. Amgen, Inc.*, 573 F.3d 728, 732–36 (9th Cir. 2009).

106.   Plaintiff Nathan Marfice ("Marfice") has been a participant in the Plan from on or before 2009 to the present. During that time, he has at various times had funds invested in the AllianzGI Retirement 2040 Fund, the PIMCO RealPath 2040 Fund, the AllianzGI NFJ Dividend Value Fund, the AllianzGI Focused Growth Fund, the PIMCO Stocks Plus Fund, the AllianzGI Micro Cap Fund, the AllianzGI Mid-Cap Fund, the PIMCO Real Return Fund, the PIMCO Short Asset Investment Fund, and the PIMCO Total Return Fund. Because the value of his account is less than it would have been had Defendants honored their fiduciary duties and refrained from self-dealing, Marfice has statutory and Article III standing to bring the present action. *Harris*, 573 F.3d at 732–36.

107.   Plaintiffs did not have knowledge of all material facts (including, among other things, comparisons of Plan costs and investment performance versus other available alternatives, comparisons to other similarly-sized plans, and the underlying holdings of the Plan's default investment option and target-date funds) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of

-37-

Defendants' decision-making processes with respect to the Plan, including Defendants' processes and motivations for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## **CLASS ACTION ALLEGATIONS**

108. Plaintiffs bring this action on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

109. Plaintiffs assert their claims in Counts I - III on behalf of the following class: [6]

> All participants and beneficiaries of the Allianz Asset Management of America, L.P. 401(k) Savings and Retirement Plan at any time on or after October 7, 2009. Excluded from this class are Defendants, their directors, and any employees with responsibility for the Plan's investment or administrative functions.

110. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan has had between approximately 3,000 and 3,900 participants during the applicable statutory period.

111. Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Plan, who have suffered injuries as a result of Defendants' mismanagement of the Plan and self-dealing. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants managed the Plan as a single

---

[6] Plaintiffs reserve the right to revise their class definition, and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

entity, and therefore Defendants' imprudent decisions and self-dealing affected all Plan participants similarly.

112. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class, as their interests are aligned with the Class that they seek to represent and they have retained counsel experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

113. <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a. Whether the Fiduciary Defendants breached their duties of prudence and loyalty by offering only proprietary investments within the Plan;

    b. Whether the Fiduciary Defendants breached their duties of prudence and loyalty by failing to monitor and remove the Plan's investments in proprietary investments managed by PIMCO and Allianz Global Investors;

    c. Whether the Fiduciary Defendants failed to exercise appropriate skill, care, loyalty, and diligence, by failing to investigate and attempt to negotiate lower-cost alternatives to the proprietary investments within the Plan from investment managers who were not affiliated with the Allianz Family;

    d. Whether the Fiduciary Defendants breached their duty of loyalty, their duty to make prudent investment decisions, and their duty to monitor plan investments and subsequently remove imprudent investments, by adding new and untested proprietary mutual funds to the Plan and failing to remove those funds at the earliest available opportunity;

    e. Whether the Fiduciary Defendants breached their duty of loyalty, their duty to make prudent investment decisions, and their duty to monitor plan investments and subsequently remove imprudent investments, by retaining the Global Allocation Fund

<div align="center">-39-</div>

within the Plan and designating the Global Allocation Fund as the default investment option in light of the Fund's pattern and practice of investing in new and unproven mutual funds and the Fund's track record of poor performance;

f.  The proper measure of monetary relief; and

g.  The proper form of equitable and injunctive relief.

114.  Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. Separate lawsuits would establish incompatible standards to govern Defendants' conduct.

115.  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Plan participants, as a practical matter, would be dispositive of the interests of other Plan participants or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court such as removal of particular Plan investments or removal of a Plan fiduciary would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

116.  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint has applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's

**EXHIBIT A -79-**

individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)

117. 29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty on the Fiduciary Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

118. As described throughout this Complaint, the Fiduciary Defendants breached their fiduciary duties of prudence and loyalty with respect to the selection, retention, and management of the Plan's investment options by, *inter alia*:

    a. Selecting and retaining investments in the Plan because they were affiliated with the Allianz Family and would contribute to the Allianz Family's bottom line;

    b. Failing to monitor Plan investments and investigate whether the investment management services provided by the Allianz Family could be provided at lower cost, with comparable or superior performance, by an investment manager not affiliated with the Allianz Family;

    c. Adding new and untested mutual funds within the Plan to support the business objectives of the Allianz Family, despite these funds' lack of a sufficient track record to warrant their addition by the Plan, and subsequently failing to promptly remove these new and untested mutual funds when they underperformed;

    d. Selecting and retaining the AllianzGI Global Allocation Fund as the

-41-

**EXHIBIT A  -80-**

default investment fund because of the fund's ability to support the Allianz Family's business objectives despite the Global Allocation Fund's high costs and poor performance;

119. Each Fiduciary Defendant performing investment-related duties knowingly participated in the breaches of the other Defendants performing such duties, knowing that other Defendants were breaching their fiduciary duties, and enabling commission of these breaches by failing to lawfully discharge their own fiduciary duties or make any reasonable effort under the circumstances to remedy other Defendants' breaches. For these reasons, the Fiduciary Defendants are also liable as co-fiduciaries under 29 U.S.C. § 1105.[7]

120. Each Fiduciary Defendant is personally liable, and the Fiduciary Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

121. On behalf of the Plan, Plaintiffs are also entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3) (including the equitable relief described in the Prayer for Relief), recovery of pre-judgment interest, *see Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007), and attorney fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine.

