1   Christina Queiros Bouchot (SBN 289701)
    *cbouchot@goodwinlaw.com*
2   Steven A. Ellis (SBN 171742)
    *sellis@goodwinprocter.com*
3   **GOODWIN PROCTER LLP**
    601 S Figueroa Street, 41st Floor
4   Los Angeles, CA  90017
    Tel.:  213.426.2500
5   Fax.:  213.623.1673

6   James O. Fleckner (*pro hac vice*)
    *jfleckner@goodwinlaw.com*
7   Paul E. Nemser (*pro hac vice*)
    *pnemser@goodwinlaw.com*
8   David Rosenberg (*pro hac vice*)
    *drosenberg@goodwinlaw.com*
9   **GOODWIN PROCTER LLP**
    100 Northern Avenue
10  Boston, MA  02210
    Tel.:  617.570.1000
11  Fax.:  617.523.1231

12  Attorneys for Defendants

13          **UNITED STATES DISTRICT COURT**
14          **CENTRAL DISTRICT OF CALIFORNIA**

15  ALEKSANDR URAKHCHIN, *et al.*,          Case No. 8:15-cv-01614-JLS-JCG

16              Plaintiffs,                 **CLASS ACTION**

17      v.                                  **DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**
18  ALLIANZ ASSET MANAGEMENT OF
    AMERICA, L.P., *et al.*,                Date:        October 27, 2017
19                                          Time:        2:30 PM
                Defendants.                 Courtroom:   10A
20
21                                          Judge:      Hon. Josephine L. Staton

22                                          Filed Concurrently with:
                                            1.  Motion for Summary Judgment
23                                          2.  Statement of Uncontroverted Facts
                                                and Conclusions of Law
24                                          3.  Declaration of David Rosenberg
                                            4.  [Proposed] Judgment
25
26
27
28

91898714

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

    I.     A Generous and Successful Plan ......................................................... 3

    II.    The Choices Available to Class Members under the Plan.................... 4

    III.   Participants Have Chosen and Prefer AllianzGI and PIMCO Funds. ................................................................................................ 6

    IV.   Participants in the Plan Have Different Characteristics and Invest Differently from Other Retirement Plan Participants .......................... 7

    V.    The Committee Accounted for Class Members' Retirement Needs .................................................................................................. 8

ARGUMENT ..................................................................................................... 10

    I.     Summary Judgment Standard ............................................................ 10

    II.    Plaintiffs Cannot Establish A Breach Of Duty ................................. 11

         A.    The Committee Acted in Participants' Best Interests. ............. 11

         B.    The Investment Options Are Objectively Prudent For This Plan. ........................................................................................ 13

              1.    AllianzGI and PIMCO Funds Are Widely Used in 401(k) Plans. ................................................................... 15

              2.    Plaintiffs Ignore the Actual Characteristics, Preferences, and Needs of Plan Participants. ................. 16

              3.    Economic Analysis Shows that the Plan's Investment Options Were Prudent Choices that Performed Well and Did Not Charge Excessive Fees. ............................................................................. 18

    III.   Plaintiffs Cannot Establish Loss Causation ...................................... 19

         A.    A Core Lineup Consisting Solely of Passively Managed Vanguard Funds Is Not a Plausible Alternative. ..................... 20

         B.    The Plan Offered The Funds Plaintiffs' Seek.......................... 22

    IV.   Damages Will Present an Additional Roadblock to Plaintiffs' Case. ................................................................................................. 23

    V.    Summary Judgment Should Be Granted Because Plaintiffs' Claims Are Barred by the Statute of Limitations. ............................. 24

CONCLUSION.................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ........................................................................... 10

*Brotherston v. Putnam Inv. LLC*,
   No. 15-13825, 2017 WL 2634361
   (D. Mass. June 19, 2017) ...................................................2, 11, 14, 15, 16, 20, 24

*Brotherston v. Putnam Invs. LLC*,
   No. 15-13825, 2017 WL 1196648
   (D. Mass. March 30, 2017) .................................................................................. 18

*Bussian v. RJR Nabisco Inc.*,
   223 F.3d 286 (5th Cir. 2000) .............................................................................. 14

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................ 10

*In re Computer Scis. Corp. ERISA Litig.*,
   635 F. Supp. 2d 1128 (C.D. Cal. 2009) ........................................................ 17, 21

*DiFelice v. U.S. Airways, Inc.*,
   497 F.3d 410 (4th Cir. 2007) .............................................................................. 16

*Dupree v. The Prudential Ins. Co. of Am.*,
   No. 99-8837, 2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) ................................... 2

*Fink v. Nat'l Sav. & Tr. Co.*,
   772 F.2d 951 (D.C. Cir. 1985) ............................................................................ 14

*Friend v. Sanwa Bank Cal.*,
   35 F.3d 466 (9th Cir. 1994) ................................................................................ 20

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) .............................................................................. 19

*Martin v. Feilen*,
   965 F.2d 660 (8th Cir. 1992) .............................................................................. 20

ii

*In re McKesson HBOC, Inc. ERISA Litig.*,
   391 F. Supp. 2d 812 (N.D. Cal. 2005)............................................................ 11, 14

*Meiners v. Wells Fargo & Co.*,
   No. 16-3981, 2017 WL 2303968 (D. Minn. May 25, 2017)................................ 21

*In re Northrop Grumman Corp. ERISA Litig.*,
   No. 06-06213, 2015 WL 10433713 (C.D. Cal. Nov. 24, 2015).......................... 25

*Olive v. Am. Express Long Term Disability Ben. Plan*,
   183 F. Supp. 2d 1191 (C.D. Cal. 2002)............................................................ 10

*Pegram v. Herdrich*,
   530 U.S. 211 (2000) ........................................................................................ 11

*Quan v. Computer Sci. Corp.*,
   623 F.3d 870 (9th Cir. 2010) ..................................................................... 21, 22

*Shirk v. Fifth Third Bancorp*,
   No. 05-049, 2009 WL 3150303 (S.D. Ohio Sept. 30, 2009).............................. 25

*Tibble v. Edison Int'l*,
   729 F.3d 1110 (9th Cir. 2011) ............................................................. 12, 17, 19

*Tibble v. Edison Int'l*,
   No. 07-5359, 2017 WL 3523737 (C.D. Cal. Aug. 16, 2017)................... 18, 21, 22

*Tibble v. Edison Int'l*,
   No. 07-5359, 2010 WL 2757153 (C.D. Cal. July 8, 2010) ........................... 13, 14

*Tussey v. AAB, Inc.*,
   746 F.3d 327 (8th Cir. 2014) ........................................................................... 21

*In re Unisys Sav. Plan Litig.*,
   173 F.3d 145 (3d Cir. 1999) ............................................................................ 13

*Urakhchin v. Allianz Asset Mgmt. of Am. LP*,
   No. 15-01614, 2017 WL 2655678 (C.D. Cal. June 15, 2017) ............................ 12

*Urakhchin v. Allianz Asset Mgmt. of Am. LP*,
   No. 15-01614, 2016 WL 4507117 (C.D. Cal. Aug. 5, 2016).............................. 24

*White v. Chevron Corp.*,
   No. 16-0793, 2017 WL 2352137 (N.D. Cal. May 31, 2017) .............................. 19

iii

91898714

*Wilkinson v. Torres*,
    610 F.3d 546 (9th Cir. 2010) ................................................................. 12

*Wright v. Or. Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004) ............................................................. 10

**Statutes**

29 U.S.C. § 1104(a)(1)(B) (ERISA § 404(a)(1)(B)) ................................ 13

29 U.S.C. § 1109 (ERISA § 409) ....................................................... 20, 21

29 U.S.C. § 1113(2) (ERISA § 413(2)) ................................................... 24

**Other Authorities**

U.S. Dep't of Labor, Participant Directed Individual Account Plans, 56
    Fed. Reg. 10724 (Mar. 31, 1991) ........................................................ 2

Fed. R. Civ. P. 56(a) ............................................................................ 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