---

[7] AAM and Maney are also liable as co-fiduciaries under 29 U.S.C. § 1105 given the General Partner's authority, acting on behalf of the Plan Sponsor, to appoint and remove members of the Committee and to amend the Plan, AAM and Maney's knowledge of each Defendant's breaches of fiduciary duties, and AAM and Maney's failure to exercise their authority to take reasonable steps to prevent these breaches.

<u>**COUNT II**</u>
**Failure to Monitor Fiduciaries**

122.   As alleged throughout the Complaint, AAM and Maney are fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21).

123.   AAM and Maney are responsible for appointing and removing members of the Committee, appointing and removing trustees, and for appointing and removing the Plan's recordkeeper.

124.   Given that AAM and Maney had overall oversight responsibility for the Plan, and the explicit fiduciary responsibility to appoint and remove members of the Committee, AAM and Maney had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Committee.

125.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

126.   To the extent that AAM or Maney's fiduciary monitoring responsibilities were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

127.   AAM and Maney breached their fiduciary monitoring duties by, among other things:

       a.   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

       b.   failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein in violation of ERISA;

-43-

**EXHIBIT A  -82-**

c. failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

128. As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had AAM and Maney discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan, the named Plaintiffs, and other Class members lost millions of dollars of retirement savings.

129. AAM and Maney are personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Complaint, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate. Each of these Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches, and thus each Defendant is liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

## COUNT III
### Other Equitable Relief Based on Ill-Gotten Proceeds
### 29 U.S.C. § 1132(a)(3)

130. Under 29 U.S.C. § 1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under that section regardless of whether it is a fiduciary. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had

-44-

1   actual or constructive knowledge of the circumstances that rendered the transaction

2   or payment unlawful.

3       131.   The Employer Defendants knew or should have known that the act or

4   practice of using exclusively Allianz Family mutual funds as the Plan's designated

5   investment options allowed the Employer Defendants to benefit financially through

6   excessive fees paid by the Plan and at the expense of the Plan's participants, in

7   breach of the Fiduciary Defendants' duties of prudence and loyalty.

8       132.   Each of the Employer Defendants participated in the Fiduciary

9   Defendants' breaches of their fiduciary duties, and knowingly received excessive

10  fees paid from Plan assets.

11      133.   Therefore, to the extent any ill-gotten proceeds and profits are not

12  disgorged under the fiduciary relief provisions of 29 U.S.C. § 1109(a), the Court

13  should order restitution or disgorgement as appropriate equitable relief under 29

14  U.S.C. § 1132(a)(3) to restore these monies to the Plan.

15                          **PRAYER FOR RELIEF**

16      WHEREFORE, Plaintiffs Urakhchin and Marfice, individually and as

17  representatives of the Class defined herein, and on behalf of the Plan, pray for relief

18  as follows:

19      A.   A determination that this action may proceed as a class action under
20           Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal
             Rules of Civil Procedure;
21
22      B.   Designation of Plaintiffs as Class Representatives and designation
             of Plaintiffs' counsel as Class Counsel;
23
24      C.   A declaration that the Fiduciary Defendants have breached their
             fiduciary duties in the manner described in the Complaint;
25
26      D.   An order compelling Defendants to personally make good to the
             Plan all losses that the Plan incurred as a result of the breaches of
27           fiduciary duties and self-dealing described above and to restore the

28

**EXHIBIT A -84-**

Plan to the position it would have been in but for such breaches and self-dealing;

E.  An order imposing a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duties described herein, and directing Defendants to disgorge such monies and return them to the Plan;

F.  An order granting equitable restitution and other appropriate equitable monetary relief against the Employer Defendants for knowingly participating in the Fiduciary Defendants' fiduciary breaches;

G.  An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; removal of imprudent mutual funds as core investment options; transfer of Plan assets in imprudent mutual funds to prudent alternative investments; and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.  An award of pre-judgment interest;

J.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

K.  An award of such other and further relief as the Court deems equitable and just.

Dated: January 6, 2016                    **NICHOLS KASTER, PLLP**

                                          By:   /s/ Kai H. Richter
                                          Kai H. Richter, MN Bar No. 0296545*
                                          NICHOLS KASTER, PLLP
                                          krichter@nka.com
                                          Carl F. Engstrom, MN Bar No. 0396298*

-46-

1 cengstrom@nka.com
Adam W. Hansen, CA Bar No. 264241
2 ahansen@nka.com
3 4600 IDS Center
80 South 8th Street
4 Minneapolis, MN 55402
Phone: (612) 256-3200
5 Fax: (612) 338-4878
6 *admitted pro hac vice

7
KABATECK BROWN KELLNER LLP
8 Richard L. Kellner, CA Bar No. 171416
9 rlk@kbklawyers.com
644 South Figueroa Street
10 Engine Company No. 28 Building
Los Angeles, CA  90017
11 Telephone: (213) 217-5000
12 Facsimile: (213) 217-5010

13
ATTORNEYS   FOR   INDIVIDUAL   AND
14 REPRESENTATIVE PLAINTIFFS

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND EQUITABLE RELIEF

**EXHIBIT A  -86-**