91898714

## **INTRODUCTION**

Plaintiffs cannot meet their burden to show any breach of ERISA, or that any loss resulted from Defendants' actions.  All objective measures demonstrate that this is an exceptionally generous and well-designed employee benefit Plan.[1]  The Plan makes available the same PIMCO[2] and AllianzGI funds selected by fiduciaries of four of the top five largest defined contribution retirement plans, 13 of the 25 largest; all told, fiduciaries of over 30,000 other retirement plans have selected PIMCO and AllianzGI funds.  Barron's Magazine named PIMCO the best overall asset manager for the past five and ten years, and three AllianzGI funds in the Plan have won Lipper awards as the best in their categories.  PIMCO funds have attracted more investments this year—in and out of retirement plans—than funds of any other active manager.  PLANSPONSOR Magazine selected the Plan as a finalist for its 2017 "Best in Class" 401(k) plan designation, recognizing retirement plans and their sponsors that "are committed to helping employees save for retirement . . . ."  SUF[3] ¶¶ 71, 74.  According to the former managing director and chief investment officer for the largest 401(k) plan in the country, "with the quality of talent, organization and governance like PIMCO, it would be illogical to offer another fund family's options among [the Plan's] primary menu choices."  Kanner R.[4] at 17.

Class Counsel's suggestion that the Plan instead should have utilized only competitors' index funds is entirely irrational where Plan participants, including the named Plaintiffs' themselves, demonstrated time and again their preference for

---

[1] Allianz Asset Management of America L.P. 401(k) Savings and Retirement Plan.

[2] "PIMCO" includes Pacific Investment Management Company LLC, PIMCO Global Advisors Resources LLC, and PIMCO Investments LLC.  "AllianzGI" includes Allianz Global Investors Distributors LLC, Allianz Global Investors U.S. Holdings LLC, and Allianz Global Investors U.S. LLC and its predecessors.  "AAM" includes Allianz Asset Management of America LLC and Allianz Asset Management of America LP.  PIMCO and AllianzGI were dismissed from this case by the Court's August 5, 2016 order.  Dkt. No. 61.

[3] Statement of Uncontroverted Facts and Conclusions of Law.

[4] The reports of Ray Kanner ("Kanner R."), Randolph E. Bucklin ("Buck. R."), and Russell E. Wermers ("Wermers. R."), are attached as Exhibits 1-3 to the Declaration of David Rosenberg filed contemporaneously with this document.

1

PIMCO and AllianzGI funds.  Even the regulators have made clear that it would run "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor."[5]

The overwhelming, objective evidence establishes that this Plan functioned exactly as ERISA required.  Fiduciaries cannot be liable for offering such objectively prudent investments, regardless of the process employed to select them, nor can fiduciaries be liable where, as here, participants incurred no losses.  On the facts and the law, this is a case for summary judgment.  There is no reason to burden the Court and the parties with a needless trial.  Courts have entered judgment on similar claims where the investments at issue were much less acclaimed and less widely utilized.  *See Brotherston v. Putnam Inv. LLC*, No. 15-13825, 2017 WL 2634361, at *13 (D. Mass. June 19, 2017), *appeal docketed*, No. 17-1711 (1st Cir. Jul. 20, 2017); *Dupree v. The Prudential Ins. Co. of Am.*, No. 99-8837, 2007 WL 2263892, at *55 (S.D. Fla. Aug. 7, 2007).

None of Plaintiffs' groundless theories change this result.  For example, Plaintiffs rely on a smattering of emails that supposedly demonstrate that "the Plan existed to serve [Defendants'] business interests."[6]  But the record shows just the *opposite*.  During the class period, the committee responsible for selecting the Plan's investments (the "Committee") *rejected* 15 of 22 requests to add funds.  Further, Class Counsel's unsupported assertion that low-cost index funds are not currently available to Plan participants absent additional costs[7] is *patently false*—the actual facts show that index funds that charge minimal fees (0.03%) are available today at no additional cost through the Personal Choice Retirement Account ("PCRA").

Finally, summary judgment is also warranted due to the statute of limitations. Plaintiffs are challenging the way the Plan had been managed for years before they

---

[5] U.S. Dep't of Labor, Participant Directed Individual Account Plans, 56 Fed. Reg. 10724, 10730 (Mar. 31, 1991).

[6] Pls. Mem. in Supp. of Class Cert., Dkt. No. 79 ("Pls. Cert. Mem."), at 6.

[7] Pls. Cert. Reply, Dkt. No. 98 ("Pls. Cert. Reply"), at 3-4 n.1.

1  brought suit, with a mix of investment options, performance, and fees that have

2  remained largely constant since before the limitations period.  Although the Court

3  denied Defendants' 12(b)(6) motion due to a lack of pleaded allegations about pre-

4  2013 fees, a factual record now exists and shows no material difference before or

5  after the limitations period.

## BACKGROUND

### I.    A Generous and Successful Plan.

8  The Plan is one of the benefits offered to employees of AllianzGI, PIMCO

9  and AAM.  SUF ¶ 9.  It is designed to "provide for the accumulation of funds for the

10  benefit of the eligible employees."  *Id.*

11  Participating employees can elect how much, if any, of their salary to

12  contribute to the Plan.  SUF ¶ 35.  In addition, AllianzGI, PIMCO, and AAM make

13  contributions to eligible employees' Plan accounts.  *Id.* ¶ 37.  The employers

14  contribute 5.4% of each eligible employee's total compensation, plus matching

15  contributions and discretionary contributions.  *Id.* ¶ 38.  In total, from the last

16  quarter of 2009 to the end of 2016 employers have contributed $334.1 million to the

17  Plan, compared to $213.8 million in employee contributions.  *Id.* ¶ 39.  Thus, 61%

18  of contributions were made by AAM, AllianzGI, and PIMCO from the beginning of

19  the class period through 2016, with average contributions per employed participant

20  totaling ***$137,209*** during that time.  *Id.* ¶¶ 40-41.

21  To further encourage employees to save for retirement, the Plan provides for

22  both auto-enrollment (automatically enrolling new eligible employees in the Plan)

23  and auto-escalation (automatically increasing participants' contribution rates),

24  unless employees opt out.  SUF ¶ 43.  These two progressive programs place the

25  Plan at the forefront of retirement plans nationwide, at a significant cost to the

26  employers in the form of additional matching contributions.  *Id.* ¶ 44.  The

27  participating employers also make available, at no cost to class members,

28  investment advice services from GuidedChoice, an independent investment adviser,

3

that includes advice on "which investment funds to select from within the Plan and how much to invest in each of those funds." *Id.* ¶¶ 25, 28-31.  They have also made available, again at no cost, individual financial advice through Ayco.  *Id.* ¶ 33.

Likely as a result of the Plan's generous and well-thought-out structure, it was recognized as a finalist for PLANSPONSOR Magazine's 2017 "Best in Class" 401(k) plan award, which recognizes those retirement plans that "demonstrate[] excellence in the more than 25 attributes of plan design and governance" and plan sponsors that "are committed to helping employees save for retirement by offering 401(k) plans that make use of industry best practices."  SUF ¶¶ 71-74.  Only 70 of 4,200 retirement plans were selected as finalists.  *Id.* ¶ 72.

## II.    The Choices Available to Class Members under the Plan.

Participants can invest their Plan accounts in any option available under the Plan.  SUF ¶ 36.  The available options during the class period include 71 "core" funds, 64 of which have been managed by AllianzGI and PIMCO.  *Id.* ¶¶ 79-81.[8] These include some of the best funds available in the marketplace.  Together, AllianzGI and PIMCO manage over $1.6 trillion in investor assets.  *Id.* ¶ 6.  In 2017, Barron's Magazine named PIMCO the best overall asset manager for the past five and ten years.  *Id.* ¶ 97.  According to IBM's former chief investment officer, Ray Kanner, it has been the "premier fixed income manager in the U.S." for at least the last two decades.  Kanner R. at 17.  Through July 2017, PIMCO funds' net inflows were higher than any other family of actively managed funds this year.  SUF ¶ 98.  And, in 2016, three AllianzGI funds received Lipper Awards as the best funds in their asset categories.  *Id.* ¶¶ 99-101.

PIMCO and AllianzGI funds have been chosen time and again by fiduciaries of other retirement plans. 13 of the 25 largest defined contribution retirement plans in the country, including four of the top five largest, utilized one or more PIMCO or

---

[8] One of the core options during the class period was a series of target-date funds managed by Charles Schwab.  *Id.* ¶ 80.  Six others are sub-advised by Research Affiliates, LLC ("RAE"), though PIMCO acts as the investment adviser.  *Id.* ¶ 89.

4

1    AllianzGI funds as of 2015.  SUF ¶ 115.  That year, those 25 plans—all of which

2    are unaffiliated with Defendants—held $4.473 billion in PIMCO and AllianzGI

3    funds, which is more than *six times* the $719.8 million then held in the Plan's core

4    lineup.  *Id.* ¶¶ 116-17.  The largest defined contribution plan, sponsored by IBM,

5    held over one billion dollars in PIMCO and AllianzGI funds—more than was held

6    in the Plan—including *every* PIMCO fixed income fund.  *Id.* ¶¶ 104-06, 109.[9]  Mr.

7    Kanner explains that this was because of the IBM committee's belief in the strength

8    of PIMCO's products.  *Id.* ¶ 105.  Overall, the PIMCO Total Return Fund is *the*

9    *second most widely held fund in all 401(k) plans today*; over 30,000 retirement

10   plans include at least one PIMCO or Allianz fund.  *Id.* ¶¶ 102-03.

11        PIMCO and AllianzGI funds have performed very well, net of all fees.  When

12   Mr. Kanner evaluated PIMCO fixed income funds for the IBM plan, he observed

13   that they had "an average rating of an almost unheard of 4.93 [Morningstar] stars

14   (all out of 5)" and their 10-year rankings "beat out 95% of fixed income funds."

15   SUF ¶ 113.  As of year-end 2016, 92% of the Plan assets were invested in mutual

16   funds on the core lineup that had 3 or more Morningstar stars.  *Id.* ¶ 125.  Dr.

17   Russell Wermers, Director of the Center for Financial Policy at the University of

18   Maryland, demonstrates that the long-term performance histories of all of the mutual

19   funds in the Plan were, in aggregate, *higher* than their respective prospectus

20   benchmarks and the medians of their respective peer groups each year during the

21   class period.  *Id.* ¶¶ 120-22.  Moreover, the asset-weighted fees of the mutual funds

22   on the core lineup were, in aggregate, *lower* than the respective peer medians each

23   year.  *Id.*  When Mr. Kanner compared the weighted-average fees of PIMCO's fixed

24   income funds to those of the top 30 fund families, he found that they were the

25   second lowest.  *Id.* ¶ 112.  Further, Plan participants have been able to invest in five

26   collective investment trusts advised by AllianzGI or PIMCO, each of which has

27   _____

28   [9] When Mr. Kanner retired from IBM, its pension plan held even more PIMCO and AllianzGI investment products, totaling over $10 billion.  *Id.* ¶ 110.

91898714

1   lower fees than the mutual fund that follows a similar strategy.  *Id.* ¶¶ 229-40.

2       Participants are not limited to the AllianzGI, PIMCO and RAE funds on the

3   core lineup, however.  Any participant who wishes to do so may invest up to 100%

4   of her Plan account balance through the PCRA in a large universe of stocks, bonds,

5   derivatives and mutual funds not affiliated with either PIMCO or AllianzGI.  SUF

6   ¶ 134.  Contrary to Class Counsel's misstatements, participants are assessed ***no fee***

7   for opening or holding a PCRA and may use it to buy and sell over ***four thousand***

8   ***mutual funds without any transaction fees***.  *Id.* ¶¶ 137, 140.  Included in these no-

9   fee options are several low-cost index funds, such as the Schwab S&P 500 Index

10  Fund and Schwab Total Stock Market Index, both with a current expense ratio of

11  0.03%—***below*** the lowest cost (0.04%) of any fund identified in the First Amended

12  Complaint ("FAC") as a possible alternative.  *Id.* ¶¶ 142-43.

13  ### III.   Participants Have Chosen and Prefer AllianzGI and PIMCO Funds.

14      Not surprisingly, class members demonstrate enthusiasm for the Plan and its

15  investments.  98% of eligible employees participate (SUF ¶ 47), and those

16  participants show an unambiguous preference for AllianzGI and PIMCO funds.

17      For example, although index funds are available through the Plan at no cost

18  other than the 0.03% expense ratio, participants overwhelmingly choose AllianzGI

19  and PIMCO funds, even when investing through the PCRA.  Although all but three

20  of the Vanguard funds Plaintiffs' expert Dr. Pomerantz lists as a comparator are

21  already available through the PCRA (SUF ¶ 144), only ***seven*** participants have

22  invested in any of them.  *Id.* ¶ 149.  By contrast, ***199*** participants invested $15.30

23  million in PIMCO funds through the PCRA and ***60*** invested $13.73 million in

24  AllianzGI funds, making PIMCO and AllianzGI the two most popular managers of

25  funds selected within the PCRA.  *Id.* ¶¶ 152-53.[10]

26      The behavior of former employees provides additional evidence.  As of 2016,

27

28  [10] By comparison, 30 participants invested $1.87 million in Schwab funds, the most popular fund family in the PCRA after AllianzGI and PIMCO funds.  *Id.* ¶¶ 155-56.

91898714

1,595 former employees were still Plan participants even though they could have rolled their accounts over and invested in funds outside of the PIMCO/AllianzGI family.  SUF ¶¶ 15-16.  Indeed, both named Plaintiffs are former employees who decided not to roll over their Plan accounts into their other retirement plans and accounts—even after they filed this suit.  *Id.* ¶¶ 347, 359.  Mr. Urakhchin believes that the fund he selected for his Plan account, the PIMCO StocksPLUS Fund, is "doing well"; in his words, "I like what I have."  *Id.* ¶ 348.  He believes PIMCO is "great."  *Id.* ¶ 350.  Mr. Marfice similarly believes that he chose "good investments" for his Plan account and has declined to roll over into the Vanguard funds in his new plan.  *Id.* ¶ 358.  In addition, Mr. Marfice has elected to invest in the retail share class of the AllianzGI Focused Growth Fund outside of the Plan.  *Id.* ¶ 360.[11]

## IV.    Participants in the Plan Have Different Characteristics and Invest Differently from Other Retirement Plan Participants.

Although Class Counsel and their expert have sought to compare the Plan's investments and structure to other retirement plans,[12] doing so ignores the evidence that the composition of participants in this Plan renders it different.

Several examples demonstrate the sophisticated way that class members use their account and the way in which the Plan structure, with its generous contributions and wide range of choice, caters to this participant base.  These differences apply both to the investment professionals who represent about 28% of participants and to participants who are not investment professionals.  SUF ¶ 20.  All Plan participants are much less likely than participants in other plans to invest in the default options.  *Id.* ¶¶ 55-62.  Indeed, Plan participants exchange—that is,

---

[11] This is consistent with the desire exhibited by current and former employees to invest in PIMCO and AllianzGI funds.  As of June 2017, PIMCO, AllianzGI, and AAM employees had invested over $154 million in AllianzGI and PIMCO funds through 2,437 accounts, pursuant to a program separate from the Plan.  *Id.* ¶¶ 163-64.  Additionally, some class members have certified in Securities and Exchange Commission filings that they, too, invest in these funds.  *Id.* ¶¶ 257-59.

[12] *See, e.g.*, Preliminary Expert Report of Steve Pomerantz, PhD (Feb. 14, 2017) ("Pom. R."), Dkt. No. 78-2, at 10-11.

trade—their Plan investments for others at a rate almost **three times** higher than the average across other retirement plans.  *Id.* ¶¶ 63-67.  ***Nearly nineteen times*** more Plan participants use the PCRA than use brokerage windows in other plans, and as noted above, Plan participants then chiefly invest in PIMCO and AllianzGI mutual funds.  *Id.* ¶¶ 158-61.  The Plan participation rate is significantly higher than the average rate, even when controlling for plans that use automatic enrollment like the Plan.  *Id.* ¶ 48.  All of this has led to an average participant account balance that is over **2.5 times** larger than the average across other plans.  *Id.* ¶¶ 51-54.

## V.     The Committee Accounted for Class Members' Retirement Needs.

The Plan's investment lineup was chosen by the Committee, which has been and is comprised of AGI, PIMCO, and AAM employees.  SUF ¶¶ 165-66.  Those Committee members utilize their experience at the different organizations to represent the "employees of the various entities" that participate in the Plan and to act in their best interests.  *Id.* ¶¶ 167, 187.  As of the end of 2016, the Committee consisted of seven members, including two individuals with extensive experience working with 401(k) plans, two with investment management experience, two with human resources expertise, and one with an accounting background.  *Id.* ¶ 182.  One Committee member, Stacy Schaus, founded Hewitt Financial Services—a leading consultant to retirement plan fiduciaries—and is widely respected as a leader in the retirement industry.  *Id.* ¶¶ 176-77.  Another, Glenn Dial, has decades of experience working with retirement plan sponsors and fiduciaries on plan design.  *Id.* ¶ 178.

The Committee believed that a core lineup of AllianzGI, PIMCO (and RAE) strategies—complemented with inexpensive index funds and other investments available in the PCRA—would serve class members' best interests by enabling them to design individualized retirement strategies.  SUF ¶¶ 187-205.  As Committee member Mike Puntoriero testified, because employees believe in AllianzGI and PIMCO funds, selecting them helped build a Plan that "our employees want to participate in" and "incentiv[ized] our employees to provide for their retirement."

8

1   *Id.* ¶ 190.  Plaintiffs themselves wanted the funds.  *See supra* Background Sect. III.

2         The Committee took into account the specific attributes of this Plan's

3   participants, with a "willingness to add new strategies given the higher-than-average

4   investment knowledge of a large segment of the participant base."  SUF ¶¶ 243-44.

5   New funds were added to the Plan only when Committee members believed they

6   would serve participants' best interests; the Committee did not add funds for any

7   other purpose, such as to provide them with seed capital or increase assets under

8   management for the asset managers.  *Id.* ¶¶ 187, 208-12.  The Plan's investment

9   options also met the needs of employees, like the named Plaintiffs, who would not

10  characterize themselves as sophisticated investors.  *Id.* ¶¶ 249, 253.  The Committee

11  selected as default investment options a 50/50 allocation of age-appropriate

12  AllianzGI and PIMCO target-date funds.  *Id.* ¶ 250.  As Mr. Dial explained, this

13  design provided "added protection for participants" because the funds employ

14  different risk mitigation strategies.  *Id.* ¶ 252.  Indeed, Mr. Marfice affirmatively

15  chose to invest in both suites of target-date funds "[t]o diversify."  *Id.* ¶ 357.

16        While any participant—including Plaintiffs—could ask for a fund to be

17  considered for the Plan, the Committee *rejected* far more requests than it accepted.

18  It selected for the core lineup only seven of 22 funds requested by employees.  SUF

19  ¶¶ 261-339.  In fact, the Committee *rejected nine of the 15* requests that Plaintiffs or

20  their expert identified as supposedly demonstrating that Committee members

21  acceded to participant requests.  *Id.*  While AllianzGI and PIMCO have offered to

22  the public over 200 mutual funds during the class period, the core lineup included

23  only 70 funds advised by AllianzGI or PIMCO.  *Id.* ¶ 84.

24        The Committee regularly monitored the Plan's options.  Because Committee

25  members worked with the funds on the core lineup on a day-to-day basis—and were

26  "intimately familiar" with their fees and performance, as well as those of

27  comparable funds—they could monitor the Plan's funds "every day."  SUF ¶¶ 216-

28  17.  Committee members also received quarterly reports from the Plan's

9

recordkeeper that contained information on fees and performance compared to benchmarks comprised of funds unaffiliated with AllianzGI or PIMCO.  *Id.* ¶¶ 219-21.  During their reviews, Committee members "looked for opportunities to add value, [and] potentially improve performance, fee reductions, and diversification to participants' investment options."  *Id.* ¶ 227.  For example, the Committee reduced participants' cost to invest—at the expense of the affiliated investment advisers, AllianzGI and PIMCO—by switching Plan investments to lower-cost share classes and collective investment trusts once they were available.  *Id.* ¶ 229.

## ARGUMENT

## I.    Summary Judgment Standard

Summary judgment should be entered when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The defendant may either (1) produce evidence that refutes an essential element of plaintiffs' claim or (2) "point[] out . . . that there is an absence of evidence to support the [plaintiff's] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986).  In either event, "[t]he burden then shifts to the [plaintiff] to present evidence sufficient to support a verdict in its favor on every element of its claim for which it will carry the burden of proof at trial."  *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).  Here, Plaintiffs bear the burden of establishing, among other things, that (i) the Committee breached its fiduciary duties, (ii) there were losses to the Plan, and (iii) those losses were caused by such fiduciary breaches.  *See Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004); *Olive v. Am. Express Long Term Disability Ben. Plan*, 183 F. Supp. 2d 1191, 1195 (C.D. Cal. 2002).  Summary judgment should be entered here because, as a matter of law, Plaintiffs cannot prove these elements.

Summary judgment is also warranted because Plaintiffs and class members had actual knowledge of all material facts at least three years prior to Plaintiffs' suit.

**II.     Plaintiffs Cannot Establish A Breach Of Duty.**

    **A.     The Committee Acted in Participants' Best Interests.**

Defendants are entitled to summary judgment on Plaintiffs' loyalty claim. There is no evidence that the Committee acted disloyally when making decisions with respect to the Plan; although Plaintiffs have sought to justify an inference of disloyalty, Plaintiffs' argument has been entirely misleading, and the evidence, fairly regarded, permits no such inference.

ERISA expressly contemplates that plan fiduciaries can have personal or corporate interests, even ones that could deviate from participants' interests. Unlike a common-law trustee, an employer that is also an ERISA fiduciary can take action adverse to employees—such as terminating an employee or providing less generous benefits. *Pegram v. Herdrich*, 530 U.S. 211, 224-26 (2000). Surely, then, it is wholly appropriate for investment management professionals—whether members of the class or members of the Committee—to promote investment products.

The question for the Court, therefore, is not whether anyone at AAM, PIMCO, or AllianzGI—including Defendants—had an interest in selling investment products. The ***sole*** question is whether Plaintiffs can "point to specific circumstances in which the Defendants have actually put their own interests ahead of the interests of Plan participants [when acting as Plan fiduciaries]." *Brotherston*, 2017 WL 2634361, at *8 ("pointing to self-dealing alone is insufficient").[13]

They cannot. The evidence contradicts Class Counsel's assertion that the Committee members put their own interests ahead of Plan participants'. As the sworn testimony and declarations of Committee members establishes, no Committee member made a single decision for the Plan with the intent of benefitting AAM, AllianzGI, PIMCO, or the mutual funds at the expense of participants. SUF ¶¶ 186-87. Instead, the Committee selected PIMCO and AllianzGI funds as core

---

[13] *Accord In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 834-35 (N.D. Cal. 2005) (a plaintiff must show "actual disloyal conduct," not just conflicts of interest).

11

1   investment options because class members valued those funds, the Committee

2   believed that those funds provided a well-diversified menu at an appropriate cost,

3   and class members could choose a vast array of non-PIMCO and AllianzGI funds

4   through the PCRA.  *Id.* ¶¶ 186-205.[14]

5        The crux of Plaintiffs' case is "that Defendants managed and selected funds

6   for the Plan based on whether the funds would benefit Defendants and the Allianz

7   family rather than Plan participants."  *Urakhchin*, 2017 WL 2655678, at *2 (C.D.

8   Cal. June 15, 2017).  The factual record—and the very emails which Class Counsel

9   have waved around—show no such thing.

10       ***First***, Plaintiffs materially distort the record.  Plaintiffs and their expert

11  identified 15 requests by class members to add funds.  SUF ¶¶ 261-339.  But

12  Plaintiffs ignore the plain fact that the Committee ***rejected*** nine of those 15 requests.

13  *Id.*  Because Plaintiffs' evidence is misleading, summary judgment is required.  *See*

14  *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) ("Plaintiffs' sanitized version

15  [of the facts] cannot control on summary judgment when the record as a whole does

16  not support that version.").  Given that the Committee rejected more requests than it

17  accepted, there is no basis to infer that the Committee was putting its own interests

18  ahead of participants'.

19       ***Second***, the requests themselves reflect that participants (non-fiduciary class

20  members) sought to have access to the funds that they manage.  Participants'

21  motivations—even if "selfish" (Pls. Cert. Mem. at 7)—are entirely appropriate.  The

22  simple fact that Committee members agreed to add some requested funds, after

23  independent deliberation, is not nefarious.  Instead, the Ninth Circuit embraces

24  fiduciary responsiveness to participant requests, because "participant choice is the

25  centerpiece of what ERISA envisions for defined-contribution plans."  *Tibble v.*

26  *Edison Int'l*, 729 F.3d 1110, 1134-35 (9th Cir. 2011), *rev'd on other grounds*, 135 S.

27  ─────────────────────
    [14] Class Counsel's repeated argument that class members cannot obtain low-cost

28  index funds through the PCRA without additional fees (*e.g.*, Pls. Cert. Reply at 3-4 n.1) is simply untrue.  SUF ¶¶ 137, 140.

Ct. 1823 (2015).  As Mr. Kanner explains, accommodating participant requests is a hallmark of appropriate fiduciary behavior.  Kanner R. at 6-7.

After expensive, exhaustive discovery, Plaintiffs have no evidence to support their unfounded allegation that the Committee "treat[ed] the Plan as an opportunity . . . to . . . maximize profits."  *See* FAC ¶ 5.  There is no direct evidence of disloyalty, and no evidence that supports an inference of disloyalty.[15]  Summary judgment should therefore be granted with respect to Plaintiffs' disloyalty claim.

### B.       The Investment Options Are Objectively Prudent For This Plan.

ERISA requires that a "fiduciary shall discharge his duties . . . with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man in a like capacity and familiar with such matters would use *in the conduct of an enterprise of a like character and with like aims*."  29 U.S.C. § 1104(a)(1)(B) (emphasis added).  Summary judgment should be awarded on Plaintiffs' prudence claim because they cannot establish that the investment options in the lineup would not have been chosen by a hypothetical prudent fiduciary, *i.e.*, that the investment options were objectively imprudent.  *See In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 154 (3d Cir. 1999); *see also Tibble*, 2010 WL 2757153, at *21 (granting summary judgment because "a hypothetical prudent fiduciary would have made the same investment decision" as that challenged).  According to then-Judge Scalia, "I know of no case in which a trustee who has happened—through prayer, astrology or just blind luck—to make (or hold) objectively prudent investments (*e.g.*, an

---

[15] Ultimately, Plaintiffs' theory makes no economic sense.  PIMCO and AllianzGI manage over *$1.6 trillion* in assets, whereas the amounts invested in the funds on the Plan's core lineup comprised less than one half of one percent of all assets under management.  Moreover, the employers contributed to the Plan more than *ten times* the amount of the allegedly excessive fees during the class period.  *Compare* SUF ¶ 39 ($334.1M in employer contributions) *with* Supplement to Pom. R., PhD, Dkt. No. 98-2 at 12 ("Pom. Supp. R.") ($30.8M in fee damages).  Mr. Puntoriero, AAM's Chief Financial Officer, further explained that Plan assets were *de minimis* to AllianzGI and PIMCO.  SUF ¶ 210.  That PIMCO and AllianzGI may have "incidentally benefit[ted]" does not mean that ERISA's duties were breached. *Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *19 (C.D. Cal. July 8, 2010), *overruled on other grounds by* 729 F.3d 1110.

1    investment in a highly regarded 'blue chip' stock) has been held liable for" that

2    decision.  *Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia,

3    J., concurring in part and dissenting in part).

4         Plaintiffs allege that Defendants selected high-cost options within the Allianz

5    family and failed to investigate lower-cost options outside the Allianz family.  FAC

6    ¶ 118.  According to Plaintiffs, had Defendants prudently monitored the Plan's

7    investments, Defendants "would have removed the Plan's investments in favor of

8    investments such as . . . non-Allianz [index] funds . . . ."  *Id.* ¶ 74.  Plaintiffs

9    challenge the entire menu, emphatically arguing that the alleged breach affected the

10   "Plan as a whole."  Pls. Cert. Mem. at 17.  Plaintiffs are contending, in other words,

11   that, because of this alleged imprudence in investigation and monitoring, every

12   option on the lineup is *per se* imprudent.  *See Brotherston*, 2017 WL 2634361, at

13   *12 (summarizing, and rejecting, a similar argument).  However, fiduciaries cannot

14   be liable "for failing to investigate other investment options" if the investments

15   selected are objectively prudent.  *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F.

16   Supp. 2d at 833-34.[16]

17        Plaintiffs ignore the widespread use of AllianzGI and PIMCO funds in

18   retirement plans, and they ignore how the core lineup fits the characteristics and

19   needs of the participants of this specific Plan—their own class members.  Also, even

20   though prudence must be judged as of the time of the challenged decision, Plaintiffs

21   use an improper hindsight-driven mode of analysis to suggest imprudence.  They

22   compare fundamentally different products—pairing off each actively managed fund

23   on the menu with a single, cherry-picked index fund.  Sound economic analysis

24   demonstrates the fallacy in Plaintiffs' approach.  In fact, the funds at issue—the

25

26   [16] *See also Bussian v. RJR Nabisco Inc.*, 223 F.3d 286, 300 (5th Cir. 2000)
     ("ERISA's obligations are . . . satisfied if the [investment] selected would have been
27   chosen had the fiduciary conducted a proper investigation."); *Tibble*, 2010 WL
     2757153, at *37 ("even if Defendants' process . . . was somehow deficient,
28   Plaintiffs' claim for damages fails if a hypothetical prudent fiduciary would have
     made the same . . . decision").

14

options on the Plan's core lineup during the class period—have performed in line with or better than the relevant benchmarks and their peers; furthermore, the expense ratios of the funds at-issue were not excessive.  Finally, Plaintiffs' theory of imprudence in the Complaint is based on the failure to replace the core lineup with index funds, yet Plaintiffs ignore that index funds with lower costs than the examples that they include in the FAC have been available at no extra cost to participants through the PCRA.  Because Defendants' evidence shows that the Plan investments were objectively prudent, summary judgment is warranted regardless of the details of the Committee's investigation into those options.[17]

### 1. AllianzGI and PIMCO Funds Are Widely Used in 401(k) Plans.

Plaintiffs' expert, Dr. Pomerantz, recently testified that whether other retirement plans invest in a fund is important in determining whether the fund is a prudent choice, and he criticized a different plan—one sponsored by Putnam Investments—because Putnam funds were rarely held by other plans (SUF ¶ 119):

> Q. All the rest of the Putnam funds were owned by five plans or less, mostly zero; correct?
> A. Yes.
> Q. Why does that matter? Why does what other plans are doing matter to a fiduciary?
> A. Well, earlier I testified that it's important that a fiduciary act in accordance with the way that other people performing a similar job are going to do. There's somewhat of a standard for the industry.  These are all 401K plans that have performed their own due diligence process, and yet as a result of that due diligence process, for a lot of those processes, none of these funds were equity [sic] selected.  And for some of these funds only a handful, at most 20 of the due diligence processes being followed by somebody else will basically conclude with the inclusion of one of these funds. A fiduciary has to ask themself [sic] why is nobody else investing in this fund?

---

[17] While Defendants are prepared to prove at trial that the Committee's processes for selecting and reviewing investments were entirely sound and also support a finding of no liability, the Court can award Defendants summary judgment without reaching that issue.  There can be no liability given the objective prudence of the investment options.  In addition, Plaintiffs will not be able to prove their allegations that an imprudent process rendered the entire core lineup imprudent, which thereby caused a loss to the Plan.  No trial is necessary, just as the Court in *Brotherston* was able to award judgment after plaintiffs' case because plaintiffs' proof was similarly deficient.  2017 WL 2634361, at *13.

91898714

1    The investment options in the Allianz Plan stand on a very different footing

2    than did the Putnam funds.  The due diligence processes of over 30,000 unrelated

3    fiduciaries led them to conclude that it was prudent to make PIMCO and AllianzGI

4    funds available to their participants, as one would expect where Barron's calls

5    PIMCO the leading mutual fund family over the last five and ten years, and Lipper

6    rates three AllianzGI funds as the best in their asset category.  SUF ¶¶ 97-103.

7    Indeed, as of year-end 2015, 13 of the 25 largest 401(k) plans included AllianzGI or

8    PIMCO funds as investment options—including the nation's largest 401(k) plan, the

9    IBM plan, which held more assets in PIMCO and AllianzGI funds than did the Plan

10   itself.  *Supra* Background Sect. II.  It makes no sense to contend, as Plaintiffs do,

11   that participants in the Plan should be denied access to their own family of funds

12   when so many other plans make those same funds available.  At any rate, the

13   widespread use of AllianzGI/PIMCO funds in large plans makes absurd any

14   contention that the at-issue funds were *per se* imprudent.

### 2.    Plaintiffs Ignore the Actual Characteristics, Preferences, and Needs of Plan Participants.

15

16

17   Plaintiffs propose a simple redesign of the Plan:  replace the entire menu with

18   index funds chosen by Class Counsel and their expert.  *See, e.g.*, Tr. of Hr'g on Mot.

19   for Class Cert. at 11-12 (May 5, 2017) (the lawsuit seeks "remov[al] . . . from the

20   Plan" of "Allianz investment option[s]"); Pom. R. Ex. 3 (listing index funds).  One

21   size, however, does not fit all, and it would have been imprudent for Defendants to

22   ignore who their participants are and what motivates them to save.  The Committee

23   members were obligated to take into account the interests and needs of their

24   participants.  *See, e.g.*, *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir.

25   2007) (prudence turns on the "character and aim of the particular plan");

26   *Brotherston*, 2017 WL 2634361, at *8 n.12 ("The prudence of the [Putnam] Plan's

27   investments is measured against what a prudent investor would do in Putnam's

28

16

1   shoes").[18]  Plaintiffs' theory that the Plan's core lineup is *per se* imprudent and

2   should have been replaced with Vanguard index funds ignores the specific

3   characteristics of participants in this specific Plan.

4        Expert evidence shows the characteristics of the Plan's diverse participants.

5   For example, on average, participant account balances are significantly larger than

6   those in other 401(k) plans, and there were very few participants who had account

7   balances less than $10,000.  SUF ¶¶ 49-54.  A significant portion of the

8   population—about 28%—consisted of investment professionals.  *Id.* ¶ 20.

9   Hundreds of those professionals were the portfolio managers of PIMCO and

10  AllianzGI funds, including those funds that Plaintiffs attack in this lawsuit.  *Id.* ¶ 23.

11  But regardless of their investment sophistication, the participants have valued these

12  choices in the Plan investment lineup.  *Id.* ¶¶ 68-70, 150-56.[19]

13       More broadly, the evidence shows that class members—including the named

14  Plaintiffs—prefer PIMCO and AllianzGI funds; indeed, PIMCO employees

15  preferred PIMCO funds and AllianzGI employees preferred AllianzGI funds.  SUF

16  ¶¶ 129-30.  640 Plan participants elected to roll over $42 million into the Plan, more

17  than 92% of which was then invested in AllianzGI and PIMCO funds.  *Id.* ¶¶ 69-70.

18  The evidence also shows that Plan participants had little interest in investing in

19  index or other funds of PIMCO and AllianzGI competitors.  *Id.* ¶¶ 149-56.  As

20  would be expected of employees of asset management companies that specialize in

21  actively managed funds, participants displayed a strong preference for actively

22  managed investments, even if those funds were more expensive than others.  *Id.*

23  ¶ 68.  Former employees, including the named Plaintiffs, chose to leave their assets

24  in the Plan, rather than roll them over to another plan or an IRA where they could

25

26  _____

    [18] *See also In re Computer Scis. Corp. ERISA Litig.*, 635 F. Supp. 2d 1128, 1134
    (C.D. Cal. 2009) (prudence is to be viewed "in light of the character and aims of the
27  particular type of plan the fiduciary serves") (internal quotations omitted).
    [19] This Circuit recognizes that participant choices is critical.  *Tibble*, 729 F.3d at
28  1134-35 ("[P]articipant choice is the centerpiece of what ERISA envisions . . . .").

17

1    invest in index or other funds managed by competitors.  *Id.* ¶¶ 16, 347, 359.

2            Courts reject theories, like Plaintiffs', that hinge on the "unambiguously

3    irrational" supposition that participants would be invested in an index that they

4    "consciously chose to avoid."  *Tibble*, 2017 WL 3523737, at *13-14 (C.D. Cal. Aug.

5    16, 2017) (refusing to apply the S&P 500 index to measure damages where

6    participants chose other investments).  Plaintiffs are arguing that the very funds that

7    they and the class members desired should have been removed in favor of Vanguard

8    index funds that none of them wanted.  This argument is absurd and cannot prove

9    that the Plan is imprudent as a whole.

10           **3.**      **Economic Analysis Shows that the Plan's Investment Options**
11                     **Were Prudent Choices that Performed Well and Did Not**
12                     **Charge Excessive Fees.**

13            Plaintiffs certainly have no basis for contending that being provided access to

14    the AllianzGI and PIMCO funds was imprudent.  As Dr. Wermers demonstrates, the

15    Plan's core investment options were objectively prudent options throughout the

16    class period.  Wermers R. ¶¶ 25-54.  Plaintiffs cannot prove that it was imprudent to

17    select actively managed funds, which retirement plan fiduciaries frequently choose

18    as investment options and which attract at least 80% of mutual fund assets in

19    defined contribution plans.  *Id.* ¶¶ 25-29; *see also id.* ¶¶ 30-31 (actively managed

20    funds frequently held by individual and institutional investors).  Plaintiffs also

21    ignore that actively managed funds are a different type of product than a passive

22    index fund, and so comparisons between them are apples and oranges.  *Id.* ¶¶ 32-36;

23    *see also Brotherston*, 2017 WL 1196648, at *7 (D. Mass. March 30, 2017).

24           Dr. Wermers' economic analyses of the Plan's core investment options shows

25    that over the long term the funds at-issue have, in aggregate, outperformed

26    prospectus benchmarks and peer groups of similar funds.  SUF ¶¶ 120-21.  On an

27    asset-weighted basis, up to 95% of Plan assets were invested in funds rated as a 3

28    (of 5) or higher by Morningstar, and up to 94% were rated as a 3 (of 5) or higher by

91898714

1  Lipper, for net-of-fees performance during the class period.  *Id.* ¶ 26.  Dr. Wermers

2  concluded that "there is no statistical support for Plaintiffs' assertion that the

3  [Plan's] investment options . . . were imprudent."  Wermers R. ¶ 40.

4        Plaintiffs and their expert are also wrong in asserting that the investment

5  management fees for every option were excessive throughout the class period.

6  ***First***, the investment management fees are only one factor in determining the

7  prudence of an investment option.  Wermers R. ¶ 63.  A "fiduciary might have

8  chosen funds with higher fees for any number of reasons, including potential for

9  higher return, lower financial risk, more services offered, or greater management

10  flexibility."  *Tibble*, 739 F.3d at 1135.  ***Second***, the fees of the Plan's investment

11  options were reasonable, and ERISA requires nothing more.  *See White v. Chevron*

12  *Corp.*, No. 16-0793, 2017 WL 2352137, at *11 (N.D. Cal. May 31, 2017), *appeal*

13  *docketed*, No. 17-16208 (9th Cir. June 9, 2017).  "[N]othing in ERISA requires

14  every fiduciary to scour the market to find and offer the cheapest possible fund

15  . . . ." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).  As of the end of

16  every year from 2009 to 2016, the average expense ratio for the Plan's core

17  investment options was lower by six to 12 basis points (0.06% to 0.12%) than the

18  medians for their respective peer groups.  SUF ¶ 122.  In short, the expense ratios

19  for the Plan's core investment options were consistent with those for mutual funds

20  with roughly similar characteristics, regardless of how they compared to dissimilar

21  Vanguard index funds.[20]  *Id.*  This analysis defeats any argument that the Plan's

22  entire core lineup was imprudent because of purportedly excessive fees.

23  **III.    Plaintiffs Cannot Establish Loss Causation.**

24        Not only can Plaintiffs not establish a breach of duty, but they cannot tie any

25  loss to the breaches they allege.  To recover damages for a breach of fiduciary duty,

26  it is not enough to show imprudence or disloyalty; the plaintiff also must show a

27

28  _____

[20] And class members could always select Vanguard funds, and even cheaper Schwab index funds at no cost, through the PCRA.  SUF ¶¶ 137, 140-44.

91898714

1    loss to the plan resulting from the breach.  29 U.S.C. § 1109; *see, e.g.*, *Friend v.*

2    *Sanwa Bank Cal.*, 35 F.3d 466, 469 (9th Cir. 1994) (granting summary judgment

3    because "ERISA holds a trustee liable for a breach of fiduciary duty only to the

4    extent that losses to the plan result from the breach").[21]  Any loss to the Plan must

5    be tied to one or more specific investment decisions by fiduciaries:  "Plaintiffs must

6    point to a specific imprudent investment decision or decisions to make a showing of

7    loss due to a breach of fiduciary duty."  *Brotherston*, 2017 WL 2634361, at *11

8    (collecting cases).  Here, Plaintiffs instead have challenged in broad strokes the

9    selection and maintenance of ***all*** investment options on the Plan's core lineup.  FAC

10   ¶ 118.  Plaintiffs cannot show that these decisions affecting the entire lineup caused

11   a loss to the Plan.  As shown in Argument Sect. II.B, *supra*, Plaintiffs cannot prove

12   an across-the-board Plan-wide loss caused by imprudence of the Plan's entire lineup

13   because there was no across-the-board imprudence.  Similarly, Plaintiffs cannot

14   establish loss causation because:  (1) their proposed alternative funds are not

15   plausible alternatives for themselves or the Plan, and (2) the funds they claim were

16   prudent, and others like them, were already available through the PCRA.

17       **A.    A Core Lineup Consisting Solely of Passively Managed Vanguard
18              Funds Is Not a Plausible Alternative.**

19       Plaintiffs and their expert have offered similar but not identical lists of all or

20   mostly all Vanguard index funds as purportedly prudent alternatives to the Plan's

21   core lineup, and they have alleged that it was imprudent not to remove the existing

22   funds and replace them with Vanguard index funds or similar funds.  FAC ¶ 72;

23   Pom. R. at 57-62.  However, to show damages, Plaintiffs must actually be able to

24   show that participants would have invested in their chosen alternatives.  For

25   example, in *Tussey v. ABB, Inc*., the court affirmed dismissal where the Plaintiffs

26   had calculated damages by assuming that plan participants would have invested in

---

27   [21] *See also Martin v. Feilen*, 965 F.2d 660, 672 (8th Cir. 1992) ("[T]he district court
28   must determine the specific damages that resulted from each of the transactions in
     which ERISA fiduciary duties were breached.").

1    one fund, but had set forth no evidence that they would have actually done so. 746

2    F.3d 327, 339 (8th Cir. 2014). And just last week, Judge Wilson rejected plaintiffs'

3    attempt to use the S&P 500 index as a measure of damages where there was "no

4    evidence" that participants chose that "dissimilar investment strategy": it would be

5    "unreasonable to bind [class members] to the exact investments they consciously

6    chose to avoid." *Tibble*, 2017 WL 3523737, at *13-14.

7         Plaintiffs' theory is similarly deficient. Because Plaintiffs cannot show that

8    wholesale use of the index funds they identify (or any others) is a plausible

9    alternative for this Plan, let alone any other plan, Plaintiffs cannot show damages

10   under 29 U.S.C. § 1109. Simply asserting that Vanguard index funds are cheaper is

11   patently insufficient. *Meiners v. Wells Fargo & Co.*, No. 16-3981, 2017 WL

12   2303968, at *2-3 (D. Minn. May 25, 2017) (rejecting comparison to Vanguard

13   funds), *appeal docketed*, No. 17-2397 (8th Cir. June 23, 2017).

14        *In re Computer Sciences Corp. ERISA Litig*ation is instructive. That case

15   concerned the drop in the value of company (CSC) stock offered as an investment

16   option under a plan. Plaintiffs argued that the proper measure of loss was "the

17   difference between the actual performance of CSC stock during the Class Period and

18   what that stock position in the Plan would have earned if, hypothetically it had been

19   reinvested in an 'equally plausible and most appropriate investment alternative.'"

20   635 F. Supp. 2d at 1136 (quoting *Donovan v. Bierwirth*, 754 F.2d 1049, 1054-56 (2d

21   Cir. 1985)). Plaintiffs cited the price drop and some possible company misconduct

22   explaining it, but they offered no evidence of what an equally plausible and most

23   appropriate investment alternative might be, let alone what more the plan might

24   have earned. *Id.* at 1137. On appeal, the Ninth Circuit affirmed, ruling, *inter alia*,

25   that the participants had failed to show the requisite "'***causal link*** between the

26   failure to investigate [or divest] and the harm suffered by the plan.'" *Quan v.*

27   *Computer Sci. Corp*., 623 F.3d 870, 885 (9th Cir. 2010) (quoting *Wright*, 360 F.3d

28   at 1099) (emphasis in original). Like here, the participants had done nothing to

21

1   show that any loss they suffered resulted from the alleged breach.  *Id*. at 885-86.

2   These cases require summary judgment here.  Plan participants work for

3   acclaimed asset managers, whose funds (i) are held widely in large retirement plans

4   managed by fiduciaries unrelated to Defendants and (ii) have attracted more assets

5   so far this year than funds of any other active manager.  *Supra* Background Sect. II.

6   Hundreds of Plan participants are the portfolio managers for the at-issue funds, and

7   many more work on them.  SUF ¶¶ 20, 23.  Class members across the board have

8   demonstrated a strong propensity to invest in AllianzGI and PIMCO funds—both

9   within and outside of the Plan—and not in passively managed index funds.  *Supra*

10   Background Sect. III.  Defendants have seen no evidence that class members prefer

11   to have only competitors' funds or would choose such funds over those available

12   through the Plan.  Indeed, ***all*** of the top 25 plans use a substantial number of active

13   funds, and ***none*** are comprised solely of index funds; even Vanguard's own 401(k)

14   plan—comprised exclusively of Vanguard's own funds—is heavily populated with

15   active funds.  SUF ¶¶ 92-94.  In sum, it is implausible to suggest that the index

16   funds proffered by Class Counsel and their expert—the "exact investments [class

17   members] consciously chose to avoid," *Tibble*, 2017 WL 3523737, at *13-14—are

18   an appropriate alternative for AllianzGI or PIMCO funds for this Plan.

19   **B.    The Plan Offered The Funds Plaintiffs' Seek.**

20   Plaintiffs' loss causation and imprudence theories also ignore the PCRA and

21   the Plan's use of enhanced index funds on the core lineup.  Contrary to what

22   Plaintiffs have told the Court, there was no transaction cost for purchasing

23   inexpensive index funds (and thousands of other funds not on the core lineup)

24   through the PCRA and there was no annual fee for using the PCRA.  SUF ¶¶ 140-

25   44.  Administratively, accessing the PCRA was "easy."  *Id*. ¶¶ 138-39.  190 index

26   funds, including Schwab funds, are available through the PCRA at no extra cost to

27   participants.  *Id.* ¶¶ 141-42.  The expense ratios of such funds were comparable to,

28   and often lower than, Dr. Pomerantz's chosen Vanguard comparators.  *Id.* ¶ 145.

22

1   The expense ratios for some index funds were as low as 0.03%, which is the

2   expense ratio Dr. Pomerantz identifies in the vastly larger (and publicly subsidized)

3   Federal Thrift Savings Plan.  SUF ¶ 142; Pom. R. at 11.  Although Dr. Pomerantz

4   implies that Vanguard index funds should have been included on the core lineup, the

5   only possible theory of breach from such an omission is that it was imprudent to

6   make the similarly-priced Schwab index funds available through the PCRA rather

7   than through the core lineup.  There is no basis for such a contention, and Plaintiffs

8   cannot show any loss at all from that menu placement.

9       Indeed, there is no evidence that, but for the supposed imprudence of making

10  unaffiliated index funds available through the PCRA rather than the core lineup,

11  participants would have invested any differently.  Professor Bucklin of the UCLA

12  Anderson School of Business offers several analyses—of participants who invested

13  through the PCRA and of former employees such as the named Plaintiffs—

14  indicating that participants in the Plan showed little interest in investing in passively

15  managed index funds, whether Vanguard funds or otherwise.  SUF ¶¶ 70, 152-57.[22]

16  Instead, participants have shown greater interest in funds employing an "enhanced

17  index investing strategy," a hybrid active-passive approach capable of

18  outperforming an index net of fees.  *Id.* ¶¶ 85-91.  Seven such funds are presently on

19  the Plan's core menu, *id.*, including the popular PIMCO StocksPLUS fund favored

20  by Mr. Urakhchin.  *Id.* ¶¶ 85-91.  And each outperformed its index, net of fees,

21  during the class period.  *Id.*  In sum, Plaintiffs cannot show what, if any, loss

22  occurred to them or the Plan as a result of any supposed global breach based on a

23  failure to place index funds on the core lineup.

24  **IV.   Damages Will Present an Additional Roadblock to Plaintiffs' Case.**

25      Even if Plaintiffs could prove a breach and loss causation, which they cannot,

26  they would still have a substantial damages problem.  In granting judgment on

27  _____

[22] Mr. Marfice has invested in the AllianzGI Focused Growth Fund even outside the
28  Plan and Mr. Urakhchin says that his claim is not about removal of the PIMCO
    StocksPLUS fund, which he likes.  SUF ¶¶ 349, 360.

1  partial findings in a challenge to the all-Putnam lineup provided to participants of

2  the Putnam plan, the court explained that "any voluntary contributions or other

3  payments the class member received from the Defendants" could "potentially off-

4  set[]" relief.  *Brotherston*, 2017 WL 2634361, at *5.  Given that the corporate

5  contributions to the Plan here—$334.1 million (SUF ¶ 39)—are more than five

6  times Plaintiffs' damages claim of $57.9 million (Pom. Supp. R. at Ex. 4), any such

7  offset would eliminate any damages in this case.

8  **V.    Summary Judgment Should Be Granted Because Plaintiffs' Claims Are
            Barred by the Statute of Limitations.**

9

10  ERISA precludes claims that are filed more than "three years after the earliest

11  date on which the plaintiff had actual knowledge of the breach or violation."  29

12  U.S.C. § 1113(2).  The Court denied Defendants' motion to dismiss on statute of

13  limitations grounds because it was not obvious on the face of the complaint or in

14  "judicially noticeable documents . . . that pre-2013 fees, expenses or cost

15  percentages of alternative plans were the same or lower than the 2013 or 2014

16  figures alleged in the FAC."  *Urakhchin*, 2016 WL 4507117, at *6 (Aug. 5, 2016)

17  (emphasis omitted).  After discovery, the uncontroverted evidence is that the overall

18  "costs" of the Plan—measured by the weighted expense ratios of the investment

19  options—has remained relatively constant since before 2013.  SUF ¶¶ 75-76, 96.

20  Furthermore, costs for plans of a similar size were also approximately "the same"

21  prior to 2013 as they were after 2013.  *Id.* ¶¶ 77-78.

22  Plaintiffs have unquestionably known of the fees and performance of the

23  Plan's challenged investments[23] compared to alternatives since before October 2012.

24  Each named Plaintiff testified that he knew three years prior to suing that the Plan

25  only consisted of AllianzGI and PIMCO funds.  SUF ¶¶ 351, 362.  All quarterly

26  Plan account statements, which each Plaintiff received and reviewed, informed

27
28  [23] Plaintiffs do not appear to challenge the fees of any funds offered through the
     PCRA, nor do they or their expert assert that the fees for the collective investment
     trusts are excessive.  *See* FAC ¶ 72; Pom. R. at 35-39.

Plaintiffs of each Plan investment option's performance and the performance of most of the options' benchmarks, and directed Plaintiffs to the fund's public filings for further information on performance and fees.  *Id.* ¶¶ 352-54, 364-66.[24]  In August 2012, more than three years before Plaintiffs brought suit, Plan participants were sent a document listing the investment options available in the Plan and their performance and fees.  *Id.* ¶ 370.  Based on these facts, Plaintiffs had actual knowledge of their claims.  *See In re Northrop Grumman Corp. ERISA Litig.*, No. 06-06213, 2015 WL 10433713, at *19-22 (C.D. Cal. Nov. 24, 2015) (granting summary judgment with respect to fiduciary duty claims where similar documents were sent to participants); *Shirk v. Fifth Third Bancorp*, No. 05-049, 2009 WL 3150303, at *6 (S.D. Ohio Sept. 30, 2009) (same, where documents sent to plan participants informed them of the availability of information in public filings).

Additionally, it is reasonable to infer that many class members have actual knowledge of the fees and performance of the Plan's investments and comparable options given their professional responsibilities.  Class members include many Plan participants who had knowledge of the comparable fees and performance of other funds, such as the portfolio managers of the PIMCO and AllianzGI funds on the menu, fund operations personnel, account managers, distribution personnel, and many others.[25]  Therefore, summary judgment should at least be entered with respect to them on the basis that their claims are time-barred.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted.

---

[24] The public filings similarly show the fees and performance compared to benchmarks.  *Id.* ¶¶ 367-68.

[25] These personnel are now represented by Class Counsel, so Defendants cannot approach them to obtain evidence.  To date, Class Counsel have not provided competent evidence from these class members that they were unaware of competitors' fees.  Similarly, under Plaintiffs' theory of the case, members of the classes participated in the Committee process by recommending their own funds, which itself establishes their knowledge of that process.

25

1  Dated:  August 25, 2017

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

By: */s/ James O. Fleckner*
James O. Fleckner (*pro hac vice*)
*jfleckner@goodwinlaw.com*
Paul E. Nemser (*pro hac vice*)
*pnemser@goodwinlaw.com*
David Rosenberg (*pro hac vice*)
*drosenberg@goodwinlaw.com*
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, Massachusetts 02210
Telephone:  (617) 570-1000
Facsimile:  (617) 523-1231

Christina Queiros Bouchot
*cbouchot@goodwinlaw.com*
Steven A. Ellis
*sellis@goodwinprocter.com*
**GOODWIN PROCTER LLP**
601 South Figueroa Street, 41st Floor
Los Angeles, CA 90017
Telephone:  (213) 426-2500
Facsimile:  (213) 623-1673

*Attorneys for Defendants*
**ALLIANZ ASSET MANAGEMENT OF
AMERICA L.P.; ALLIANZ ASSET
MANAGEMENT OF AMERICA LLC;
COMMITTEE OF THE ALLIANZ
ASSET MANAGEMENT OF AMERICA,
L.P. 401(K) SAVINGS AND
RETIREMENT PLAN; and JOHN
MANEY**

91898714

26